## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **PLAINTIFFS UNDER SEAL** | Civil Action No. *3:20 cv 3678 - mCRl EMT* |
| **v.** | JURY TRIAL DEMANDED |
| **DEFENDANTS UNDER SEAL** | |

## COMPLAINT

### FILED IN CAMERA AND
### UNDER SEAL PURSUANT TO
### 31 U.S.C. § 3730(b)(2)

FILED USDC FLND PN
FEB 26 '20 PM 3:48

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA
*ex rel.* Robert V. Smith

    Qui Tam Plaintiff,

v.

JAY A. ODOM; OKALOOSA
COUNTY, BOARD OF
COUNTY COMMISSIONERS;

    Defendants.

Civil Action No. *3:20Cu 3678-mCR)GmT*

JURY TRIAL DEMANDED

## COMPLAINT

### FILED IN CAMERA AND
### UNDER SEAL PURSUANT TO
### 31 U.S.C. § 3730(b)(2)

1

The United States of America, by and through *qui tam* relator, Robert V. Smith ("Relator"), by and through his attorneys, brings this action under 31 U.S.C. § 3729, *et seq.* as amended (**"False Claims Act"**) to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States. Moreover, Relator brings this action under § 68.083 *et seq.* Florida Statutes ("Florida FCA") to recover all damages, penalties, and other remedies established by the Florida FCA on behalf of the State of Florida.

## I.   PRELIMINARY STATEMENT

1.     Defendant Jay A. Odom devised, orchestrated, and executed a scheme whereby he caused knowingly fraudulent and false statements by Defendant Okaloosa County, Board of County Commissioners (**"Okaloosa County"**) to the federal and state government in order to induce payment.

2.     As a result, Okaloosa County, as an airport sponsor of three federally regulated airports, received millions of dollars in state and federal funding predicated on knowingly false and fraudulent statements made on grant applications.

3.     Airport sponsors, such as Okaloosa County, are prohibited from granting an exclusive right for the use of the airport to anyone providing or intending to provide aeronautical services to the public.

4.      It is a violation of federal law to grant an "exclusive right" to any one fixed-base operator ("**FBO**") or one entity if that entity owns or controls all FBOs on the airport field.

5.      Despite this prohibition, Defendant Odom, through the use of strawmen-owned entities, covertly gained control of both FBOs operating at Destin Executive Airport ("**DTS**"). Thus, effectively only one aeronautical service provider has operated DTS since 2012.

6.      In 2014, Okaloosa County approved a merger of the two FBO's at DTS into one FBO, also controlled by Odom. This approval came despite a warning against it from a Federal Aviation Administration employee that Okaloosa County is "opening themselves up to a future complaint of allowing an exclusive right, a violation of Grant Assurance 23."

7.      Odom utilized straw buyers to acquire control of one of the FBOs at DTS while already being the owner of the other FBO at the same airport. Specifically, in 2012, using a corporation owned by a straw owner, Odom purchased Miracle Strip Aviation, Inc., creating an "exclusive right" to provide aeronautical services at the Destin Executive Airport, in violation of federal law and federal grant assurances.

8.      The monopoly Odom created enabled him to raise fuel and service prices to the airports customers. Okaloosa County, initially unaware that Odom had

purchased Miracle Strip Aviation, subsequently executed multiple "Application[s] for Federal Assistance," (form 424 and FAA Form 5100-100) and received millions of dollars in Federal funds. The "Application for Federal Assistance" form 424 and FAA Form 5100-100 require the airport sponsor, in this case Okaloosa County, to certify that "There is no grant of an exclusive right for conduct of any aeronautical activity at any airport owned or controlled by the Sponsor . . ."

9.     Odom's use of a straw company to purchase Miracle Strip Aviation resulted in Okaloosa County making a false certification on an "Application for Federal Assistance" that Okaloosa County, the airport sponsor, was in compliance with Federal laws and regulations that are the prerequisites to receipt of federal funds. These false certifications are a violation of the False Claims Act.

10.     At all times material to this action, the information concerning Odom's use of a straw company was or should have been known to Okaloosa County.

11.     Because of this scheme resulting in violations of state and federal law, DTS lacks the requisite aeronautical services and fair competition required of a federally obligated airport, and thus causes harm to the public, Federal government, and State government.

12.     Since 2012, Okaloosa County has received at least eleven Federal Airport Improvement Program Grants totaling over $10 million and numerous

Florida Department of Transportation Airport Grants based on fraudulent and false information contained in the grant applications.

13. The fraudulent and false information was material to the receipt of both Federal and State funds.

14. Okaloosa County continues to seek both Federal and State Grants and continues to submit fraudulent, false or materially misleading applications.

