# Relator's Request for Judicial Notice in Support of Opposition Motion to Dismiss

# Exhibit "A"



# Electronically Certified Court Record

This is to certify that this is a true and correct copy of the original document, which may have redactions as required by law.

---

## DOCUMENT INFORMATION

| | |
|---|---|
| **Agency Name:** | Okaloosa County Clerk of Circuit Court and Comptroller |
| **Clerk of the Circuit Court:** | The Honorable JD PEACOCK II |
| **Date Issued:** | 11/28/2022 10:45:54 AM |
| **Unique Reference Number:** | CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J |
| **Case Number:** | 462005CA004671SXXXXX |
| **Case Docket:** | PETITION FOR WRIT OF CERTIORARI |
| **Requesting Party Code:** | 100 |
| **Requesting Party Reference:** | 5726763 |

---

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable JD Peacock II, Okaloosa County Clerk of the Circuit Court and Comptroller, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Okaloosa Clerk of the Circuit Court. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This document contains a Unique Reference Number for identification purposes and a tamper-evident seal to indicate if the document has been tampered with. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. You can also verify this document by scanning the QR code or visiting https://Verify.Clerkecertify.com/VerifyImage .

**The web address shown above contains an embedded link to the verification page for this particular document.



Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 1 of 32



IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT
IN AND FOR OKALOOSA COUNTY, FLORIDA

OKALOOSA COUNTY
and DESTIN JET, LLC

      Petitioners,

vs.

THE CITY OF DESTIN, FLORIDA,
a Florida municipal corporation,

      Respondent.

_____/

CASE NO. 05 CA 4671

## PETITION FOR WRIT OF CERTIORARI

    Petitioners, Okaloosa County ("the County") and Destin Jet, LLC ("Destin Jet") petition this Court for issuance of a Writ of Certiorari quashing the denial of Petitioners' application for a development order by the City of Destin, Florida ("the City"). Petitioners' application requested approval of a Fixed Base Operation ("FBO") and related facilities at the Destin/Fort Walton Beach Airport ("the Airport").[1] The Court should quash the City's denial of the application on the following three grounds: (1) the City has no jurisdiction to regulate development within the Airport boundaries; (2) the City's decision violates federal law prohibiting a grant of exclusive rights at the Airport; and (3) the City's decision is not supported by competent substantial evidence.

---

[1] An FBO typically offers general aviation services such as arrival and departure areas, hangar space, maintenance services, refueling facilities, etc.

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF AN OFFICIAL RECORD OR DOCUMENT AUTHORIZED BY LAW TO BE RECORDED OR FILED AND ACTUALLY RECORDED OR FILED IN THE OFFICE OF THE OKALOOSA COUNTY CLERK OF THE CIRCUIT COURT & COMPTROLLER. THIS DOCUMENT MAY HAVE REDACTIONS AS REQUIRED BY LAW.

VISIT http://www.okaloosaclerk.com/index.php/e-certify-documents-info TO VALIDATE THIS DOCUMENT

Digitally signed by The Honorable JD Peacock II
Date: 2022.11.28 10:45:54 -06:00
Okaloosa County Clerk of Circuit Court and
Comptroller
Location: 101 E. James Lee Blvd, Crestview, FL

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 2 of 32

I.

## JURISDICTION AND STANDARD OF REVIEW

Jurisdiction is based on Article V, Section 5(b), Florida Constitution, and Fla. R. App. P. 9.030(c)(1)(A), which grant circuit courts jurisdiction to issue writs of certiorari. This Petition is brought pursuant to Fla. R. App. P. 9.100(c) within 30 days of rendition of the City's written decision denying Petitioners' development order application on October 21, 2005.

Quasi-judicial decisions of local governments are subject to judicial review by certiorari. *See Park of Commerce Associates v. City of Delray Beach*, 636 So. 2d 476 (Fla. 1993). "Although termed 'certiorari' review, review at this level is not discretionary but rather is a matter of right and is akin in many respects to a plenary appeal." *Florida Power & Light Co. v. City of Dania*, 761 So. 2d 1089, 1092 (Fla. 2000).

The standard of review in these proceedings is well-established:

> [C]ertiorari review in circuit court to review local administrative action under Florida Rule of Appellate Procedure 9.030(c)(3) is not truly discretionary common-law certiorari, because the review is of right. <u>In other words, in such review the circuit court functions as an appellate court</u> . . . .

> We have held that circuit court review of an administrative agency decision, under Florida Rule of Appellate Procedure 9.030(c)(3), is governed by a three-part standard of review: (1) whether procedural due process is accorded; (2) whether the essential requirements of law have been observed; and (3) whether the administrative findings and judgment are supported by competent substantial evidence.

*Haines City Community Development v. Heggs*, 658 So.2d 523, 530 (Fla. 1995) (citations omitted) (emphasis supplied). *See also Broward County v. G.B.V. International, Ltd.*, 787 So. 2d 838, 843 (Fla. 2001) ("[F]irst-tier certiorari review is not discretionary but rather is a matter of right and is akin in many respects to a plenary appeal . . . .").

2

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 3 of 32

Since this is the first tier of judicial review, a "departure from the essential requirements of the law" for purposes of this proceeding is the same degree of error that would require reversal on a direct appeal -- a substantive or procedural error that is not harmless. *See City of Winter Park v. Jones*, 392 So. 2d 568, 571 (Fla. 5th DCA 1980) (observing that "nonfundamental error should cause reversal in the circuit court" on certiorari review). Moreover, "[r]eviewing courts scrutinize quasi-judicial acts by non-deferential standards." *Jennings v. Dade County*, 589 So.2d 1337, 1340 (Fla. 3d DCA 1991), *rev. den.*, 598 So.2d 75 (Fla. 1992); *City of Apopka v. Orange County*, 299 So.2d 657 (Fla. 4th DCA 1974).

## II.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This Petition is supported by an Appendix consisting of the transcript of testimony given at the two public hearings conducted on Petitioners' application and pertinent materials received in evidence at those public hearings. References to the Appendix will be shown as "App. _____" with the appropriate number inserted in the space. An index to the Appendix is also provided.

The City's denial of Petitioners' application should be quashed on three separate and distinct grounds. First, the City has no jurisdiction to regulate land use and development at the Airport under section 125.015, Florida Statutes (2005), which provides that "any project [including airports] owned or operated by [a] county and lying within the boundaries of a municipality shall be under the exclusive jurisdiction of the county and shall be without the jurisdiction of said municipality." Under this provision, the City has no jurisdiction over the Airport and no authority to grant or deny Petitioners' application.