## II. PARTIES

15. Relator, Robert V. Smith ("Smith"), is an individual and citizen of the United States of America residing in Okaloosa County, Florida. From 2011 until 2013, Smith worked as a pilot for a federal defense contractor on a contract for the United States Navy and held a security clearance. Smith has prior business dealings with Defendant Jay A. Odom. Because of Smith's unique familiarity with Defendants, he was able to unmask the straw buyer scheme executed by the Defendants to defraud the Federal Aviation Administration and the United States of America, and the public, in addition to defrauding Smith's company. Relator Smith is an original source of the straw buyer scheme executed by Defendants. Prior to the filing of this Complaint, Relator Smith provided the Government with written disclosure of substantially all material evidence and information that he possessed, in accordance with 31 U.S.C. § 3730(b)(2).

5

16.     Defendant, Jay A. Odom ("Odom") is an individual citizen of the United States of America residing in Okaloosa County, Florida.

17.     Defendant Okaloosa County ("Okaloosa County") is a political subdivision of the State of Florida, governed by its elected Board of County Commissioners, and managed by the County Administrator and other county employees. At all times relevant, Okaloosa County is and was the "Sponsor" of three federally obligated airports in Okaloosa County, Florida: Destin Executive Airport (*formerly known as Destin-Fort Walton Beach*) ("DTS"); Crestview Airport (CEW); and Destin-Fort Walton Beach Airport *formerly known as Northwest Florida Regional Airport* (VPS).

### III.    JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to the False Claims Act, 31 U.S.C. §§ 3729 and 3730.

19.     This court has supplemental jurisdiction over the subject matter of this action brought pursuant to the Florida False Claims Act  § 68.083, Florida Statutes since the claims brought thereunder share the same common nucleus of facts as the federal question claim.

20.    There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. § 3730(e).

21.    This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because all the defendants have at least minimum contacts with the United States, and can be found in, reside, or transact or have transacted, business in the Northern District of Florida.

22.    Venue exists in the United States District Court for the Northern District of Florida pursuant to 31 U.S.C. § 3730(b)(1) because all of the defendants have at least minimum contacts with the United States, and all the defendants can be found in, reside, or transact or have transacted business in the Northern District of Florida.

## IV.    DISCUSSION AND APPLICABLE LAW

### A. Airway Improvement Act

23.    As a condition precedent to providing airport development assistance under the Airport Improvement Program ("**AIP**"), 49 U.S.C. § 47107, *et seq.*, the Secretary of Transportation and, by extension, the FAA must receive certain assurances from an airport sponsor.

24.    Title 49, Section 47107(a) sets forth the statutory sponsorship requirements to which an airport sponsor receiving Federal financial assistance must agree.

25.    The FAA has a statutory mandate to ensure that airport owners comply with these sponsor assurances.  FAA Order 5190.6B, *Airport Compliance Manual* (FAA Order 5190.6B), issued on September 30, 2009, provides the policies and procedures to be followed by the FAA in carrying out its legislatively mandated functions related to the Federally obligated airport owners' compliance with their sponsor assurances.

26.    Title 49, Section 47107, *et seq*., sets forth assurances to which an airport sponsor agrees as a condition of receiving Federal financial assistance.  Upon acceptance of an AIP grant, the assurances become a binding contractual obligation between the airport sponsor and the Federal government.  The assurances made by airport sponsors in AIP grant agreements are important factors in maintaining a viable national airport system for the benefit of the public.

27.    Grant Assurance number 5 "Preserving Rights and Powers" states:

> a. It will not take or permit any action which would operate to deprive it of any of the rights and powers necessary to perform any or all of the terms, conditions, and assurances in this grant agreement without the written approval of the Secretary, and will act promptly to acquire, extinguish or modify any outstanding rights or claims of right of others which would interfere with such performance by the sponsor ...

28.   Grant assurance number 23 "Exclusive Rights," referring to the airport

sponsor, states:

> 23. Exclusive Rights.
>
> It will permit no exclusive right for the use of the airport by any person providing, or intending to provide, aeronautical services to the public. For purposes of this paragraph, the providing of the services at an airport by a single fixed-based operator shall not be construed as an exclusive right if both of the following apply:
>
> a.   It would be unreasonably costly, burdensome, or impractical for more than one fixed-based operator to provide such services, and
>
> b.   If allowing more than one fixed-based operator to provide such services would require the reduction of space leased pursuant to an existing agreement between such single fixed-based operator and such airport. It further agrees that it will not, either directly or indirectly, grant or permit any person, firm, or corporation, the exclusive right at the airport to conduct any aeronautical activities, including, but not limited to charter flights, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, air carrier operations, aircraft sales and services, sale of aviation petroleum products whether or not conducted in conjunction with other aeronautical activity, repair and maintenance of aircraft, sale of aircraft parts, and any other activities which because of their direct relationship to the operation of aircraft can be regarded as an aeronautical activity, and that it will terminate any exclusive right to conduct an aeronautical activity now existing at such an airport before the grant of any assistance under Title 49, United States Code. (these exceptions do not apply at this airport)

29.    Moreover, the relevant sections of the Code include 49 U.S.C. § 40103
as follows:

> (e) No Exclusive Rights at Certain Facilities. — A
> person does not have an exclusive right to use an air
> navigation facility on which Government money has
> been expended. However, providing services at an
> airport by only one fixed-based operator is not an
> exclusive right if—
>
>> (1) it is unreasonably costly, burdensome, or
>> impractical for more than one fixed-based operator to
>> provide the services; and
>>
>> (2) allowing more than one fixed-based operator to
>> provide the services requires a reduction in space
>> leased under an agreement existing on September 3,
>> 1982, between the operator and the airport.