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 4 of 32

Second, the City's decision directly conflicts with federal law in that it perpetuates an exclusive right in favor of the one existing FBO at the Airport. Under established principles of conflict preemption, the City's action is invalid because it prevents the County from allowing the construction of a competing FBO at the only available site on the Airport, as it is required to allow under federal law and regulations.

Finally, even assuming that the City's Comprehensive Plan and Land Development Code ("LDC") were applicable, there is no competent substantial evidence to support the City's decision to deny Petitioners' application. The uncontroverted evidence received at the two public hearings, including the analysis and approval recommendation of the City's own staff, was that the application meets all applicable requirements. There is no basis in law or fact for the City's decision.

### III.

### STATEMENT OF FACTS

The Destin/Fort Walton Beach Airport is located within the city limits of the City of Destin but is owned and operated by Okaloosa County. There is only one FBO at the Airport, and Destin Jet requested authority from the County to develop a competing facility. As explained in more detail below, the County is obligated under federal law to allow such a facility to be developed upon request by a qualified applicant.

Pursuant to Destin Jet's request, the County submitted an application to the City in April 2004 requesting a development order on Destin Jet's behalf for the new FBO. (App. 4 at 0128.) Destin Jet holds a lease on the project site and would develop the FBO if approved. (App. 4 at 1.) The current proposal consists of eleven hangars, office areas, a fuel depot, a tarmac for airplane towing, aircraft and automobile parking areas and stormwater management facilities.

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 5 of 32

(App. 4 at 1; App. 7)  The project site is roughly 12 acres located entirely within the Airport boundaries on the northwest side of the runway.[2]  (*Id.*)  This location has been designated in the Airport master plan since at least 1989 as an area for development of aviation support functions like an FBO or the construction of aircraft hangars.  (App. 1 at 88.)

The application was first considered by the City Council at a public hearing conducted on March 14, 2005.  (App. 4 at 1.)  The project had undergone numerous revisions during the development review process to address issues raised by City staff and to mitigate potential impacts on adjacent residential properties.  (App. 3 at 26-29.)  It was undisputed at the March hearing that the proposal met all technical requirements of the Comprehensive Plan and LDC relating to setbacks, buffers, stormwater treatment and similar criteria.  (App. 3 at 58.)  The only issue was whether it satisfied the compatibility criteria set forth in policy 7.A.4.6 of the Comprehensive Plan (App. 23) and section 7.09.03 of the LDC (App. 24).[3]

To address the compatibility requirement, the City retained Renaissance Planning Group ("RPG"), an independent consultant from Orlando, to review the application and perform a compatibility analysis.  (App. 3 at 113.)  RPG identified the potential for additional noise from the project as the most significant issue and focused primarily on whether and to what extent noise might impact adjacent residential properties.  (App. 3 at 114-116.)  At the direction of City staff, RPG applied a compatibility standard that adjacent properties would experience <u>no net increase</u> in noise as a result of the project, a standard the City's land use attorney characterized as "the most restrictive condition that could be put into place with regard to the noise issue."  (App. 3 at 120, 192.)

---

[2] The Airport contains a total of approximately 224.4 acres.  (*Id.*)

[3] As discussed in more detail below, these provisions require compatibility of adjacent land uses as measured by specific criteria set forth in the Comprehensive Plan and the LDC.

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 6 of 32

Destin Jet implemented a number of measures to satisfy this stringent standard. Most significantly, it agreed to construct an eight-foot high solid concrete sound barrier around the entire perimeter of the project site. (App. 3 at 25.) Even though the City has no authority to regulate the operation of aircraft, it also voluntarily agreed to designate a "tow-only" area on the aircraft apron so that aircraft would not be allowed to operate under engine power on certain areas of the ramp. (App. 3 at 28-29.) In addition, it proposed a substantially larger buffer area than required by City code and agreed to plant and maintain significantly more vegetation than required within that buffer. (App. 3 at 29-30.)

In light of Destin Jet's extensive mitigation commitments, RPG recommended that the project be found consistent with the City's compatibility requirements, with conditions. (App. 3 at 119-120.) The conditions included, in addition to those already agreed to by Destin Jet, conferring with an acoustical engineer to ensure that the noise barrier would prevent any increase in noise to adjacent properties and possible future mitigation based upon the results of an air quality study to be requested from the County and the results of an FAA "Part 150" noise study that was underway at the time.[4]

At the conclusion of the five-hour hearing, the City Council voiced concerns about the need to receive data on existing Airport noise impacts that would be produced as part of the Part 150 study and about the need for data on potential air quality impacts on adjacent properties. (App. 3 at 215- 218.) There were also questions about the status of the Airport master plan, even

---

[4] As discussed in more detail below, a Part 150 study is a federally-regulated land use study that is designed to assess noise conditions in the vicinity of an airport and to develop recommendations for improving compatibility between airport operations and land uses near an airport. *See* 14 C.F.R. Part 150.

though there is no City code requirement that there be an Airport master plan.[5]  Because data from the Part 150 study was anticipated to be available by August 2005,[6] the Council voted to continue the public hearing until September 2005; that date was later deferred again to October 10, 2005.  (App. 3 at 215-216.)

In the intervening time between the first and second public hearings, Destin Jet revised the project again to address the additional issues raised at the first public hearing.  The layout was substantially changed to locate 10 hangars around the perimeter of the site, effectively replacing the originally proposed eight-foot sound wall with a 26-foot sound barrier.  (App. 7.) Separate sound walls would be constructed in the two areas where there were small gaps between the hangars.  (*Id.*)  The main FBO building and hangar remained in the original location, which was as far away from the adjacent properties as possible.  (*Id.*)  The tow-only restriction was retained, as were the enhanced buffers and vegetation areas.  (*Id.*)

Destin Jet also retained Environmental Science Associates ("ESA"), a nationally-recognized acoustical engineering firm, to conduct an independent noise study to determine whether there would be any additional noise impact from the project on adjacent residential properties.  In addition, even though the City has never used air quality as a criteria for determining compatibility (App. 2 at 208), Destin Jet retained a consultant to address questions about potential air quality impacts.  It also retained an expert to analyze whether the new FBO would contribute to or induce growth of the Airport, in response to concerns raised by public

---

[5] The City recently adopted an amendment to its Comprehensive Plan that would require a City-approved Airport master plan before further development at the Airport will be permitted.  It is undisputed that this amendment does not apply to the present application, which was submitted well before the amendment was adopted.

[6] The data for the Part 150 study was expected to be available by that time but the study was not expected to be formally accepted by the County or approved by the Federal Aviation Administration by that date, a process that would take about an additional year.

7

testimony during the first hearing.  Finally, Destin Jet retained its own independent consultant to conduct a separate compatibility analysis.