49 U.S.C. § 40103(e).

30.    The conditions do not provide an option for one fixed-base operator to
purchase or obtain control of a second fixed-base operator, which would in fact
reduce the space of the assumed fixed-base operator, and in this case, thereby
consume all the available space on the airport, creating an exclusive right.

31.    "Violations have also been found when an FBO applicant for land at
an airport is denied on the basis that all available land had been leased to the
incumbent FBO. *See Pompano Beach*, 774 F2d at 1542; *Niswonger v. American
Aviation, Inc.*, 411 F.Supp. 763, 769 (E.D. Tenn. 1975), *aff'd.* 529 F.2d 526 (6th Cir.
1976).

32.     The grant assurances are part of the contract between the Federal government and the airport sponsor. The existence of a single FBO, standing alone, is not considered an "exclusive right" so long as <u>both</u> conditions (1) and (2) are met. The rationale behind this policy is to protect the *airport sponsor* from undue expense, **not** commercial tenants.

33.     The US Court of Appeals states:

> In the FAA's words: "the purpose of the grant assurances is to protect the interest in the operation of Federally obligated airports. The purpose is not to provide alternative or supplemental rights to those normally available to commercial tenants..."

quoting from Penobscot Air Service v. Knox County, FAA Docket No. 16-97-04 (September 25, 1997) (Director's Determination) (Penobscot).

34.     The US Court of Appeals adds:

> We agree with the FAA that Congress did not intend "grant assurances and the FAA Compliance process to provide a device by which commercial aeronautical tenant can abrogate an otherwise valid commercial lease with a sponsor because the operations under the lease are less profitable than the tenant anticipated."

35.     The airport sponsor may not create an exclusive right to protect the profits of a commercial tenant.

36.     In Sun Valley Aviation v. Valley International Airport FAA Docket No. 16-10-02 (Director's Determination) the Director states: "The theory that FBO

competition may decrease one FBO's bottom line is not relevant to the grant assurances."

37.    According to an FAA Advisory Circular on Exclusive Rights at Federally Obligated Airports and the FAA Airport Compliance Manual, FAA policy prohibits the creation or continuance of exclusive rights agreements at airports where the airport sponsor has received federal funds and it does not matter how the exclusive right was created.

38.    Appendix C of FAA Advisory Circular on Exclusive Rights at Federally Obligated Airports, Dated 09/30/2009, Number 5190.6B, states:

> FAA policy prohibits the *creation* or *continuance* of exclusive rights agreements at obligated airports where the airport sponsor has received federal airport development assistance for the airport's improvement or development. This prohibition applies regardless of how the exclusive right was created, whether by express agreement or the imposition of unreasonable minimum standards and/or requirements (inadvertent or otherwise) [emphasis added].

39.    According to the FAA Airport Compliance Manual Airport Improvement Program (AIP) grants cannot by awarded until any exclusive right is removed.

**FAA Airport Compliance Manual — Order 5190.6B**

**Airports**

**Chapter 8. Exclusive Rights**

**8.1. Introduction.** This chapter describes the sponsor's federal obligations under Grant Assurance 23, Exclusive Rights, which prohibits an airport sponsor from granting an exclusive right for the use of the airport, including granting an exclusive right to any person or entity providing or intending to provide aeronautical services to the public.

In particular, the sponsor may not grant a special privilege or a monopoly to anyone providing aeronautical services on the airport or engaging in an aeronautical use. The intent of this restriction is to promote aeronautical activity and protect fair competition at federally obligated airports.

**8.4. Development of the Exclusive Rights Prohibition into FAA Policy.**

**d. Effect of the Prohibition on Airport Improvement Program (AIP) Grants.** Federal statutory law prohibits sponsors from granting an exclusive right. Consequently, it does not matter how the sponsor granted the exclusive right (e.g., express agreement, unreasonable minimum standards, action of a former sponsor, or other means). *The FAA will not award a sponsor an Airport Improvement Program (AIP) grant until that exclusive right is removed from the sponsor's airport.* The FAA may also take other actions to return the sponsor to compliance with its federal obligations. [Emphasis added.]

## B. THE FALSE CLAIMS ACTS

40.    Pursuant to both the federal and Florida False Claims Acts ("the Acts"), liability attaches to any person who knowingly presents or causes a false or fraudulent claim to be presented for payment, or to a false record or statement made to get a false or fraudulent claim paid by the government. 31 U.S.C. § 3729(a)(1)&(2) and § 68.083, Florida Statutes.