In addition to this additional analysis by Destin Jet, the Federal Aviation Administration during this interim period conducted its own review of the impact of the proposed project under federal law.  It determined that the project did not have even the potential to produce any significant adverse impact on the environment.  (App. 6.)  In finding that the project was categorically excluded from environmental analysis, the agency necessarily found that the project is "reasonably consistent with plans or goals that have been adopted by the community in which the project is located" and that the project is not likely to "have a significant impact on noise levels [or] … air quality."  (App. 6 at ¶¶ e, h and j.)

In light of changes in the project and this new information, City staff reviewed the revised proposal and again recommended approval based on its determination that the project was consistent with all applicable provisions of the Comprehensive Plan and LDC.  (App. 4 at 2.)  RPG reviewed the revised plan for the project and, except for an "inconclusive" concern about potential noise impacts, determined that it would not generate any additional impacts on adjacent properties.  (App. 4 at 0156.).  To analyze the noise issue, RPG retained its own acoustical engineer, Landrum & Brown, to review the ESA noise study.

The evidence received at the October public hearing unequivocally established that the project met all applicable requirements of the City's Comprehensive Plan and LDC, including the compatibility requirement.  Destin Jet presented unrebutted evidence on each of the key issues that had been raised by the public, by City staff or by City consultants.

Regarding the noise issue, Destin Jet presented the ESA analysis demonstrating that not only would adjacent properties not experience an increase in noise as a result of the project, but

8

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 9 of 32

that a number of adjacent properties would actually experience a <u>decrease</u> in existing noise levels because of the sound barrier effect of the 26-foot hangars around the perimeter of the site. (App. 1 at 32-46; App. 4 at 0099-0112; App. 18; App. 19.)  In preparing its analysis, ESA used the acoustical data collected as part of the Part 150 study and supplemented that data with site-specific sound measurements taken over a two-day period from various areas around the project location. (App. 1 at 33.)  To ensure a conservative approach, ESA assumed that the tow-only restriction would <u>not</u> be enforced and that the hangars would consist of a single metal wall, rather than the actual design of the buildings, which includes a front door and rear wall. (App. 1 at 34, 39-41.)

Landrum & Brown generally agreed with ESA's conclusions. (App. 2 at 125; App. 4 at 0158-0161.) The only question that it raised was whether ESA had accounted for the acoustic effects of removing vegetation during construction and replacing it with impervious surface, which is more noise-reflective. (App. 2 at 125-126.)  Although Landrum & Brown did not perform any independent analysis or study of its own, but merely reviewed the ESA study for accuracy (App. 2 at 123-124), it recommended construction of an additional sound wall along an area north of the site to address any possible adverse effects. (App. 4 at 0160.)  It acknowledged that the additional noise wall would be unnecessary if ESA's data confirmed that the removal of vegetation would not result in additional noise. (App. 2 at 127-128.)

ESA introduced evidence at the hearing to specifically address Landrum & Brown's concern and to demonstrate that removal of vegetation would <u>not</u> result in additional noise. (App. 1 at 34-36.) After reviewing Landrum & Brown's written report, ESA performed an additional analysis to investigate the potential acoustic impacts of removing vegetation. (App. 1 at 35.)  The results were substantially identical to the original analysis, showing no net increase

9

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 10 of 32

in noise to adjacent properties and some actual decrease. (*Id.*) As a result, the uncontroverted evidence on this issue demonstrated that there would be no increase in noise impacts as a result of the project and some actual improvement in existing conditions.

To address concerns that the project would contribute to or induce growth at the Airport, Destin Jet presented testimony from an aviation forecasting expert, who testified that the nature of the services to be offered by the FBO would not affect the existing growth forecast. (App. 1 at 49-51; App. 17.) It is undisputed that the Airport forecast shows that the Airport is projected to grow, but the growth rate would not be affected by the project. (*Id.*) There is no evidence in the record to substantiate the public's concern on this point.

The testimony regarding air quality issues was likewise uncontroverted. To address questions about fumes from fueling operations, Destin Jet presented testimony from an environmental consultant confirming that all applicable state and federal requirements would be met. (App. 1 at 59.) Special vapor recovery equipment would be used to ensure that no fumes escape during bulk fueling operations. (App. 1 at 60.) Moreover, uncontroverted evidence was offered that the volume of fuel handled at the site would be roughly one half the volume of a typical convenience store gas station. (App. 1 at 67.)

Destin Jet also presented testimony from a former DEP air program administrator confirming that there would be no increase in air emissions as a result of the project, since the growth projections for the Airport would be unaffected. (App. 1 at 68.) Moreover, the orientation of the hangars around the perimeter of the site would act as a vapor barrier for adjacent properties (in addition to a noise barrier), so that air quality impacts from existing Airport operations would not only <u>not</u> increase as a result of the project, but would in fact <u>decrease</u>. (App. 1 at 68-69.)

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 11 of 32

Finally, Destin Jet presented an independent compatibility analysis based upon the compatibility criteria set forth in the City's Comprehensive Plan and LDC. (App. 1 at 76-81; App. 4 at 79-112.) That analysis concluded that the project met all applicable City compatibility requirements.

Significantly, the City presented no evidence to question or contradict the Destin Jet presentation. To the contrary, City staff recommended approval of the project, and the evidence presented by the City at the hearing was consistent with that recommendation. As the City's land use counsel stated:

> [T]his applicant has really gone to a tremendous effort to not only lay the site out in an intelligent manner, but also to substantiate that project with good information, especially here tonight. The applicant did a very good presentation on that. So this is a difficult situation. But in the end, Staff felt that it had to recommend that the City Council approve [the project], because the Staff is convinced that it does not exacerbate the existing incompatibilities with the airport.

(App. 2 at 143.)

Notwithstanding staff's approval recommendation and the uncontroverted record evidence on these issues, the City Council expressed concerns during its deliberations about air quality, noise and the approval status of the Airport master plan. (*See, e.g.*, App. 2 at 172, 174, 188-89, 190-91.) In response to Council comments about air quality, the City's land use attorney explained that the City has never previously used air quality as a measure of compatibility and has permitted projects with very large parking lots without considering potential air quality impacts. (App. 2 at 208.) The City Manager echoed that concern, explaining that air quality was "not something we felt we could use as an evaluation tool." (App. 2 at 209.) Even if air quality were a valid criterion, the City's land use counsel further explained that Destin Jet presented

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 12 of 32

"competent testimony" from an environmental scientist that air quality would not be adversely affected by the project. (App. 2 at 208-209.) No party presented evidence to the contrary.

The Council's concerns about potential noise impacts were likewise unsupported by the record. The only evidence in the record demonstrated that the project would not increase, but would in fact decrease, noise to adjacent properties.