13

41.     Under the Acts, "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b). 21 and § 68.083, Florida Statutes.

42.     A violation occurs not only by a person who makes a false statement or a false record to get the government to pay a claim, but also by one who engages in a course of conduct that causes the government to pay a false or fraudulent claim for money. 31 U.S.C. § 3729(a)(1)&(2) and § 68.083, Florida Statutes.

## V.     BACKGROUND, FACTS, AND ALLEGATIONS

### A. How Odom Took Over an Airport

#### i. *Summary of Events*

43.     Okaloosa County owns two airports: Destin Executive Airport (DTS) and Crestview Airport (CEW), and leases property from the United States Air Force for an aviation terminal for the Destin-Fort Walton Beach Airport (VPS).

44.     Okaloosa County, as the sponsor of each above-named airport, has received millions of dollars in grants from the Federal government and State of Florida.

45.     Initially, Miracle Strip Aviation, Inc. ("**Miracle**") was the only fixed-base operator (FBO) providing aeronautical services to the public at DTS.

46.    After years of litigation[1] and a significant scandal[2], Odom opened a second FBO, Destin Jet, in 2009.

---

[1] In 2005, Defendant Odom sued the City of Destin, seeking to reverse the denial of his application for development order to establish Destin Jet at DTS. Odom argued, referring to the "Exclusive Rights" prohibition in both the Federal Code and Federal Grant Assurances, that the City of Destin was mandated to provide for competition among aeronautical service providers at the federally funded airport now knows as DTS. See Okaloosa County Circuit Court case No. 2005-CA-4671.

[2] For several years, Odom tried and failed to obtain either federal or state money to build an aircraft hanger at the Destin airport. In 2009, the St. Petersburg Times/Miami Herald reported a link between a private developer's continued...request for a state-funded airplane hangar and $6 million in funding State Representative Ray Sansom got for an airport building to be used by Okaloosa-Walton Junior College, subsequently renamed Northwest Florida State College (NWFSC). On April 17, 2009, a Leon County Grand Jury indicted state legislator Ray Sansom and President of NWFSC for Official Misconduct. The indictment states: *When Jay Odom's efforts to obtain state funding for his planned FBO at the Destin Airport failed, Speaker Designate Ray Sansom used the power of his position to accomplish what Mr. Odom was unable to do for nearly three years. Your Grand Jurors believe that NWFSC had every intention of then sub-leasing back to Destin Jet the hanger portion of the building funded by Speaker Sansom. But for the discovery of this appropriation by a state-wide newspaper reporter, this appropriation would have gone unnoticed and Jay Odom's planned FBO would have been successful funded by taxpayer dollars.* In the ensuing months, Ray Sansom, then Speaker of the Florida House would resign from a $110,000 part time job at the college, Sansom would be removed as Speaker of the House and resign his House seat on the eve of an ethics trial by the House. Northwest Florida State College President Bob Richburg was fired by the College for his role. According to the Tampa Bay Times, Richburg "portrayed the idea as one hatched by Sansom and Jay Odom, a friend and political contributor who wanted to use the building for his private jet business." The College board of trustees returned the $6 million appropriation to the State with the exception of $310,000 that had already been spent designing the project. In 2010, Odom, was charged with Grand Theft and Conspiracy to Commit Grand Theft by the State of Florida and Sansom and Richburg's charges were upgraded from Official Misconduct to Grand Theft and Conspiracy to Commit Grand Theft. The Charges were eventually dropped mid trial after Odom, Sansom and Richburg agreed to repay the $310,000 that had been spent.

47.     In 2012, Odom covertly purchased <u>all of the stock in Miracle</u> using the entity Regal Capital, LLC ("**Regal Capital**"), which Odom controlled through his strawmen, Phillip D. Ward ("**Ward**") and John E. (Jack) Simmons ("**Simmons**").

48.     Regal Capital's acquisition of Miracle, later operated as **Regal Air Destin**, combined with Odom's Destin Jet gave Odom an exclusive right to provide aeronautical services to the public at DTS, in violation of state and federal law and Federal grant assurances, and enabled him to raise fuel and service prices to the airport's customers.

49.     In December 2013, Sterling Diversified, LLC ("**Sterling**") became the owner of Regal Capital, and therefore controlled Regal Air.

50.     Defendant Odom controlled Sterling, and therefore continued to have an exclusive right to provide aeronautical services to the public at DTS in violation of federal law, while giving the appearance of two separate FBO facilities.

51.     In March 2014, Okaloosa County most certainly knew Odom's ownership of Sterling, and therefore also his ownership of Regal Capital and Regal Air Destin.

52.     In fact, Okaloosa County was previously warned by an FAA employee as early as 2013 that they are "opening themselves up to a future complaint of

---

16

allowing an exclusive right, a violation of Grant Assurance 23." See email dated April 8, 2013 from Rebecca Henry (FAA) to Mike Stenson (Okaloosa County).