Finally, the Council's comments regarding the need for an Airport master plan have no bearing on whether the project complies with the City's Comprehensive Plan and LDC. Nothing in the City codes gives the City authority to require approval of a master plan as a condition of authorizing further development within the Airport.

Despite the uncontroverted record evidence demonstrating that the application fully complied with the City's Comprehensive Plan and LDC, and that the purported environmental impacts were purely speculative, the City Council voted 4-3 to deny the application. (App. 2 at 218.) It formally notified the applicant of its decision in writing by letter dated October 21, 2005, and rendered by the City Clerk that same day. (App. 22.) This Petition is timely filed within 30 days thereafter.

## IV.

### ARGUMENT

### A.     The City Has No Jurisdiction to Regulate Development Within the Airport Boundaries.

The Airport is a proprietary operation wholly owned by the County. Its boundaries are entirely within the city limits of the City. As such, the City has taken the position that any development contemplated at the Airport must come before it for development order and/or zoning amendment approval before such development may commence. Respectfully, the City has no such authority, as it is specifically precluded from acting by general statutory law.

The zoning power of a municipality is derived from Article VIII, section 2 (b) of the Florida Constitution, which provides, in pertinent part:

> Municipalities shall have governmental, corporate and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services, and may exercise any power for municipal purposes <u>except as otherwise provided by law</u>.

*Id*. (emphasis added). This constitutional authority has been further construed and elucidated by the Legislature in Chapter 166, Part I, Florida Statutes, the Municipal Home Rules Powers Act. Under that Act, the Legislature set forth the broad powers to be granted municipal government, first again reiterating the Constitution's mandate:

> As provided in s.2(b), Art. VIII of the State Constitution, municipalities shall have the governmental, corporate, and proprietary powers to enable them to conduct municipal government, perform municipal functions, and render municipal services, and may exercise any powers for municipal purposes, <u>except when expressly prohibited by law</u>.

§166.021(1), Fla. Stat. (emphasis added).

The Legislature then explained that, under this broad grant of power, "the legislative body of each municipality has the power to enact legislation concerning any subject matter upon which the state Legislature may act," with certain specific exceptions. §166.021(3), Fla. Stat. These exceptions include where the subject is one requiring a general or special law before the municipality may act (i.e., annexation, merger and exercise of extraterritorial power), *see* §166.021(3)(a), Fla. Stat.; where the subject is expressly prohibited by the constitution, *see* §166.021(3)(b), Fla. Stat.; where the subject is expressly preempted to state or county government by the constitution or by general law, *see* §166.021(3)(c), Fla. Stat.; and where the subject is preempted to a county pursuant to county charter, *see* §166.021(3)(d), Fla. Stat.

As stated yet a third time within the statute,

13

> [t]he provisions of this section shall be so construed as to secure for municipalities the broad exercise of home rule powers granted by the constitution.  It is the further intent of the Legislature to extend to municipalities the exercise of powers of municipal governmental, corporate, or proprietary purposes <u>not expressly prohibited by the Constitution, general or special law, or county charter</u> and to remove any limitations, judicially imposed or otherwise, on the exercise of home rule powers <u>other than those so expressly prohibited</u>.

§166.021(4), Fla. Stat. (emphasis added).

The courts in Florida have interpreted this broad grant of authority to include the rights of municipalities to enact local zoning laws and regulate development within their boundaries. Moreover, it has been held that, in a situation in which one governmental unit proposes to use property within the boundaries of another governmental unit contrary to the host government's existing zoning regulations,

> the better rule, the rule allowing for the greatest flexibility and fairness, is one which requires that one governmental unit be bound by the zoning regulations of another governmental unit in the use of its extraterritorial property, purchased or condemned, <u>in the absence of specific legislative authority to the contrary.  In the absence of express legislative immunity from zoning,</u> the intruding governmental unit should apply to the host governmental unit's zoning authority for a special exception or for a change in zoning, whichever is appropriate.

*City of Temple Terrace v. Hillsborough Association of Retarded Citizens, Inc.*, 322 So. 2d 571, 576 (Fla. 2d DCA 1975), *aff'd Hillsborough Ass'n, etc. v. City of Temple Terrace*, 332 So. 2d 610 (Fla. 1976) (quoting *Orange County v. City of Apopka*, 299 So. 2d 652, 655 (Fla. 4th DCA 1974)) (emphasis added).  *See also Palm Beach County v. Town of Palm Beach*, 310 So. 2d 384, 385 (Fla. 4th DCA 1975) ("We affirm the general proposition . . . that one governmental unit is bound by the zoning regulations of another governmental unit where one governmental unit seeks to utilize property within the geographical limits of a different governmental unit . . . .").

14

Thus, under the emphasized language from the quoted constitutional, statutory and case law cites, above, before it can be determined whether the County, as owner of property within the City's corporate boundaries, and Destin Jet, as proposed lessee and developer of a portion of that Airport property, must come to the City and seek its approval in order to undertake any development at the Airport, it is first necessary to determine whether some constitutional or statutory provision exists which exempts the County and Destin Jet from the City's development order/zoning approval process. *See, e.g., Pal-Mar Water Management District v. Martin County*, 377 So. 2d 752, 754 (Fla. 4th DCA 1979) ("We find no statutory exemption in the creation of water management districts contained in Chapter 298; therefore it is necessary to determine whether some other authority exists which exempts Pal-Mar from the County's zoning ordinances.").

In this instance, such authority exists in §125.015, Fla. Stat.  This particular statutory section, a part of the chapter setting forth the broad home rule powers and duties of county government, generally, deals with a situation exactly as the one before this Court -- where a county owns an airport located within the territorial boundaries of a municipality.  Under those unique circumstances, the Legislature has made clear that "[a]ny project owned or operated by such County and lying within the boundaries of a municipality <u>shall be under the exclusive jurisdiction of the County and shall be without the jurisdiction of said municipality.</u>"  *Id.* (emphasis added).[7]

---

[7] The term "project" is defined to include:

> . . . airport facilities of all kinds for land and sea planes, including, but not limited to, landing fields, water areas for the landing and taking off of aircraft, hangars, shops, buses, trucks, and all other facilities for the landing, taking off, operating, servicing, repairing, and parking of aircraft, and the loading and unloading and

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 16 of 32

In three separate cases, two appellate courts in Florida have found this jurisdictional language to be absolute. In *City of Dania v. The Hertz Corporation*, 518 So. 2d 1387 (Fla. 4th DCA 1988), the Fourth District Court of Appeal was faced with a situation where the City of Dania had attempted to impose upon the Hertz Corporation its occupational license ordinance by virtue of the car rental company's conduct of business as a concessionaire and lessee of property at the Fort Lauderdale - Hollywood International Airport. The airport was located within the municipal boundaries of the City of Dania but was wholly owned and operated by Broward County. *See id.* at 1388. The court, relying upon §125.015, Fla. Stat., to reject the City's arguments and attempts to regulate Hertz, held that

> [u]nder Florida law a county which operates an airport facility that is located in whole or in part within a municipality has jurisdiction over the airport and all those facilities necessary and convenient to its operation, to the exclusion of any exercise of jurisdiction by the municipality.