53.     Despite its duty to prevent and break-up any exclusive right by the FBOs to provide aeronautical services to the public, Okaloosa County ratified the illegal arrangement when Odom offered more cash and additional fees to the County. Okaloosa County did not just turn a blind eye at this point, rather it officially approved and sanctioned Odom's exclusive right to be the sole provider of aeronautical services at DTS, at the expense of the public and the federal and state government.

54.     Okaloosa County gave Odom the approval to merge Destin Jet with Regal Air, notwithstanding its assurances to prevent and disassemble any exclusive right.

55.     According to an Okaloosa County Board of County Commissioners Agenda Request, dated March 3, 2015 states,

> **BACKGROUND:** Over the last year, concerns have been raised regarding the viability of sustaining two FBOs at the Destin Airport due to declining fuel sales due to downturn in general aviation activity; resulting losses of airport revenues and compliance with existing lease agreements.
>
> The following is a summary of the negotiated settlement proposal:

17

County agrees to authorize Destin Jet and Regal Air to operate under common ownership and brand with the following conditions:

56.    Attached to the March 3, 2015 Agenda Request is a document titled:

*Background Summary – Destin Executive Airport (DTS) FBO Issues.* The

document is undated and the author is not included.

57.    The document states:

Concerns regarding compliance with the grant assurances specifically as it relates to: (1) potential for abdication of "rights and powers" of the County authority to be involved before the sale / acquisition; (2) economic non-discrimination by allowing the after the fact acquisition preventing other qualified FBO operators into the market through a RFP; and (3) creating a perceived exclusivity limiting competition were all raised to the FAA, however in each instance the FAA determined that this is a lease administration issue and that the acquisition of a competing FBO, even if it results in a single FBO provider – a prevalent practice, does not in itself constitute as a violation of grant assurances..."

58.    The County negotiated a "settlement" with Odom, creating an

Exclusive Right at the Destin Executive Airport to avoid costly litigation, threatened

by Odom, and because Odom offered cash and additional fees that would be paid by

airports users.

59.    An October 24, 2014, article in the Northwest Florida Daily News,

*Destin Airport deal appears near*, states, "Harmon said the negotiations to

18

consolidate the airport fixed based operators were made possible after the FAA "washed its hands" of lease negotiations at Destin Airport."

60.     An FAA document titled *Q&As – FBO Industry Consolidation and Pricing Practices*, dated December 7, 2017 states, "Airport sponsors are prohibited from granting exclusive right for the use of the airport, including granting an exclusive right to an FBO providing or intending to provide aeronautical services to the public." and ... "while seeking self-sustainability to the extent reasonable under the particular circumstances at the airport, airport sponsors have to make the airport available to users and service providers... (2) without granting exclusive rights..."

61.     The document further states that the FAA does *not* "approve airport leases with FBOs or regulate FBO market entry or exit conditions, investment or business models, cost-based rates, net operating revenues, adequate rates of return, mergers, and rates and charges schedules."

62.     FAA policy is clear in that the FAA does not approve leases or regulate business models and/or mergers; however FAA policy is equally clear that the creation or continuance of an "Exclusive Right" at an airport that has received or will receive federal funds is prohibited.

63.     As a result, Okaloosa County created an exclusive right and violated past, present, and future obligations and assurances to the federal and state government.

19

64.     Odom sold Destin Jet, which had been merged with Regal Air in violation of federal law in 2016 for an undisclosed sum in the neighborhood of $15 million to $20 million.

65.     Okaloosa County, however, remained and remains the sponsor and continues to have a duty to the public and the government to comply with federal and state law.

### ii. **Strawmen Ward & Simmons: The Odom-Regal Capital/Regal Air Connection**

66.     Upon information and belief, Ward is a known associate of Odom.

67.     In 2013, while Odom was in prison, Ward executed numerous affidavits and warranty deeds as Manager of American Eagle Diversified, LLC. According to the Articles of Organization filed with the Florida Secretary of State on May 9, 2012, American Eagle Diversified, LLC's managing members are Waters Edge Building Company and Jay A. Odom. The annual reports for 2013-2019 show the same. The annual reports for Waters Edge Building Company list Jay A. Odom as President, Secretary, Director from 2012 thru 2019.

68.     In 2013, Ward executed documents on behalf of Regency Acquisition 1, LLC. The 2013 annual report filed with the Florida Secretary of State for Regency Acquisition 1, LLC list Sterling Diversified, LLC as manager and Timothy Edwards as the Registered Agent.

69.    The 2013 annual report filed with the Florida Secretary of State for Sterling Diversified listed Jay Odom, Chester Kroeger and Timothy Edwards as managers and Jay Odom as the Registered Agent.

70.    On information and belief, Simmons was a neighbor and acquaintance of Ward that was enlisted by Ward for his minimal aviation experience.

71.    On information and belief, Ward and Simmons were not actual purchasers, investors or experienced FBO operators but merely straw buyers engaged by Odom to conceal his involvement.

72.    Additional evidence of Odom's ownership of Regal Air surfaced when Odom ventured into medical marijuana investments.