*Id.*

Similarly, in *City of Opa-Locka v. Dade County*, 384 So. 2d 937 (Fla. 3rd DCA 1980), the Third District Court of Appeal, adopting the lower court's findings of fact and conclusions of law as its own, found that §125.015, Fla. Stat., precluded the City of Opa-Locka from exercising its authority to attempt to extend municipal services to those individuals and entities residing or operating businesses on the portion of the Opa-Locka Airport located within the City's municipal boundaries, since the airport was wholly owned and operated by Dade County. *See id.* at 938-939. The Court found that

> handling of passengers, rail, express and freight; . . . and may include all property rights, easements, and franchises relating to any such project and deemed necessary or convenient for the acquisition, construction, purchase, or operation thereof . . . .

§125.011(2)(a), (b), Fla Stat.

16

> [t]he legislative intent of Section 125.015, Florida Statutes, is clear and that section applies to the entire portion of the Airport which lies within the municipal limits of the plaintiff city, including all of the facilities and property necessary or convenient for the operation of the Airport lying within such portion.

*Id.* The Court thus held that the City of Opa-Locka,

> its officers, employees and agents have no jurisdiction upon and may not lawfully exercise jurisdiction upon any part of the Airport, its facilities, easements or property lying within [the City's] municipal boundaries, except in the event of hot pursuit of persons suspected of having committed violations of law . . . within the City's boundaries but outside the boundaries of the Airport.
>
> The defendant County has exclusive jurisdiction, vis-à-vis the plaintiff City, over all of the Airport, its facilities, easements and property which lie within the plaintiff City's municipal boundaries, subject only to the exception of hot pursuit noted . . . above.

*Id. See also City of Opa-Locka v. Metropolitan Dade County*, 247 So. 2d 755 (Fla. 3rd DCA 1971) (reaching the same conclusion under a predecessor statute). The Court further held that not only was the City not required to adopt a Comprehensive Plan with respect to the Airport land, but it could not enforce such Plan within the Airport's boundaries, as it had no jurisdiction to do so. *See id.* at 939.

Based upon the foregoing analysis, Petitioners respectfully assert that the City of Destin had no authority to require either the County, as owner of the Airport property, or Destin Jet, as the County's lessee, to come before the City for development order approval. The City simply has no jurisdiction to act with respect to the Airport, including its facilities, easements and property necessary or convenient for the operation of the Airport.[8] Such jurisdiction is solely

---

[8] Because this is an issue of subject matter jurisdiction, it cannot be waived, enlarged or conferred by agreement of the parties. *See, e.g., Swebilius v. Florida Construction Industry Licensing Board*, 365 So. 2d 1069, 1070 (Fla. 1st DCA 1979). Moreover, the issue can be raised, as here, for the first time on appeal. *See id.* at 1071.

17

and exclusively within the province of the County.  The City's actions must therefore be vacated and deemed void in all respects.

> **B.**  **The City's Denial of Petitioners' Application is Preempted by Federal Law.**

Even if the City had jurisdiction over the Airport, it's denial of the Destin Jet application conflicts with federal law and is therefore preempted.  By denying the application to construct a competing FBO on the Airport, the City's action directly and irreconcilably frustrates the Congressional mandate that the County must ensure competition among providers of aeronautical services at the Airport.

> **1.**  **Preemption Exists if State or Local Law Is an Obstacle to the Accomplishment of Congress' Objectives**

"If Congress so intends, '[p]reemption … is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Boyes v. Shell Oil Products Co.*, 199 F.3d 1260 (11th Cir. 2000) (quoting *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 96 (1992)).  The Supreme Court has recognized three types of preemption:  (1) express preemption, where the statute contains explicit preemptive language, (2) field preemption, where the scheme of federal preemption is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and (3) conflict preemption.  *Id.*  It is conflict preemption which is at issue here.

Conflict preemption arises "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Id.* (finding conflict preemption where Florida storage tank laws failed to provide citizen suit option under the Resource Conservation and Recovery Act).  *See also State v. Harden*, 873 So.2d 352, 355 (Fla. 3d DCA

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 18 of 32

2004) (finding implied conflict preemption where state statute would criminalize activity for which a safe harbor existed under federal law).

Courts have regularly found local regulatory actions to be subject to conflict preemption in the airport context. For example, in *United States v. City of Berkeley*, 735 F. Supp. 937 (E.D. Mo. 1990), the court found that a city's denial of a building permit and demand for a special use permit relating to a Federal Aviation Administration ("FAA") radar facility was preempted by federal aviation laws. The court determined that the city's actions stood as an obstacle to Congress's statutory objective of establishing and improving air navigation facilities for the safety of the public. "*Congressional objectives such as enhanced air safety may not be 'thwarted by local fiat.'*" *Id.* at 940 (*quoting Don't Tear It Down v. Pennsylvania Ave. Dev. Corp.*, 642 F.2d 527, 534 (D.C. Cir. 1980) (emphasis added).

Similarly, in *Burbank-Glendale-Pasadena Airport Authority v. City of Los Angeles*, 979 F.2d 1338, 1341 (9ᵗʰ Cir. 1338), the United States Court of Appeals for the Ninth Circuit found that a city ordinance that purported to require prior submission and approval of plans for development of a proposed taxiway development project was preempted. The court found that the city's attempt to exercise land use powers conflicted with federal regulation of airport operations. *Id.* "Stated simply, a non-proprietor municipality may not exercise its police power to prohibit, delay, or otherwise condition the construction of runways and taxiways at a non-city-owned airport." *Id. See also, Dallas/Fort Worth International Airport Board v. City of Irving*, 854 S.W.2d 161, 168 (Ct.App.Tex. 1993) ("No one disputes that federal laws preempt local regulation within the boundaries of an airport.").