73.    In July of 2015, Chestnut Hill Tree Farm, LLC submitted an application to the State of Florida seeking a license to grow and dispense medical marijuana.

74.    Odom served as the financial backer of the organization and as such was required to provide his personal financial statements and the financial statements of his companies. Pages 804 through 806 of the application contain the financial statements for Destin Jet. Page 807 of the application is titled "Regal Air Destin, LLC General Ledger Balance Sheet Report As of 12/31/2014" and is marked, "Run: 4/28/2015 10:18AM." Pages 808 through 810 are titled "Regal Air Destin, LLC General Ledger Standard Income Report For the Period: 1/01/2014 Through: 12/31/2014."

### iii.  **Strawmen Kroeger & Edwards: Odom-Sterling Connection**

75.     Upon information and belief, Chester Kroeger and Timothy Edwards are known associates of Odom.

76.     Sterling Diversified, LLC, included Chester Kroeger and Timothy Edwards as partners.

77.     Regal Air's managing member was Regal Capital and Regal Capital's manager was Sterling Diversified.  The 2014 Annual Report for Regal Capital, LLC listed the Current Principal Place of Business as 20001-A Emerald Coast Parkway, Destin, Florida 32541 and bears the electronic signature of Timothy Edwards as Manager of Sterling Diversified, LLC as Managing Member of Regal Capital, LLC. The address 20001-A Emerald Coast Parkway, Destin, Florida 32541 is the physical address of Chester Kroeger and Timothy Edwards' Fudpucker's restaurant.  The 2014 annual report for Sterling Diversified, LLC list Chester Kroeger and Timothy Edwards as managers but does not include Odom.  However, Odom publicly admitted that he still holds a one-third ownership interest in Sterling Diversified.

78.     At all times relevant to this complaint, Chester Kroeger and Timothy Edwards were in financial trouble and had defaulted on numerous mortgages. Neither Chester Kroeger nor Timothy Edward had any experience with FBOs.

79.    On information and belief, Chester Kroeger and Timothy Edwards were not actual purchasers, investors or experienced FBO operators but merely straw buyers engaged by Odom to conceal his involvement.

## B. Okaloosa County's False Statements Caused by Odom

80.    On December 4, 2012, Don R. Amunds, Chairman of the Okaloosa County Board of Commissioners executed a "State of Florida Department of Transportation Public Transportation Joint Participation Agreement" grant application requesting $1 million to "Construct Air Traffic Control Tower, Construct Roadway & Construct Site Utilities at Destin-Ft Walton Beach Airport." Section D of Exhibit C, of the application titled "Aviation Program Assurances" contains 24 assurances to which the Agency (applicant) must certify compliance. Number 3 "Preserving Rights and Powers" (a) states: "The Agency will not take or permit any action which would operate to deprive it of any of the rights an powers necessary to perform any or all of the terms and assurances of this Agreement ..." Number 15 "Federal Funding Eligibility" (a) states: The Agency assures it will take appropriate actions to maintain federal funding eligibility for the airport and it will avoid any action that renders the airport ineligible for federal funding." Number 17 "Exclusive Rights" states: "The Agency assures that it will not permit any exclusive right for use of the airport by any person providing, or intending to provide, aeronautical services to the public." Section A(5) of Exhibit C states: "The shall be no limit on

23

the duration on the terms and assurance of this Agreement regarding Exclusive Rights and Airport Revenue so long as the property is used as a public airport."

81.    When Odom purchased Miracle Strip Aviation, which he later operated as Regal Air Destin; Odom had obtained an "Exclusive Right" for FBO services. Odom's Destin Jet was the only other FBO at the airport, and there was no other location that could be made available for a competing FBO, because the remaining land was controlled by Odom. Therefore, Odom obtained an Exclusive Right to provide FBO services at the Destin Executive Airport in violation of federal law.

82.    Odom's use of a straw owner to purchase the competing FBO at the Destin Executive Airport, and Odom's attempts at concealment of Odom's ownership from the airport sponsor, Okaloosa County, caused Okaloosa County to make a false certification to the Florida Department of Transportation, on a "PUBLIC TRANSPORTATION JOINT PARTICIPATION AGREEMENT" grant application, that Okaloosa County, the "Agency", was in compliance with regulations that are the prerequisites to receipt of state funds, a violation of the Florida False Claims Act.

83.    On July 25, 2013, Don R. Amunds, Chairman of the Okaloosa County Board of Commissioners executed an "APPLICATION FOR FEDERAL ASSISTANCE SF-424." The application sought $2,743,526 in federal funding to:

24

"Construct Quick Response ARFF building on Eglin AFB to satisfy VPS Part 139 requirement."