2. **Federal Law Forbids the Creation of Exclusive Rights on Federally Funded Airports**

19

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 20 of 32

In this case, the denial of the Destin Jet application by the City directly conflicts with federal requirements that mandate competition among aeronautical service providers at federally-funded airports like the Destin/Fort Walton Beach Airport.  Congress has required since the Civil Aeronautics Act of 1938 that:

> (e)   No Exclusive Rights at Certain Facilities. - *A person does not have an exclusive right to use an air navigation facility on which Government money has been expended.*  However, providing services at an airport by only one fixed-based operator is not an exclusive right if -
>
> (1)   it is unreasonably costly, burdensome, or impractical for more than one fixed-based operator to provide the services; and
>
> (2)   allowing more than one fixed-based operator to provide the services requires a reduction in space leased under an agreement existing on September 3, 1982, between the operator and the airport.

49 U.S.C. § 40103(e) (emphasis added).  To reinforce this express requirement barring exclusive rights on airports, Congress requires the FAA to obtain and maintain contractual assurances from recipients of federal funds such as the County.  One of these assurances relevant to the current matter is that:

> a person providing, or intending to provide, aeronautical services to the public will not be given an exclusive right to use the airport, with a right given to only one fixed-base operator to provide services at an airport deemed not to be an exclusive right if -
>
> (A) the right would be unreasonably costly, burdensome, or impractical for more than one fixed-base operator to provide the services; and
>
> (B) allowing more than one fixed-base operator to provide the services would require reducing the space leased under an existing agreement between the one fixed-base operator and the airport owner or operator.

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 21 of 32

49 U.S.C. § 47107(a)(4).  Congress further underlined the importance of its pro-competition

policy in its findings relating to the aviation statutes:

> 47101(d) Consistency With Air Commerce and Safety Policies. –
> Each airport and airway program should be carried out consistently
> with section 40101(a), (b), (d), and (f) of this title to foster
> competition, prevent unfair methods of competition in air
> transportation, maintain essential air transportation, and prevent
> unjust and discriminatory practices, including as the practices may
> be applied between categories and classes of aircraft.

49 U.S.C. § 47107(a)(4).  Congress also gave the FAA the authority to enforce the prohibition

against exclusive rights, including through judicial enforcement.  *See, e.g.,* 49 U.S.C. § 47111(f).

The term "exclusive right" is "intended to describe a power, privilege or other right

excluding or debarring others from enjoying a like power, privilege, or right."  *City of Pompano*

*Beach v. FAA*, 774 F.2d 1529, 1541 (11th Cir. 1985); 40 Op. Att'y Gen. 71, 72 (1941).  "The type

of exclusive right prohibited by [this provision of the Act] has been described as one of the sort

noxious to the anti-trust laws."  *Pompano Beach*, 774 F.2d at 1542.  *See also Lake in the Hills*

*Aviation Group, Inc. v. Village of Lake in the Hills*, 698 N.E.2d 163, 168 (Ill. App. 1998) ("The

purpose of [the exclusive rights] provisions is to prohibit monopolies and combinations in

restraint of trade and encourage competition in civil aeronautics.").

"An exclusive right can be conferred either by express agreement, by the imposition of

unreasonable standards or requirements, or by any other means."  FAA Order 5190.6A (1989),

Appendix 5, "Definitions;" *United States Construction Corporation v. City of Pompano Beach*,

2002 WL 1821882 at *14 (Federal Aviation Administration, July 10, 2002).[9]  "[I]t is FAA's

policy that the sponsor of a federally obligated airport will permit no exclusive right for the use

---

[9] FAA's interpretation of the statutes and regulatory requirements must be given deference,
because Congress has committed the statutes at issue to FAA for administration.  *See Pompano*
*Beach*, 774 F.2d at 1541.

of the airport by any person providing, or intending to provide, aeronautical services to the public, and will not, either directly or indirectly, grant or permit any person, firm or corporation, the exclusive right of airport use to conduct any aeronautical activities." *United States Construction Corp*, 2002 WL 1821882 at *14. "The FAA has concluded that the existence of an exclusive right to conduct any aeronautical activity at an airport limits the usefulness of the airport and deprives the using public of the benefits of a competitive enterprise. Apart from legal considerations, the FAA considers it inappropriate to provide Federal funds for improvements to airports where the benefits of such improvements will not be fully realized due to the inherent restrictions of an exclusive monopoly on aeronautical activities." FAA Order 5190.6A at § 3-8(a).

In interpreting the statutory requirements, FAA has determined that airport proprietors like the County have an affirmative obligation to make property available for FBOs:

> The prime obligation of the owner of a federally-assisted airport is to operate it for the use and benefit of the public. The public benefit is not assured merely by keeping runways open to all classes of users. While the owner is not required to construct hangars and terminal facilities, it has the obligation to make available suitable areas or space on reasonable terms to those who are willing and otherwise qualified to offer flight services to the public … support service (i.e., fuel, storage, tie down, flight line maintenance, etc.) to aircraft operators. This means that unless it undertakes to provide those services itself, the airport owner has a duty to negotiate in good faith for the lease of such premises as may be available for the conduct of aeronautical activities.

FAA Order 5190.6A at §4-15. *See also United States Construction Corp*, 2002 WL 1821882 at *18 (FAA administrative finding that airport failed to comply with federal obligations when it failed to provide property to prospective FBO on reasonable terms).

Courts have found exclusive rights violations when prospective FBOs were saddled with restrictive requirements that were not made applicable to existing FBOs on an airport, *even when*

*there is more than one FBO already at an airport. Id.; see also Pompano Beach,* 774 F.2d at
1544-45. Violations have also been found when an FBO applicant for land at an airport is denied
on the basis that all available land had been leased to the incumbent FBO. *See Pompano Beach,*
774 F.2d at 1542; *Niswonger v. American Aviation, Inc.,* 411 F.Supp. 763, 769 (E.D. Tenn.
1975), *aff'd,* 529 F.2d 526 (6th Cir. 1976).

3.  **The City's Denial of the Destin Jet Application for a
    Development Order Is Preempted Because it Frustrates the
    Congressional Requirement To Prevent Airport Monopolies.**

    (a)  *The City's Action is in Direct Conflict with Federal Law.*

Miracle Strip Aviation is the only FBO operating at the Airport. (App. 1 at 50-51, 57,
91.) It currently has a monopoly in the sale of fuel and other essential aeronautical services at
the Airport. The record reflects that it has a captive market, insofar as adding a second or even a
third FBO would not increase the amount of aviation activity at the Airport. (App. 17.)
Accordingly, the Airport would constitute the "market" for FBO services for antitrust purposes
and Miracle Strip would constitute a monopoly. *See Pompano Beach,* 774 F.2d at 1541 (11th
Cir. 1985) ("The type of exclusive right prohibited [] has been described as one of the sort
noxious to the anti-trust laws.").