PART II – SECTION C of the application states:

> The Sponsor hereby represents and certifies as follows:
>
> 5.   Exclusive Rights. - There is no grant of an exclusive right for the conduct of any aeronautical activity at *any* airport owned or controlled by the Sponsor except as follows:  [Emphasis added.]
>
> The answer on the application is: "**N/A**"

84.   The use of a straw owner to purchase the competing FBO at the Destin Executive Airport, and concealment of Odom's ownership from the airport sponsor, Okaloosa County, caused Okaloosa County to make a false certification to the Federal Aviation Administration, on an "APPLICATION FOR FEDERAL ASSISTANCE" form 424, that Okaloosa County, the airport sponsor, was in compliance with regulations that are the prerequisites to receipt of federal funds.

85.   While Okaloosa County may have initially not known of Odom's concealed ownership interest in Regal Air, Okaloosa County would soon learn of same, and in fact, had Okaloosa County property sought full disclosure of ownership interest behind the FBO entities they could have and would have learned of Odom's scheme much earlier.

### C. Okaloosa County's Knowingly False Statements

25

86.     On August 5, 2014, *approximately six months after* Okaloosa County discovered Odom's ownership of the competing FBO, Charles K. Windes, Jr., Chairman of the Okaloosa County Board of Commissioners executed another "APPLICATION FOR FEDERAL ASSISTANCE", form 424. The application sought $2,000,000 in federal funding to: "Design, Construct and Equip Air Traffic Control Tower and Access Road for Destin Airport." This application would have been executed and submitted with full actual knowledge of Odom's ownership and scheme.

PART II – SECTION C of the application states:

The Sponsor hereby represents and certifies as follows:

5. Exclusive Rights. - There is no grant of an exclusive right for the conduct of any aeronautical activity at any airport owned or controlled by the Sponsor except as follows:

The answer on the application is: "**None**."

87.     In **March of 2015**, Okaloosa County negotiated a "settlement" with Odom, thereby approving an Exclusive Right at the Destin Executive Airport to avoid costly litigation, threatened by Odom, and because Odom offered cash and additional fees that would be paid by the airports users to Okaloosa County.

88.     Okaloosa County accepted kick-backs from Odom in the form of additional fees and continued to make false certifications on "Applications for Federal Assistance," all in violation of the False Claims Act.

89.    This came even **after** discovering (a) Odom's straw buyer scheme; (b) that Odom's scheme had created an "exclusive right" at Destin Executive Airport and; (c) that Odom's scheme caused unlawful, false and fraudulent material statements in order to induce the government to award grant monies.

90.    Okaloosa County proved to be more fearful of litigation with Odom than of defrauding the state and federal government.   Okaloosa County was unwilling to fulfill their obligations to the United States, the State of Florida and the public in order to remain in the good graces of Odom.

91.    Since 2012, Okaloosa County has received at least eleven Federal Airport Improvement Program Grants totaling over $10 million and numerous Florida Department of Transportation Airport Grants based on fraudulent information contained in the applications.

92.    The fraudulent information was material to the receipt of both Federal and State funds. Okaloosa County continues to seek both Federal and State Grants and continues to submit fraudulent applications.

93.    The following tables list a summary of instances in which Odom caused and Okaloosa County did make a false and fraudulent statement in order to obtain payment from the federal and/or state government:

# FAA Airport Improvement Program Grants - Okaloosa County Airports

| Fiscal Year | Identifier | AIP Federal Funds | Work Description |
|---|---|---|---|
| 2017 | DTS | $175,267 | Update Airport Master Plan Study |
| 2014 | DTS | $2,000,000 | Construct Building |
| 2012 | DTS | $2,736,972 | Rehabilitate Runway  - 14/32 |
| 2019 | CEW | $414,774 | Rehabilate Runway 17/35 |
| 2017 | CEW | $179,141 | Update Airport Master Plan Study |
| 2018 | VPS | $498,323 | Expand Apron |
| 2017 | VPS | $176,285 | Conduct Miscellaneous Study |
| 2017 | VPS | $1,736,897 | Rehabilitate Taxiways |
| 2014 | VPS | $1,876,387 | Improve Terminal Building |
| 2013 | VPS | $2,743,526 | Construct Aircraft Rescue & Fire Fighting Building |
| 2012 | VPS | $2,576,367 | Rehabilitate Parking Lot |
| | | $10,201,700 | |