When it denied the Destin Jet application for a development order, the City effectively
created an exclusive right for Miracle Strip Aviation and assured its continuing monopoly at the
Airport. In so doing, it frustrated Congress's mandate to avoid the creation of exclusive rights at
the Airport. (App. 1 at 32, 92; App. 6.)

By denying Destin Jet the ability to use the property it has leased from the County for
construction and operation of a FBO, the City has legally secured an exclusive right for Miracle

23

Strip. This directly frustrates federal law and, by itself, demonstrates that the City's action is preempted.

The City's action not only forces a violation of the federal prohibition on exclusive rights but it also directly conflicts with federal requirements applicable to the use of airport property. Under FAA regulations, an airport proprietor like the County <u>must</u> lease property to a prospective FBO or other aeronautical user if the unused property has been designated for aeronautical use. *See* FAA Order 5190.6A at §4-15 (airport must allow use of aeronautical property); *Niswonger*, 411 F. Supp. at 769 (same); *United States Construction Corp*, 2002 WL 1821882 at *18 (airport failed to comply with federal obligations when it failed to provide property to prospective FBO on reasonable terms). The FAA approved an Airport Layout Plan for the Airport that designated the property at issue for use for aeronautical purposes and, indeed, showed possible hangar uses consistent with the Destin Jet application. (App. 1 at 31, 32, 88; App. 20.) The City's denial of the Destin Jet application for a development order thereby conflicts with the express federal requirement that property be made available on reasonable terms to persons seeking to use such property for aeronautical purposes.

The City's actions place the County in precisely the untenable legal position that the principle of preemption is designed to prevent. The County is required by federal law and FAA regulations to lease property for a competing FBO to avoid perpetuation of an exclusive right by Miracle Strip Aviation. The County is further required to lease property for aeronautical uses at the Airport where such property has been designated for such uses. By denying the Destin Jet application for a development order, the City has forced the County to violate both federal requirements. Under basic black-letter law of conflict preemption, the federal requirements preempt the City's denial of the Destin Jet application for a development order.

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 25 of 32

**(b)   The County is Placed in an Irreconcilable Conflict Because of the Unavailability of Other Land.**

While not necessary to the finding that the City action is preempted because it perpetuates an impermissible exclusive right, the City's action is particularly at odds with federal requirements because it effectively precludes the County from allowing another FBO at the Airport.  The record shows that the site in question is the <u>only one on the Airport that could be developed for an FBO</u>.  For example, Mr. Jay Odom's unrebutted testimony was that the only other unused property on the Airport contains wetlands that would render the property undevelopable.  (App. 1 at 18-19; App. 5.)  Indeed, the City's lawyer acknowledged at the end of the hearing on October 10 that "I think it has been established in the record that there really is *not another readily available site* at the airport to accommodate the competing FBO."  (App. 2 at 143.)  (Emphasis added.)  Further, given the extraordinary accommodations and voluntary mitigation that Destin Jet included in its application, no other FBO development is conceivable on the parcel at issue.  Again, counsel for the City acknowledged this fact:  "Given the site that's available, this applicant has done everything imaginable, except for to withdraw the application, to improve this project." *Id.*

As a result, the conflict with federal law is total.  The City's action perpetuates and effectively ensures a continuing monopoly for FBO services at the Airport.  There is no way that the County could comply with both the City denial of the development order application and the federal exclusive rights prohibition.  The subject site has been designated, pursuant to FAA regulations, for aeronautical uses.  In light of the City action, the County is prevented from complying with the requirement that the subject site be made available for aeronautical purposes.  In both respects, the City's actions conflict with clear and explicit federal requirements.  Therefore, the City's action is preempted and must be vacated.

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 26 of 32

**C.    The City's Denial of Petitioners' Application is not Supported by Competent Substantial Evidence.**

It is well settled that when a local governmental body acts in a quasi-judicial capacity, its decision must be supported by competent substantial evidence to be upheld.  *See, e.g., Board of County Commissioners of Brevard County v. Snyder*, 627 So. 2d 469, 474 (Fla. 1993) ("[T]he rulings of a board acting in its quasi-judicial capacity are subject to review by certiorari and will be upheld only if they are supported by competent substantial evidence."); *Dusseau v. Metropolitan Dade County Board of County Commissioners*, 794 So. 2d 1270 (Fla. 2001) (on first tier certiorari review, the circuit court must determine whether the decision below is supported by competent substantial evidence).

It is equally well established that where all legal requirements for obtaining a development order have been met, local government has no authority to deny the application. *See, e.g., City of Lauderdale Lakes v. Corn*, 427 So. 2d 239, 242 (Fla. 4th DCA 1983) (holding that where all legal requirements for site plan approval had been met, City had no discretion to withhold approval); *City National Bank of Miami v. City of Coral Springs*, 475 So. 2d 984, 985 (Fla. 4th DCA 1985) ("It is elementary that once a party complies with all legal requirements for platting there is no discretion in government authority to refuse approval of the plat."); *Broward County v. Narco Realty, Inc.*, 359 So. 2d 509, 511 (Fla. 4th DCA 1978) (same).

The City in this case denied Petitioners' application for a new FBO at the Airport despite uncontroverted evidence -- including the analysis and approval recommendation of its own planning staff -- that the application complied with all requirements of the City's Comprehensive Plan and LDC.  Its decision is unsupported by competent substantial evidence and cannot be sustained.

26

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 27 of 32

As a preliminary matter, there has never been any question about whether the project complied with all Comprehensive Plan and LDC requirements concerning buffers, setbacks, stormwater management, parking and other technical requirements. The focus at both public hearings was solely on whether the application satisfied the City's compatibility requirements, which are set forth in the Comprehensive Plan, in pertinent part, as follows:

> In reviewing the proposed developments, the City Planning Department shall conduct a compatibility analysis and make recommendations whether the project is compatible. Compatibility shall be measured based on the following compatibility characteristics of the proposed development in relationship to surrounding development in the immediate area: (a) permitted uses, structures, and activities allowed within the land use category; (b) building location, dimensions, height, and floor area ratio; (c) location and extent of parking, access drives and service areas; (d) traffic generation, hours of operation, noise levels and outdoor lighting; (e) alteration of light and air; (f) setbacks and buffers - fences, walls, landscaping and open space treatment. It is the intent of this policy to encourage design treatments that reflect consideration of adjoining and surrounding development and land use.

Policy 7.A.4.6 (p), City of Destin Comprehensive Plan (1990). (App. 23.)