# FDOT Joint Participation Agreement Grants - Okaloosa County Airports

| Date | Airport | FDOT Funds | Work Description |
|---|---|---|---|
| 12/3/2019 | CEW | $496,979 | Increase funds connector road |
| 11/19/2019 | CEW | $250,000 | Increase funds South apron |
| 4/16/2019 | VPS | $645,000 | West terminal design |
| 8/21/2018 | CEW | $1,493,109 | Connector road |
| 7/10/2018 | CEW | $1,500,000 | Rehab aircraft parking |
| 3/21/2017 | DTS | $1,242,000 | Rehab aircraft parking |
| 10/6/2015 | VPS | $900,000 | Rehab employee parking |
| 10/6/2015 | DTS | $250,000 | Consturct maintenance building |
| 10/6/2015 | CEW | $150,000 | Replace High mast lighting |
| 12/2/2014 | VPS | $520,000 | Gate with passenger loading bridge |
| 12/2/2014 | VPS | $332,386 | Terminal flooring and parking lot lighting |
| 12/2/2014 | VPS | $75,000 | Rehab fuel farm |
| 12/2/2014 | CEW | $150,000 | Rehab aircraft parking |
| 12/2/2014 | DTS | $186,250 | Rehab taxiway |
| 10/7/2014 | VPS | $50,000 | Replace access control system |
| 4/1/2014 | CEW | $97,500 | Overlay aircraft parking apron |
| 4/1/2014 | CEW | $50,000 | Upgrede insfastructure & stormwater |
| 2/4/2014 | DTS | $271,500 | Construct & equip control tower |
| 10/15/2013 | DTS | $1,000,000 | Control tower, roadway, site utilties |
| 10/15/2013 | CEW | $3,804,231 | Construct entrance road |
| 9/3/2013 | CEW | $1,041,441 | Security System |
| 9/3/2013 | VPS | $150,000 | New Eglin Fire Station |
| 4/16/2013 | CEW | $250,000 | New passenger terminal |
| 12/4/2012 | DTS | $215,182 | Enviromental assessment for control tower |

28

| | | | |
|---|---|---|---|
| 12/4/2012 | DTS | $1,000,000 | Construct control tower |
| 5/15/2012 | CEW | $3,600,000 | Expand taxiways and aprons |
| 5/1/2012 | VPS | $189,778 | Rehab taxiway |
| 5/1/2012 | CEW | $8,750 | Rehab FBO parking area |
| 5/1/2012 | DTS | $165,181 | Rehab runway |
| 3/20/2012 | DTS | $600,000 | Rehab taxilanes and access road |
| | | $20,684,287 | |

## VI.   CAUSE(S) OF ACTION

## COUNT I – AS TO JAY A. ODOM AND OKALOOSA COUNTY, BOARD OF COUNTY COMMISIONERS
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))

94.   Relator realleges and incorporates by reference all allegations contained in the paragraphs 1- 93 above as though fully set forth herein.

95.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

96.   By virtue of the acts described above, Defendants Okaloosa County and Jay A. Odom knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval.

97.   By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent statements material to false or fraudulent claims for payment and/or approval by the Government.

98.   Relator at this time cannot identify all of the false claims for payment or approval that were caused by Defendants' conduct because Relator does not have access to all of the records containing all such false and fraudulent statements.

29

99.   The Government, unaware of the falsity of the statements and assurances made or caused to be made by Defendants, paid and continues to pay and approve funding that would not be paid but for Defendants' illegal conduct.

100.   By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

101.   Additionally, the United States is entitled to the maximum penalty for each and every violation arising from Defendants' unlawful conduct.

## COUNT II – AS TO DEFENDANT ODOM ONLY
### (Violation of Florida False Claims Act FS 68.081)

102.   Relator realleges and incorporates by reference all allegations contained in the paragraphs 1- 93 above as though fully set forth herein.

103.   This is a claim for treble damages and penalties under § 68.083, Florida Statutes, *et seq.*, as amended.

104.   By virtue of the acts described above, Defendant Jay A. Odom knowingly presented or caused to be presented, false or fraudulent claims to the State of Florida for payment or approval.

105.   By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false or fraudulent statements material to false or fraudulent claims for payment and/or approval by the State of Florida.

106.   Relator at this time cannot identify all of the false claims for payment or approval that were caused by Defendants' conduct because Relator does not have access to all of the records containing all such false and fraudulent statements.

107.   The State of Florida, unaware of the falsity of the statements and assurances made or caused to be made by Defendants, paid and continues to pay and approve funding that would not be paid but for Defendants' illegal conduct.

108.   By reason of Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

109.   Additionally, the State of Florida is entitled to the maximum penalty for each and every violation arising from Defendants' unlawful conduct.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, United States of America, through Relator, requests the Court enter the following relief:

> **A.** That defendants be ordered to cease and desist from violating 31 U.S.C. §3729 *et seq.* and § 68.083, Florida Statutes.
>
> **B.** That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. §3729;

31

**C.** That this Court enter a judgment against Defendant Jay A. Odom equal to three times the amount of damages the State of Florida has sustained because of Defendant's actions, plus a civil penalty per violation in accordance with §68.083, Florida Statutes;

**D.** That Relator be awarded the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act.

**E.** That Relator be awarded the maximum amount allowed pursuant to Section 68.083 of the Florida False Claims Act.

**F.** That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

**G.** That Relator recover such other relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Michael J. Schofield*
**MICHAEL J. SCHOFIELD**
Florida Bar No. 373656
**AMELIA H. BEARD**
Florida Bar No. 84286
CLARK PARTINGTON
125 East Intendencia Street
P. O. Box 13010
Pensacola, Florida 32591-3010
(850) 434-9200
(850) 432-7340 facsimile
mschofield@clarkpartington.com
abeard@clarkpartington.com
*Attorneys for Robert V. Smith*