These requirements are implemented through more specific criteria set forth in the section 7.09.00 of the City's LDC. (App. 24.) Subsection 7.09.01 contains a "General Compatibility Checklist" identifying "those items addressing compatibility to be reviewed as part of the development review process." The checklist is intended to "provide notice to developers of the areas which will be addressed as part of the compatibility review process." *Id.* It requests information about the nature of the project, the permitted land uses on the proposed site and on adjacent properties, setbacks, buffers, building heights, access, lighting, landscaping and similar design features. Destin Jet completed the checklist and confirmed that it satisfied each of these requirements. (App. 4 at 0090-0095.)

27

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 28 of 32

Subsection 7.09.02 sets forth additional compatibility criteria that track the standards contained in policy 7.A.4.6. It provides in pertinent part that:

> Compatibility shall be measured [by] the following characteristics of the proposed development in relationship to development in the immediate area:
>
> A.    Type of land use, zoning district, and land use category.
>
> B.    Building location, dimensions, height, and floor area ratio.
>
> C.    Location and extent of parking, access drives and service areas.
>
> D.    Traffic generation, hours of operation, noise levels and outdoor lighting.
>
> E.    Alteration of light and air.
>
> F.    Setbacks and buffers -- fences, walls, landscaping and open space treatment.
>
> It shall be the objective of this section to encourage design treatment that reflects consideration of and between adjoining developments. It is not the purpose of this provision to preclude development based upon normal change or that inconvenience which might ordinarily be expected to result from the land development process; but, rather, _it shall be the purpose of this provision to preclude any significant adverse impact that is measurable and can be documented_, based upon the above factors.

(Emphasis added).

Of the listed criteria, the only requirement about which there was any question of compliance related to noise levels. The uncontroverted evidence on that issue was that _no_ adjacent properties would experience an increase in noise levels as a result of the FBO, and the adjacent properties closest to the site would in fact experience a _decrease_ in existing noise levels. (See pp. 8-10 above.)

28

Regarding the criterion relating to "alteration of light and air," the City's land use counsel explained that this "was adopted with reference to tall buildings and the effect that that has on airflow rather than air quality." (App. 2 at 208.)  He also confirmed that the City has never previously attempted to impose an air quality standard on proposed developments and has in fact "permitted projects that have very large parking lots with hundreds and hundreds of hundreds of vehicles in daily use and has never once looked at that particular aspect of it." (*Id.*) Given the plain language of this provision and the City's consistent interpretation of it as applying to air flow rather than air quality, the City could not use concerns about air quality as a basis for denying the application.

Even if potential air quality impacts were a valid consideration, the uncontroverted evidence demonstrated that the proposed FBO would have no such effects on adjacent properties. (See p. 10 above.)  To again quote the City's land use attorney:

> [W]e did hear testimony tonight with regard to -- and this is competent testimony, frankly, with regard to compliance with all of the fueling procedures, storage tanks, bringing fuel on to the site, transferring of the fuel from the tank storage on the site on to the fueling trucks, and the procedures they're following on fueling the aircraft.  All of that is fully compliant with State law requirements regarding air quality.  And then you hear, also, testimony . . . from an environmental scientist that air quality is not going to be impacted by the project.  So you have that.  Even despite the fact that in the judgment of Staff it did not have to be addressed, you had that information brought to bear tonight.

(App. 2 at 208-209.)

In addition to this unrebutted evidence, the FAA Determination of Environmental Impacts (App. 6) confirmed that no air quality analysis or environmental assessment was required under federal law because the project could not have a significant impact on air quality. *See* FAA Order 5050.4A § 23; 40 C.F.R. § 1508.4 (regulations on determining whether certain

**Case 3:20-cv-03678-MCR-ZCB   Document 71-1   Filed 11/28/22   Page 32 of 34**

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 30 of 32

categories of actions could have a significant environmental impact). Indeed, the volume of annual operations at the Airport is roughly one third the level required to trigger an air quality assessment under federal guidelines. (App. 1 at 20.)

The only other concern voiced by the City Council during its deliberations related to the approval status of the Airport master plan. (*See, e.g.*, App. 2 at 174 ("So how we can really approve these things without a master plan escapes me.")) Under the applicable Comprehensive Plan and LDC, the status of the Airport master plan, or whether there even is one, is irrelevant to a determination of whether the proposed FBO should be approved. There is <u>no</u> provision in the applicable codes regarding the Airport master plan.

It is fundamental that an applicant for a land use permit "has a right to know what the requirements are that he must comply with in order to implement the permitted use; these requirements must be of uniform application, and once the requirements are met, the governing body may not refuse the application." *Alachua County v. Eagle's Nest Farms, Inc.*, 473 So. 2d 257, 259-60 (Fla. 1st DCA 1985) (quoting *Effie, Inc. v. City of Ocala*, 438 So. 2d 506, 509 (Fla. 5th DCA 1983)). Here, Destin Jet proved that it met or exceeded all of the applicable criteria set forth in the Comprehensive Plan and LDC, including the compatibility requirements. Because there is no competent substantial evidence to support the City's decision to deny the application, its decision should be quashed.

**V.**

**CONCLUSION**

For the reasons set forth above, Petitioners request that the City's decision be quashed because the City has no jurisdiction to regulate development within the Airport boundaries, or, alternatively, because its decision conflicts with federal law and is therefore preempted. In the

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 31 of 32

alternative, the Court should quash the City's decision as unsupported by competent substantial evidence and remand this matter to the City for further consideration in accordance with the requirements of law.

Respectfully submitted,

Peter J. Kirsch, Esq.
(appearing *pro hac vice*)
Kaplan Kirsch & Rockwell LLP
1675 Broadway, Suite 2300
Denver, CO  80202
Telephone:  (303) 825-7000
Facsimile:  (303) 825-7005

W. Douglas Hall
Florida Bar No. 347906
Carlton Fields, P.A.
Post Office Drawer 190
Tallahassee, FL 32302-0190
Telephone:  (850) 224-1585
Facsimile:  (850) 222-0398

Attorneys for Petitioners,
Destin Jet, LLC

Harry F. Chiles
Florida Bar No. 0306940
Nabors, Giblin & Nickerson, P.A.
1500 Mahan Drive, Suite 200
Tallahassee, FL  32308
Telephone:  (850) 224-4070
Facsimile:  (850) 224-4073

Attorneys for Petitioner,
Okaloosa County

31

Unique Code : CAA-BAA-BCAJB-BDFHJCIJ-FBCACG-J Page 32 of 32

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by US Mail this 16th day of November, 2005, on: MICHAEL SCOTT SHIRLEY, ESQ., Ard, Shirley & Hartman, P.A., P.O. Box 1874, Tallahassee, FL 32302-1874; and J. JEROME MILLER, ESQ., Miller & Ansley, P.A., 415 Mountain Drive, Suite 3, Destin, FL 32541-2349.

_____
ATTORNEY