# Relator's Request for Judicial Notice in Support of Opposition Motion to Dismiss

# Exhibit "E"



**U.S. DEPARTMENT OF TRANSPORTATION**
FEDERAL AVIATION ADMINISTRATION

National Policy



ORDER
5190.6B
Change 1

Effective Date:
November 22, 2021

**SUBJ**: Airport Compliance Manual

## 1. Purpose

The Airport Compliance Manual provides guidance to FAA employees on the implementation of the FAA's airport compliance program. Under the program, the FAA has the responsibility to assure airport sponsors comply with certain obligations that arise from FAA grant agreements and from deeds of property conveyance for airport use.

## 2. Distribution

The Airport Compliance Manual is located on the FAA Office of Airports website where it is available to all interested parties. *See:*
https://www.faa.gov/airports/resources/publications/orders/compliance_5190_6/

## 3. Cancellation

This Order cancels and replaces the following chapters of the Airport Compliance Manual:

> Chapter 1, Scope and Authority
> Chapter 9, Unjust Discrimination Between Aeronautical Users
> Chapter 10, Reasonable Commercial Minimum Standards
> Chapter 11, Self-Service
> Chapter 23, Reversions of Airport Property

## 4. Explanation of Changes

Since 2009, there have been changes to the laws and policies relating to the Federal obligations of airport sponsors and revisions to the procedures for investigating and resolving complaints that allege noncompliance. To incorporate any changes and provide the most useful and current program guidance to FAA employees, the Office of Airport Compliance and Management Analysis is undertaking a review of the Order and will publish updates as the chapter reviews are completed.

The Office of Airport Compliance and Management Analysis is issuing Change 1 to the Airport Compliance Manual to address the following:

- After review of public comments offered on the 2009 update, and subsequent experience with using Order 5190.6B as guidance for the airport compliance program, the FAA is updating Chapters 1, 9, 10, 11 and 23 of the Order.
- Most of the changes are editorial, based on suggestions in the public comments or recommendations from FAA staff for more effective ways of expressing policy guidance. In applicable sections of the Order, the revised chapters:

- o Add updated references to other FAA guidance documents on the same subject where applicable.
        - o Update references to Light Sport Aircraft (LSA) and experimental aircraft to reflect current policy and categories of FAA certificates.
        - o Add specific references to ethanol-free automotive gasoline.
        - o Includes citations to Part 16 determinations relating to certain policy statements.
- In other cases, the Order has been updated to reflect policy changes adopted by the agency since 2009 to remain current with Federal statutes.
- When the FAA revises its policy on a specific compliance issue, or issues a new policy statement to clarify the agency position on an issue, the agency will issue a separate policy statement after public notice and comment.
- Edits and additions to the revised chapters are intended to provide accurate and useful guidance on airport compliance policy for FAA Airports staff, and not to adopt significant changes in compliance policy. As chapters are revised, a summary of the changes will be posted on the FAA website.

- Edits to Chapter 1, *Scope and Authority*, include:
        - o Editorial changes;
        - o Updated NPIAS information for airports by category and role;
        - o Reference to special funding programs authorized by Congress to provide federal grants to airports for a specific purpose such as economic development or recovery (e.g., American Economic Recovery and Reinvestment Act of 2009 (ARRA); Coronavirus Aid, Relief, and Economic Security Act (CARES).
        - o Reference to The FAA Reauthorization Act of 2018 (Pub. L. 115-254), Section 163(a) which narrows the scope of the FAA's authority over airport land uses by generally prohibiting the FAA from directly or indirectly regulating airport land (Section 163(a) will be more fully discussed in a future update to the Order).

- Edits to Chapter 9, *Unjust Discrimination Between Aeronautical Users*, include:
        - o Section 9.2 –New brief discussion of airline incentive programs;
        - o Section 9.6 – Expands the discussion of commercial minimum standards;
        - o Section 9.7 –Guidance on leasing of general aviation apron constructed with Federal assistance (based on language in Order 5190.6A but not included in 5910.6B);
        - o Section 9.8 – Retitle to paragraph 9.8.d. as "Air Carrier Accommodation."

- Edits to Chapter 10, *Reasonable Commercial Minimum Standards*, include:
        - o Section 10.5 –Guidance on availability of automotive gasoline;
        - o Section 10.5 –Guidance on minimum standards for Specialized Aviation Service Operators;
        - o Section 10.6 –Revised language to reflect recent policy changes regarding services provided by flying clubs (81 FR 13719; March 15, 2016);
        - o Section 10.7—New section (10.7) discussing illegal air charters.

- Edits to Chapter 11, *Self-Service*, include:
  - Section 11.2 – Clarification that activities covered by the right to self-service, as well as the airport sponsor's ability to impose reasonable safety regulations, on self-servicing;
  - Section 11.3 – Detailed descriptions of the maintenance activities included in self-service, including maintenance performed on LSA and experimental aircraft, and maintenance performed by the holders of certain FAA certificates;
  - Section 11.4 –Guidance regarding when contracting to a third party is and is not permitted.

- Edits to Chapter 23, *Reversions of Airport Property*, include:
  - Organizational references update and adds an example of a reversion of airport property;
  - Identifies requires of environmental due diligence prior to property reversion;
  - Other limited editorial changes.

In addition to updating the five chapters listed above, the agency has revised several of the appendices to Order 5190.6B.  The changes update citations and documents to provide current versions, delete obsolete references, and include more recent sample documents. Also, Appendices E-1, F-3, G-1, and S have been removed.

Kevin Willis

Director
Airport Compliance and Management Analysis (ACO-1)

# Part I: Background

**Chapter 1:        Scope and Authority** ........................................................................ 1-1

**Updated November 2021**

1.1.    Purpose. ..................................................................................................... 1-1
1.2.    Audience. ................................................................................................... 1-1
1.3.    Where Can I Find This Order? ................................................................... 1-1
1.4.    Cancellation. .............................................................................................. 1-1
1.5.    Introduction. ............................................................................................... 1-1
1.6.    Scope. ........................................................................................................ 1-1
1.7.    Background. ............................................................................................... 1-2
1.8.    Compliance Program Background. ............................................................. 1-5
1.9.    Sources of Airport Sponsor Federal Obligations. ...................................... 1-6
1.10.   FAA Authority to Administer the Compliance Program. ............................. 1-7
1.11.   Statutory Limitation on FAA Authority ..................................................... 1-8
1.12 through 1.14 reserved ...................................................................................... 1-8

**Chapter 2:        Compliance Program** ........................................................................ 2-1

2.1.    Introduction. ............................................................................................... 2-1
2.2.    Background. ............................................................................................... 2-1
2.3.    Determining if an Airport is Federally Obligated. ...................................... 2-1
2.4.    Objectives of the Compliance Program. ..................................................... 2-2
2.5.    Program Elements. ..................................................................................... 2-3
2.6.    Priorities and Emphasis. ............................................................................ 2-5
2.7.    Responsibilities. ......................................................................................... 2-5
2.8.    Analyzing Compliance Status. ................................................................... 2-6
2.9.    Compliance Determination. ....................................................................... 2-6
2.10.   Airport Noncompliance List (ANL). .......................................................... 2-8
2.11 through 2.15 reserve .......................................................................................... 2-8

# Part II: Types of Federal Agreements

**Chapter 3:        Federal Obligations from Property Conveyances** ........................... 3-1

3.1.    Introduction. ............................................................................................... 3-1
3.2.    Background. ............................................................................................... 3-2
3.3.    The War Assets Administration (WAA) ..................................................... 3-2
3.4.    Nonairport Property. .................................................................................. 3-3
3.5.    The Use of Property for Revenue Production. ............................................ 3-4
3.6.    Highest and Best Use and Suitability for Airport Use. ............................... 3-4
3.7.    Types of Conveyance Instruments for Surplus Property. ........................... 3-5
3.8.    Sponsor Federal Obligations for Surplus Property. .................................... 3-5
3.9.    Duration of Surplus Property Federal Obligations. ..................................... 3-7
3.10.   Review of Specific Obligations. ................................................................. 3-7
3.11.   Nonsurplus Federal Land Conveyances ..................................................... 3-8
3.12.   Land Conveyance Federal Obligations. ...................................................... 3-8

3.13.    Bureau of Land Management................................................................................3-9
3.14.    Federal Obligations Imposed by Other Government Agencies. .................................3-9
3.15.    Duration of Nonsurplus Federal Obligations. ........................................................3-9
3.16.    Reversion Provisions. .......................................................................................3-10
3.17.    Airport Sponsor Compliance. ...........................................................................3-10
3.18.    The AP-4 Land Agreements. .............................................................................3-10
3.19.    Base Conversion and Surplus Property................................................................3-11
3.20.    Joint Use and Federal Use of Obligated Airports. ...............................................3-11
3.21.    Environmental Issues Related to Land Conveyances. .............................................3-12
3.22. through 3.25. reserved........................................................................................3-13

## Chapter 4:      Federal Grant Obligations and Responsibilities ...........................................4-1

4.1.    Introduction.......................................................................................................4-1
4.2.    Sponsor Federal Obligations Under Various Grant Agreements...................................4-1
4.3.    The Duration of Federal Grant Obligations. ...........................................................4-2
4.4.    The Useful Life of Grant Funded Projects. .............................................................4-3
4.5.    Airport Sponsor Compliance. ..............................................................................4-3
4.6.    Federal Obligations under the Basic Grant Assurance Requirements. ...........................4-3
4.7 through 4.10 reserved.............................................................................................4-8

## Part III: Complaint Resolution

## Chapter 5:      Complaint Resolution ...............................................................................5-1

5.1.    Introduction.......................................................................................................5-1
5.2.    Background. .......................................................................................................5-1
5.3.    Complaints Handled by Other FAA Offices or Other Federal Agencies. .......................5-1
5.4.    Informal Complaints under § 13.1. .......................................................................5-2
5.5.    Process for Resolving Informal Complaints. ...........................................................5-2
5.6.    Receiving the Complaint. .....................................................................................5-3
5.7.    Coordinating Resolution of the Part 13 Informal Complaint. ....................................5-4
5.8.    Evaluate the Complaint........................................................................................5-5
5.9.    Attempt to Resolve the Allegation.........................................................................5-6
5.10.    Dispute Resolution for Part 13.1 Complaints. .......................................................5-7
5.11.    Determinations on Part 13.1.1 Complaints and Notification to the Parties. ..................5-7
5.12.    Dismissing a Part 13.1.1 Complaint. ...................................................................5-7
5.13.    Notice of Potential Noncompliance. ....................................................................5-8
5.14.    Follow up and Enforcement Actions. ...................................................................5-8
5.15.    Documentation to Support the FAA's Determination. .............................................5-8
5.16.    Formal Complaint: 14 CFR Part 16. ....................................................................5-8
5.17. through 5.21. reserved........................................................................................5-9

## Part IV: Airports and Aeronautical Users

## Chapter 6:      Rights and Powers and Good Title ............................................................6-1

6.1.    Introduction.......................................................................................................6-1
6.2.    Airport Governance Structures. ............................................................................6-1

6.3.    Controlling Grant Assurances. ................................................................ 6-1
6.4.    Interrelationship of Issues. .................................................................... 6-2
6.5.    Assignment of Federal Obligations. ....................................................... 6-2
6.6.    Rights and Powers. ............................................................................... 6-2
6.7.    Transfer to another Eligible Recipient. .................................................. 6-4
6.8.    Transfer to the United States Government. .............................................. 6-4
6.9.    Delegation of Federal Obligations. ........................................................ 6-5
6.10.   Subordination of Title. ......................................................................... 6-5
6.11.   New Sponsor Document Review. ........................................................... 6-6
6.12.   Title and Property Interest. ................................................................... 6-8
6.13.   Airport Management Agreements. ......................................................... 6-9
6.14.   Airport Privatization Pilot Program. ..................................................... 6-10
6.15.   Privatization Outside of the Airport Privatization Pilot Program. ........... 6-11
6.16. through 6.20. reserved ........................................................................... 6-12

**Chapter 7:    Airport Operations** ........................................................................ **7-1**

7.1.    Introduction. ........................................................................................ 7-1
7.2.    Scope of Airport Maintenance Federal Obligations. .............................. 7-1
7.3.    Grant Assurance 19, Operation and Maintenance. ................................ 7-2
7.4.    Maintenance Procedures. ...................................................................... 7-2
7.5.    Criteria for Satisfactory Compliance with Grant Assurance 19, Operation and
        Maintenance. ........................................................................................ 7-3
7.6.    Airport Pavement Maintenance Requirement. ....................................... 7-3
7.7.    Major Pavement Repairs. ...................................................................... 7-5
7.8.    Requirement to Operate the Airport. ...................................................... 7-6
7.9.    Local Rules and Procedures. ................................................................. 7-6
7.10.   Operations in Inclement Weather. ......................................................... 7-8
7.11.   Availability of Federally Acquired Airport Equipment. .......................... 7-8
7.12.   Part-time Operation of Airport Lighting. ............................................... 7-8
7.13.   Hazards and Mitigation. ........................................................................ 7-8
7.14.   Use of Airports by Federal Government Aircraft. .................................. 7-14
7.15.   Negotiation Regarding Charges. ........................................................... 7-15
7.16.   Land for Federal Facilities. ................................................................... 7-15
7.17.   Federal Government Use during a National Emergency or War. ............. 7-16
7.18.   Airport Layout Plan (ALP). .................................................................. 7-16
7.19.   Exhibit "A" and Airport Property Map. ................................................. 7-17
7.20.   Access by Intercity Buses. .................................................................... 7-18
7.21.   Temporary Closing of an Airport. ......................................................... 7-18
7.22.   Transportation Security Administration (TSA)  Security Requirements. ... 7-20
7.23. through 7.26 reserved ............................................................................. 7-21

**Chapter 8:    Exclusive Rights** ........................................................................... **8-1**

8.1.    Introduction. ........................................................................................ 8-1
8.2.    Definition of an Exclusive Right. .......................................................... 8-1
8.3.    Legislative and Statutory History. ......................................................... 8-1
8.4.    Development of the Exclusive Rights Prohibition into FAA Policy. ......... 8-3

8.5.    Aeronautical Operations of the Sponsor. .................................................. 8-5
8.6.    Airports Having a Single Aeronautical Service Provider. ......................... 8-5
8.7.    Denying Requests by Qualified Providers. ................................................ 8-5
8.8.    Exclusive Rights Violations. ..................................................................... 8-7
8.9.    Exceptions to the General Rule. ................................................................ 8-9
8.10.   UNICOM. ................................................................................................ 8-12
8.11.   Implementation of Policy. ...................................................................... 8-12
8.12.   Military and Special Purpose Airports. ................................................... 8-13
8.13. through 8.18. reserved. ............................................................................... 8-13

**Chapter 9:      Unjust Discrimination between Aeronautical Users ................................... 9-1**

Updated November 2021
9.1.    Introduction. ............................................................................................. 9-1
9.2.    Rental Fees and Charges: General. ........................................................... 9-2
9.3.    Types of Charges for Use of Airport Facilities. ....................................... 9-3
9.4.    Airport Tenant and Concessionaire Charges to Airport Users. ................ 9-3
9.5.    Terms and Conditions Applied to Tenants Offering Aeronautical Services. ................. 9-4
9.6.    Fixed-Base Operations and Other Aeronautical Services. ........................ 9-5
9.7.    Availability of Leased Space. ................................................................... 9-7
9.8.    Air Carrier Airport Access. .................................................................... 9-10
9.9.    Civil Rights. ........................................................................................... 9-11
9.10.   FAA Policy on Granting Preferential Treatment Based on Residency. ........ 9-11
9.11. through 9.14. reserved. ............................................................................... 9-11

**Chapter 10:     Reasonable Commercial Minimum Standards. .......................................... 10-1**

Updated November 2021
10.1.   Introduction. ........................................................................................... 10-1
10.2.   FAA Recognition of Minimum Standards. ............................................. 10-1
10.3.   Use of Minimum Standards to Protect an Exclusive Right. .................... 10-1
10.4.   Benefits of Minimum Standards. ............................................................ 10-2
10.5.   Developing and Applying Minimum Standards. ..................................... 10-2
10.6.   Flying Clubs. .......................................................................................... 10-4
10.7.   Illegal Air Charters. ............................................................................... 10-6
10.8. through 10.10. reserved. ............................................................................. 10-6

**Chapter 11:     Self-Service. .................................................................................................... 11-1**

Updated November 2021
11.1.   General. ................................................................................................... 11-1
11.2.   Restrictions on Self-servicing Aircraft. ................................................. 11-1
11.3.   Permitted Activities. ............................................................................... 11-2
11.4.   Contracting to a Third Party. .................................................................. 11-3
11.5.   Restricted Service Activities. ................................................................. 11-3
11.6.   Reasonable Rules and Regulations. ........................................................ 11-4
11.7.   Restrictions Based on Safety and Location. ........................................... 11-5
11.8.   Activities Not Classified as Self-service. ............................................... 11-5

11.9.    Sponsor Self-service Prerogatives. ................................................................ 11-5
11.10.  Fractional Aircraft Ownership Programs. ...................................................... 11-6
11.11.  Air Carriers. .................................................................................................... 11-6
11.12.  through 11.14. reserved .................................................................................. 11-6

**Chapter 12:    Review of Aeronautical Lease Agreements ................................. 12-1**

12.1.    Introduction ...................................................................................................... 12-1
12.2.    Background. ...................................................................................................... 12-1
12.3.    Review of Agreements. ..................................................................................... 12-1
12.4.    FAA Opinion on Review. ................................................................................. 12-4
12.5.    Agreements Covering Aeronautical Services to the Public. ............................ 12-4
12.6.    Agreements Involving an Entire Airport. ........................................................ 12-5
12.7.    Agreements Granting "Through-the-Fence" Access. ...................................... 12-5
12.8.    through 12.12. reserved .................................................................................. 12-10

**Chapter 13:    Airport Noise and Access Restrictions ...................................... 13-1**

13.1.    Introduction and Responsibilities. ................................................................... 13-1
13.2.    Background. ...................................................................................................... 13-1
13.3.    Overview of the Noise-Related Responsibilities of the Federal Government. .............. 13-2
13.4.    CFR Part 36, Noise Standards for Aircraft Type and Airworthiness Certification. ...... 13-3
13.5.    The Aircraft Noise Compatibility Planning Program. .................................... 13-5
13.6.    Compliance Review. ......................................................................................... 13-7
13.7.    Mandatory Headquarters Review. ................................................................... 13-7
13.8.    Balanced Approach to Noise Mitigation ......................................................... 13-7
13.9.    Cumulative Noise Metric. ................................................................................ 13-9
13.10.  General Noise Assessment. .............................................................................. 13-9
13.11.  Residential Development. ................................................................................. 13-11
13.12.  Impact on Other Airports and Communities. .................................................. 13-11
13.13.  The Concept of Unjust Discrimination. .......................................................... 13-11
13.14.  Part 161 Restrictions Impacting Stage 2 or Stage 3 Aircraft. ...................... 13-12
13.15.  Undue Burden on Interstate Commerce. .......................................................... 13-14
13.16.  Use of Complaint Data. ................................................................................... 13-14
13.17.  Use of Advisory Circular (AC) 36-3H ............................................................ 13-15
13.18.  Integrated Noise Modeling. ............................................................................. 13-16
13.19.  Future Noise Policy. ........................................................................................ 13-17
13.20.  through 13.25 reserved .................................................................................... 13-17

**Chapter 14:    Restrictions Based on Safety and Efficiency Procedures and Organization
                14-1**

14.1.    Introduction. ..................................................................................................... 14-1
14.2.    Applicable Law. ................................................................................................ 14-1
14.3.    Restricting Aeronautical Activities. ................................................................. 14-1
14.4.    Minimum Standards and Airport Regulations. ................................................ 14-2
14.5.    Agency Determinations on Safety and System Efficiency. .............................. 14-4
14.6.    Methodology. .................................................................................................... 14-4

11/22/2021                                                                          5190.6B Change 1

14.7.   Reasonable Accommodation. .................................................................... 14-5
14.8.   Restrictions on Touch-and-Go Operations. ............................................ 14-6
14.9.   Sport Pilot Regulations. ......................................................................... 14-7
14.10.  Coordination. .......................................................................................... 14-7
14.11 through 14.15 reserved........................................................................... 14-7

## Part V: Financial Responsibilities

**Chapter 15:    Permitted and Prohibited Uses of Airport Revenue** ................................. 15-1

15.1.   Introduction. ............................................................................................ 15-1
15.2.   Legislative History. ................................................................................. 15-1
15.3.   Privatization. ........................................................................................... 15-2
15.4.   Grant Assurance. ..................................................................................... 15-2
15.5.   FAA Policy. ............................................................................................. 15-2
15.6.   Airport Revenue Defined. ....................................................................... 15-3
15.7.   Applicability of Airport Revenue Requirements. .................................. 15-3
15.8.   Federal Financial Assistance. ................................................................. 15-4
15.9.   Permitted Uses of Airport Revenue. ...................................................... 15-4
15.10.  Grandfathering from Prohibitions on Use of Airport Revenue. ............ 15-6
15.11.  Allocation of Indirect Costs. .................................................................. 15-8
15.12.  Standard for Documentation. .................................................................. 15-8
15.13.  Prohibited Uses of Airport Revenue. ..................................................... 15-9
15.14. through 15.19 reserved. .......................................................................... 15-11

**Chapter 16:    Resolution of Unlawful Revenue Diversion** ..................................... 16-1

16.1.   Background. ............................................................................................. 16-1
16.2.   FAA Authorization. ................................................................................. 16-1
16.3.   Section 47133 and Grant Assurance 25, Airport Revenues. .................. 16-3
16.4.   Agency Policy. ........................................................................................ 16-3
16.5.   Responsibility. ........................................................................................ 16-3
16.6.   Detection of Airport Revenue Diversion. .............................................. 16-3
16.7.   Investigation of a Complaint of Unlawful Revenue Diversion. ............. 16-5
16.8.   Investigation without a Formal Complaint. ........................................... 16-5
16.9.   Administrative Sanctions. ...................................................................... 16-5
16.10.  Civil Penalties and Interest. ................................................................... 16-6
16.11.  Compliance with Reporting and Audit Requirements. ........................... 16-7
16.12.  Statute of Limitations on Enforcement. ................................................. 16-7
16.13 through 16.17 reserved............................................................................ 16-7

**Chapter 17:    Self-sustainability** ........................................................................ 17-1

17.1.   Introduction. ............................................................................................ 17-1
17.2.   Legislative History. ................................................................................. 17-1
17.3.   Applicability. .......................................................................................... 17-2
17.4.   Related FAA Policies. ............................................................................. 17-2
17.5.   Self-sustaining Principle. ....................................................................... 17-2

17.6.    Airport Circumstances. ............................................................................ 17-2
17.7.    Long-term Approach. ............................................................................... 17-3
17.8.    New Agreements. ..................................................................................... 17-3
17.9.    Revenue Surpluses. .................................................................................. 17-3
17.10.   Rates Charged for Aeronautical Use. ...................................................... 17-3
17.11.   Nonaeronautical Rates. ............................................................................ 17-4
17.12.   Fair Market Value. ................................................................................... 17-4
17.13.   Exceptions to the Self-sustaining Rule: General. .................................. 17-4
17.14.   Property for Community Purposes. ......................................................... 17-5
17.15.   Exception for Community Use. ................................................................ 17-5
17.16.   Exception for Not-for-Profit Aviation Organizations. ........................... 17-6
17.17.   Exception for Transit Projects. ............................................................... 17-6
17.18.   Exception for Private Transit Systems. ................................................... 17-6
17.19.   Exception for Military Aeronautical Units. ............................................ 17-7
17.20    through 17.24 reserved. ........................................................................... 17-7

**Chapter 18:    Airport Rates and Charges.................................................... 18-1**

18.1.    Responsibilities. ...................................................................................... 18-1
18.2.    Policy Regarding Airport Rates and Charges. ....................................... 18-1
18.3.    Aeronautical Use and Users. ................................................................... 18-2
18.4.    Definitions. .............................................................................................. 18-2
18.5.    Principles. ................................................................................................ 18-3
18.6.    Local Negotiation and Resolution. ......................................................... 18-3
18.7.    Formal Complaints. ................................................................................. 18-4
18.8.    Fair and Reasonable. ............................................................................... 18-4
18.9.    Permitted Airfield Costs. ......................................................................... 18-6
18.10.   Environmental Costs. ............................................................................... 18-6
18.11.   Noise. ....................................................................................................... 18-6
18.12.   Insurance. ................................................................................................. 18-6
18.13.   Causation. ................................................................................................. 18-6
18.14.   Facilities under Construction. ................................................................. 18-7
18.15.   Costs of Another Airport. ........................................................................ 18-7
18.16.   Airport System. ....................................................................................... 18-8
18.17.   Closed Airport. ........................................................................................ 18-8
18.18.   Maintenance of Closed Airport. .............................................................. 18-8
18.19.   Project Costs. ........................................................................................... 18-8
18.20.   Passenger Facility Charge (PFC) Projects. ............................................ 18-8
18.21.   Prohibition on Unjust Discrimination. ................................................... 18-8
18.22.   Self-sustaining Rate Structure. ............................................................... 18-9
18.23.   through 18.28. reserved. .......................................................................... 18-9

**Chapter 19:    Airport Financial Reports ..................................................... 19-1**

19.1.    Introduction. ............................................................................................ 19-1
19.2.    Legislative History. ................................................................................. 19-1
19.3.    Grant Assurance 26, *Reports and Inspections.* ..................................... 19-1
19.4.    Applicability. ........................................................................................... 19-2

19.5.   Annual Financial Reports. ...................................................................... 19-2
19.6.   Procedures for Evaluating the Airport Owners/Sponsors Financial Reporting Program. ....
        ................................................................................................................. 19-3
19.7.   Single Audit Reports. ............................................................................... 19-3
19.8. through 19.11. reserved ........................................................................... 19-4

## Part VI: Land Use

### Chapter 20:   Compatible Land Use and Airspace Protection ......................................... 20-1

20.1.   Background. ............................................................................................. 20-1
20.2.   Zoning and Land Use Planning. ................................................................ 20-2
20.3.   Residential Use of Land on or Near Airport Property. ............................. 20-5
20.4.   Residential Airparks Adjacent to Federally Obligated Airports. ................ 20-6
20.5.   Residential Development on Federally Obligated Airports. ....................... 20-7
20.6. through 20.10 reserved ............................................................................ 20-10

### Chapter 21:   Land Use Compliance Inspection ........................................................... 21-1

21.1.   Introduction. ........................................................................................... 21-1
21.2.   Background. ............................................................................................. 21-1
21.3.   Elements of the Land Use Inspection. ...................................................... 21-1
21.4.   Responsibilities. ...................................................................................... 21-1
21.5.   Authority. ................................................................................................ 21-1
21.6.   Land Use Inspection Guidance. ............................................................... 21-2
21.7.   Sample Correspondence ........................................................................... 21-13
21.18 through 21.12 reserved ............................................................................ 21-13

## Part VII: Releases and Property Reversions

### Chapter 22:   Releases from Federal Obligations ......................................................... 22-1

22.1.   Introduction. ........................................................................................... 22-1
22.2.   Definition. ............................................................................................... 22-1
22.3.   Duration and Authority. ........................................................................... 22-1
22.4.   FAA Consideration of Releases. ............................................................... 22-2
22.5.   Request for Concurrent Use of Aeronautical Property for Other Uses. ....... 22-3
22.6.   Request for Interim Use of Aeronautical Property for Other Uses. ............. 22-4
22.7.   Release of Federal Maintenance Obligation. ............................................. 22-5
22.8.   Industrial Use Changes. ........................................................................... 22-6
22.9.   Release of National Emergency Use Provision (NEUP) ............................ 22-6
22.10.  Release from Federal Obligation to Furnish Space or Land without Charge. ............... 22-7
22.11.  Release of Reverter Clause. ..................................................................... 22-7
22.12.  Exclusive Rights Federal Obligations cannot be Released without Release and Disposal
        of the Parcel or Closure of Airport. ........................................................ 22-7
22.13.  Federal Obligations Imposed with the Airport Layout Plan and Exhibit "A." .............. 22-7
22.14.  Procedures for Operational Releases or Requests for Change in Use. ......... 22-7
22.15.  Release of Federal Obligations in Regard to Personal Property, Structures, and Facilities.
        ................................................................................................................. 22-8

22.16.  All Disposals of Airport Real Property.................................................................22-9
22.17.  Release of Federal Obligations in Regard to Real Property Acquired as Federal Surplus
        Property.......................................................................................................22-10
22.18.  Release of Federal Obligations in Regard to Real Property Acquired with Federal Grant
        Assistance. ..................................................................................................22-13
22.19.  Effect of not Receiving or Receiving a Grant after December 30, 1987. ...................22-14
22.20.  Release of Entire Airport. ...............................................................................22-15
22.21.  Procedures for the Application, Consideration, and Resolution of Release Requests. 22-15
22.22.  General Documentation Procedures. ..................................................................22-15
22.23.  Airport Sponsor Request for Release.................................................................22-16
22.24.  Content of Written Requests for Release.............................................................22-16
22.25.  Content of Request for Written Release for Disposal.............................................22-16
22.26.  Exhibits to the Written Request for Release. .......................................................22-18
22.27.  FAA Evaluation of Sponsor Requests. ...............................................................22-18
22.28.  FAA Determination on Sponsor Requests. ..........................................................22-19
22.29.  FAA Completion of Action on Sponsor Requests. .................................................22-19
22.30.  FAA Denial of Release or Modification. ..............................................................22-20
22.31.  Procedures for Public Notice for a Change in Use of Aeronautical Property. ............22-20
22.32.  FAA Consent by Letter of Intent to Release – Basis for Use. .................................22-21
22.33.  The Environmental Implications of Releases. ......................................................22-21
22.34.  through 22.37. reserved...................................................................................22-22

**Chapter 23:      Reversions of Airport Property ........................................................23-1**

Updated November 2021
23.1.   Introduction....................................................................................................23-1
23.2.   General. .......................................................................................................23-1
23.3.   Authority to Revert a Property Interest................................................................23-1
23.4.   Instruments of Conveyance..............................................................................23-2
23.5.   Voluntary Return of Property to the U.S. Government. ...........................................23-2
23.6.   Involuntary Reversion......................................................................................23-3
23.7.   Identifying the Federal Agency to Receive the Property..........................................23-3
23.8.   Determination of Default. .................................................................................23-3
23.9.   Perform and Document the FAA's Environmental Due Diligence. .............................23-3
23.10.  Notice of Intent to Revert Property.....................................................................23-3
23.11.  Voluntary Reconveyance to Correct a Default. .....................................................23-4
23.12.  Notice of Reverter of Property and Revestment of Title and Property Interest in the U.S.
        ....................................................................................................................23-5
23.13.  Recording Notice of Reverter of Property and Revestment of Title and Property Interest
        in the U.S. ....................................................................................................23-5
23.14.  Certificate of Inspection and Possession.............................................................23-6
23.15.  Possession, Posting, or Marking of Property. .......................................................23-6
23.16.  Reversion Case Studies...................................................................................23-6
23.17 through 23.21. reserved......................................................................................23-7

# Appendices

Appendix A: Airport Sponsors Assurances ................................................................. 1

Appendix B: Reserved ................................................................................................. 3

Appendix C: Advisory Circulars on Exclusive Rights and Minimum Standards for
Commercial Aeronautical Activities ........................................................................... 4

Appendix D: Policy Regarding Airport Rates and Charges ........................................ 5

Appendix E: Policies and Procedures Concerning the Use of Airport Revenue.......... 6

Appendix F: 14 CFR Parts 13 and 16 ........................................................................ 7

Appendix F-1: Part 16 Decisions (Case Files) ........................................................... 8

Appendix F-2: Reserved ............................................................................................... 9

Appendix G: Formal Compliance Inspection ............................................................. 10

Appendix G-1: Sample Airport Noncompliance List (ANL) ....................................... 30

Appendix H: Sample Audit Information ..................................................................... 32

Appendix I: SPA Reg. 16 ............................................................................................ 34

Appendix J: DoD Base Realignment and Closure (BRAC) ........................................ 38

Appendix J-1: Airport Joint Use Agreement for Military Use of Civilian Airfields .......... 42

Appendix K: Part 155 – Release of Airport Property from Surplus Property Disposal
Restrictions    ............................................................................................................. 57

Appendix L: Reserved ................................................................................................. 58

Appendix M: Reserved ............................................................................................... 59

Appendix N: Reserved ................................................................................................ 60

Appendix O: Minimum Standards for Commercial Aeronautical Activities ...................... 61

Appendix P: Sample Airport Rules and Regulations ................................................. 62

Appendix Q: Reserved ................................................................................................ 65

Appendix R: Airport Layout Plan (ALP) .................................................................... 66

Appendix S: Reserved ................................................................................................. 67

Appendix T: Sample FAA Letter on Replacement Airport ........................................ 68

Appendix U: Sample Joint-Use Agreement ................................................................ 72

11/22/2021 5190.6B Change 1

**Appendix V: Sample Deed of Conveyance** .................................................................. **91**

**Appendix W: Reserved** ...................................................................................................... **104**

**Appendix X: 14 CFR Part 161** ........................................................................................ **105**

**Appendix Y: Sample Notice of Reversion of Property and Revestment of Title to the United States** ........................................................................................................................... **136**

**Appendix Z: Definitions and Acronyms** ...................................................................... **139**

**References** ................................................................................................................................. **158**

**Index** ........................................................................................................................................... **161**

# Part I: Background

## Chapter 1:    Scope and Authority

### Updated November 2021

**1.1.    Purpose.** This Order sets forth policies and procedures for the FAA Airport Compliance Program. The Order is not regulatory and is not controlling with regard to airport sponsor conduct; rather, it establishes the policies and procedures for FAA personnel to follow in carrying out the FAA's responsibilities for ensuring airport compliance. It provides basic guidance for FAA personnel in interpreting and administering the various continuing commitments airport owners make to the United States as a condition for the grant of federal funds or the conveyance of federal property for airport purposes. The Order, *inter alia,* analyzes the various obligations set forth in the standard airport sponsor assurances, addresses the application of the assurances in the operation of public-use airports, and facilitates interpretation of the assurances by FAA personnel.

**1.2.    Audience.** FAA personnel having responsibility for monitoring airport sponsor compliance with the sponsor's federal obligations.

**1.3.    Where Can I Find This Order?** The current Order is available on the FAA website and will be updated electronically at this location.

**1.4.    Cancellation.** This Order cancels and replaces the following chapters of FAA Order 5190.6B, dated September 30, 2009: Chapter 1, Scope and Authority; Chapter 9, Unjust Discrimination Between Aeronautical Users; Chapter 10, Reasonable Commercial Minimum Standards; Chapter 11, Self-Service and Chapter 23, Reversions of Airport Property.

**1.5.    Introduction.** This chapter discusses the scope of the Order, the sources of sponsor[1] federal obligations, and the FAA's authority to administer the Airport Compliance Program within the FAA Office of Airports (ARP). The FAA Airport Compliance Program is contractually based, and it does not attempt to control or direct the operation of airports. Rather, the program is designed to monitor and enforce obligations agreed to by airport sponsors in exchange for valuable benefits and rights granted by the United States in return for substantial direct grants of funds and for conveyances of federal property for airport purposes. The Airport Compliance Program is designed to protect the public interest in civil aviation. Grants and property conveyances are made in exchange for binding commitments (federal obligations) designed to ensure that the public interest in civil aviation will be served. The FAA bears the important responsibility of seeing that these commitments are met. This Order addresses the types of these commitments, how they apply to airports, and what FAA personnel are required to do to ensure compliance with Federal obligations.

**1.6.    Scope.** This Order provides guidance, policy, and procedures for conducting a comprehensive and effective FAA Airport Compliance Program to monitor and ensure airport sponsor compliance with the applicable federal obligations assumed in the acceptance of airport development assistance.

---

[1] A sponsor is any public agency that applies for federal financial assistance, or private owner of a public use airport, as defined in the Airport and Airway Improvement Act of 1982 (AAIA), codified at 49 U.S.C. § 47102(26).

***Grants and property conveyances are made in exchange for binding commitments (federal obligations) designed to ensure the public interest in civil aviation will be served.***



*The Federal Aviation Act of 1958 (FAA Act) transferred the Civil Aeronautics Administration's (CAA) functions to a new independent body, the Federal Aviation Agency, which had broader authority to address aviation safety. The FAA Act took safety rulemaking from the Civil Aeronautics Board (CAB) and entrusted it to the new Federal Aviation Agency. It also gave the Federal Aviation Agency sole responsibility for developing and maintaining a common civil-military system of air navigation and air traffic control. Seen here, Edward R. Quesada, the first Administrator of the Federal Aviation Agency, is sworn in by Chief Justice Earl Warren and President Dwight Eisenhower. (Photo: FAA)*

**1.7.    Background.** The Air Commerce Act of 1926 was the cornerstone of the federal government's regulation of civil aviation. This landmark legislation was passed at the urging of the aviation industry, whose leaders believed that aviation could not reach its full commercial potential without federal action to improve and maintain safety standards. The Air Commerce Act charged the Secretary of Commerce with fostering air commerce, issuing and enforcing air traffic rules, licensing pilots, certificating aircraft, establishing airways, and operating and maintaining aids to air navigation. A new Aeronautics Branch of the Department of Commerce assumed primary responsibility for aviation oversight.

In 1938, the Civil Aeronautics Act transferred the federal civil aviation responsibilities from the Commerce Department to a new independent agency, the Civil Aeronautics Authority. The legislation also expanded the government's role by giving the Civil Aeronautics Authority the power to regulate airline fares and to determine the routes that air carriers would serve. In 1940, President Franklin Roosevelt split the Civil Aeronautics Authority into two agencies, the Civil Aeronautics Administration (CAA) and the Civil Aeronautics Board (CAB). The CAA was responsible for air traffic control (ATC), airman and aircraft certification, safety enforcement, and airway development. The CAB was entrusted with safety rulemaking, accident investigation, and economic regulation of the airlines. Both organizations were part of the Department of Commerce. Unlike the CAA, however, the CAB functioned independent of the Secretary of Commerce. On the eve of America's entry into World War II, the CAA began to extend its ATC responsibilities to takeoff and landing operations at airports. This expanded role eventually became permanent after the war. The application of radar to ATC helped controllers keep abreast of the postwar boom in commercial air transportation.

In the Federal Airport Act of 1946 (1946 Airport Act), Congress gave the CAA the added task of administering the Federal Aid to Airports Program (FAAP), the first peacetime program of financial assistance aimed exclusively at promoting development of the nation's civil airports. The

approaching introduction of jet airliners and a series of midair collisions spurred passage of the Federal Aviation Act of 1958 (FA Act). This legislation transferred the CAA's functions to a new independent agency, the Federal Aviation Agency, which had broader authority to address aviation safety through rulemaking and enforcement. It also gave the Federal Aviation Agency sole responsibility for developing and maintaining a common civil-military system of air navigation and air traffic control, a responsibility the CAA had shared with others.

In 1966, Congress authorized the creation of a cabinet department that would combine federal transportation responsibilities for all public modes of transportation. This new Department of Transportation (DOT) began full operations on April l, 1967. On that day, the Federal Aviation Agency became one of several modal administrations within the DOT and received a new name, the Federal Aviation Administration (FAA). At the same time, the CAB's accident investigation function was transferred to the new National Transportation Safety Board (NTSB).

The FAA has gradually assumed responsibilities not originally contemplated by the FA Act. For example, the hijacking epidemic of the 1960s brought the agency into the field of aviation security. That function was later transferred to the Transportation Security Administration (TSA) in 2001 after the events of 9/11. In 1968, Congress vested in the FAA Administrator the power to prescribe aircraft noise standards. The Airport and Airway Development Act of 1970 (1970 Airport Act) placed the agency in charge of a new airport aid program funded by a special aviation trust fund. The 1970 Airport Act also made the FAA responsible for safety certification of airports served by air carriers. In 1982, Congress enacted the current grant statute, the Airport and Airway Improvement Act (AAIA), which established the Airport Improvement Program (AIP). The FAA's mission expanded again in 1995 with the transfer of the Office of Commercial Space Transportation from the Office of the Secretary to the FAA.



The table shown above depicts the extent of the country's public-use airport system. The NPIAS reports are available online at https://www.faa.gov/airports/planning_capacity/npias/current/. (Graphics: FAA)

The airport system envisioned in the first National Airport Plan, issued in 1946, has been developed and nurtured by close cooperation between federal, state, and local agencies. The general principles guiding federal involvement[2] have remained largely unchanged for the National Plan of Integrated Airport Systems (NPIAS). The airport system should have the following attributes to meet the demand for air transportation:

- Airports should be safe and efficient, located at optimum sites, and be developed and maintained to appropriate standards.

- Airports should be operated efficiently both for aeronautical users and the government, relying primarily on user fees and placing minimal burden on the general revenues of the local, state, and federal governments.

- Airports should be flexible and expandable, able to meet increased demand and accommodate new aircraft types.

- Airports should be permanent, with assurance that they will remain open for aeronautical use over the long term.

- Airports should be compatible with surrounding communities, maintaining a balance between the needs of aviation and the requirements of residents in neighboring areas.

---

[2] Extracted from the Report to Congress, National Plan of Integrated Airport Systems (NPIAS)  (2009-2013).

- Airports should be developed in concert with improvements to the air traffic control system.

- The airport system should support national objectives for defense, emergency readiness, and postal delivery.

- The airport system should be extensive, providing as many people as possible with convenient access to air transportation, typically not more than 20 miles of travel to the nearest NPIAS airport.

- The airport system should help air transportation contribute to a productive national economy and international competitiveness.

### *Airports should be permanent with assurance that they will remain open for aeronautical use over the long term.*

In addition to these principles specific to airport development, a guiding principle for federal infrastructure investment, as stated in Executive Order 12893, *Principles for Federal Infrastructure Investments* (January 26, 1994), is that such investments must be cost beneficial, *i.e.*, must have a positive ratio of benefits to costs. The FAA implements these principles using program guidance to ensure the effective use of federal aid.

A national priority system guides the distribution of funds. Information used to establish the priority is supplemented by specific requirements for some additional analysis or justification. For example, in certain cases the airport sponsor must prepare a benefit-cost analysis for airport capacity development projects to be funded under the Airport Improvement Program (AIP).

**1.8.    Compliance Program Background.** The Civil Aeronautics Act of 1938, as amended, and the FA Act, as amended, charge the FAA Administrator with broad responsibilities for the regulation of air commerce in the interests of safety and national defense and for the development of civil aeronautics. Under these broad powers, the FAA was tasked with regulation of airmen, aircraft, navigable airspace, and airport operations. The federal interest in advancing civil aviation has been augmented by various legislative actions that authorize programs for granting property, funds, and other assistance to local communities to develop airport facilities.

In each program, the airport sponsor assumes certain federal obligations, either by contract or by restrictive covenants in property deeds, to maintain and operate its airport facilities safely and efficiently and in accordance with specified conditions. Commitments assumed by airport sponsors in deeds or grant agreements have been generally successful in maintaining a high degree of safety and efficiency in airport design, construction, operation, and maintenance. The FAA Airport Compliance Program establishes the policy and guidelines for monitoring the compliance of airport sponsors with their obligations to the United States and for ensuring that airports serve the needs of civil aviation.

### *The federal obligations a sponsor assumes in accepting FAA administered airport development assistance are mandated by federal statute.*

**1.9.** **Sources of Airport Sponsor Federal Obligations.** The federal obligations a sponsor assumes in accepting FAA-administered airport development assistance are mandated by federal statute and incorporated in the grant agreements and property conveyance instruments entered into by the sponsor and the United States Government, including:

**a.** Grant agreements issued under the various FAA-administered airport development grant programs through the years. These include, but are not limited to, the Federal Aid to Airports Program (FAAP), the Airport Development Aid Program (ADAP), and the Airport Improvement Program (AIP) under 49 U.S.C. § 47101, et seq. This statutory provision provides for federal airport financial assistance for the development of public use airports under the AIP established by the AAIA. Section 47107 sets forth assurances that FAA must include in every grant agreement as the sponsor's conditions for receiving federal financial assistance. (The current version of 49 U.S.C. § 47107 can be found online.) Pursuant to and consistent with, 49 U.S.C. § 47107(g) and (h), the FAA has prescribed some additional assurances or requirements for sponsors beyond those specifically enumerated in 49 U.S.C. § 47107. These include requirements set forth in 49 U.S.C. § 47106 and other statutes.

Occasionally, there are special funding programs authorized by Congress to provide federal grants to airports for a specific purpose such as economic development or recovery (*e.g.*, American Recovery and Reinvestment Act of 2009 (ARRA); Coronavirus Aid, Relief, and Economic Security Act (CARES), *etc.*). The grant agreements under these programs set forth the conditions for receiving the federal assistance and will vary depending on the purpose of the grant.

Upon acceptance of an AIP grant, the assurances become a binding contractual obligation between the airport sponsor and the federal government.

**b.** Instruments of surplus property transfer issued under the provisions of section 13(g) of the Surplus Property Act of 1944, as amended, 49 U.S.C. §§ 47151-47153.

**c.** Instruments of nonsurplus conveyance issued under section 16 of the 1946 Airport Act, as amended; under section 23 of the 1970 Airport Act, as amended; or under section 516 of the AAIA, as amended, codified at 49 U.S.C. § 47125.

**d.** Exclusive Rights under section 303 of the Civil Aeronautics Act of 1938, as amended, and section 308(a) of the FAA Act, as amended, codified at 49 U.S.C. § 40103(e).

**e.** Title VI of the Civil Rights Act of 1964, as amended.

**1.10.    FAA    Authority    to Administer    the    Compliance Program.** Responsibility for monitoring and ensuring airport sponsor compliance with applicable federal obligations is vested in the Secretary of Transportation by statute and delegated to the FAA under 49 CFR § 1.83:

**a.    Surplus    Property Transfers.** Surplus property instruments of transfer were issued by the War Assets Administration (WAA) and are now issued by its successor, the General Services Administration (GSA). However, section 3 of Public Law (Pub. L.) 81-311 specifically vests the FAA with the sole responsibility for determining and enforcing compliance with the terms and conditions of all instruments of transfer by which surplus airport property is, or has been, conveyed to nonfederal public agencies pursuant to the Surplus Property Act of 1944, as amended.

**b.    Nonsurplus    Property Transfers.** Nonsurplus property transfers are conveyances under section 16 of the 1946 Airport Act, under section 23 of the 1970 Airport Act, or under section 516 of the AAIA, codified at 49 U.S.C. § 47125. These are also referred to as nonsurplus property conveyances.



*The FAA is also charged with responsibility for monitoring and enforcing compliance of federally obligated sponsors with the provisions prohibiting exclusive rights set forth in section 303 of the Civil Aeronautics Act of 1938, as amended, and in section 308(a) of the FAA Act, as amended. The exclusive rights prohibition was designed to ensure that airports maintain public access and availability to all aeronautical users at airports funded with federal assistance. This applies to all commercial and noncommercial aeronautical users alike, from private aircraft operators (i.e., general aviation) to airlines and all aeronautical ground services. (Photos: FAA)*



Instruments of property conveyance issued under these sections are also issued by agencies other than the FAA. The conveyance instrument, deed, or quitclaim document assigns monitoring and enforcement responsibility to the FAA.

**c.    Grant agreements from the FAAP, ADAP, and the AIP programs (*e.g.*, ARRA, CARES, etc.).** The FAA is vested with jurisdiction over monitoring and enforcing grant agreements that the FAA and its predecessor, the CAA, executed on behalf of the United States.

**d.    Exclusive Rights Prohibition.** The FAA is also charged with responsibility for monitoring and enforcing compliance with the provisions prohibiting exclusive rights set forth in

section 303 of the Civil Aeronautics Act of 1938, as amended, and in section 308(a) of the FAA Act, as amended, codified at 49 U.S.C. § 40103(e).

e.        **Amendment, Modification, or Release of Airport Sponsor Federal Obligations.**  The authority of the FAA to release or modify the terms and conditions of airport sponsor grant agreements varies based on the respective types of agreements. Pub. L. 81-311 prescribes specific circumstances and conditions under which the FAA may release, modify, or amend the terms and conditions of surplus property conveyances. While the FAA has the ability to amend, modify, or release an airport sponsor from a federal obligation, the FAA is not required to do so. The FAA exercises its discretion when releasing a sponsor from any of its obligations. For additional information, refer to chapter 22 of this Order, *Releases from Federal Obligations*.

## 1.11.   Statutory Limitation on FAA Authority

The FAA Reauthorization Act of 2018 (Pub. L. 115-254), Section 163 narrowed the scope of the FAA's authority over airport land uses.

## 1.12 through 1.14 reserved.

9/30/2009                                                                 5190.6B Change1

## Chapter 2:   Compliance Program

**2.1.   Introduction.** This chapter is an introduction to the Federal Aviation Administration (FAA) Airport Compliance Program. The basis of sponsor federal obligations resides with federal statute, the Airport Improvement Program (AIP) grant program, land transfer documents, and surplus property agreements. It is the responsibility of the FAA airports district offices (ADOs) and regional airports divisions to advise sponsors of their compliance requirements and to ensure that sponsors comply with their federal obligations.

**2.2.   Background.** The FAA Airport Compliance Program enforces contractual federal obligations that a sponsor accepts when receiving federal grant funds or the transfer of federal property. These contractual federal obligations serve to protect the public's interest in civil aviation and achieve compliance with federal statutes. Given the great number of federally obligated airports and the variety of federal obligations, the compliance program primarily focuses on education with the goal of achieving voluntary compliance. The program



*One source to determine if an airport is federally obligated is FAA Order 5190.2R, List of Public Airports Affected by Agreements with the Federal Government, published in 1990.*

supplements this educational approach with periodic compliance monitoring and vigorous investigation of potential violations.

**2.3.   Determining if an Airport is Federally Obligated.**

**a.   General Information.** One source for determining if an airport is federally obligated is FAA Order 5190.2R, *List of Public Airports Affected by Agreements with the Federal Government*, published in 1990. The Order contains a listing of all publicly and privately owned public use airports that are affected by agreements with the federal government and handled by the FAA.

Line 25 of Form 5010, The Airport Master Record, indicates whether the airport is obligated. Form 5010 is available online.

**b.   Information Codes.** In FAA Order 5190.2R and on Form 5010, relevant federal obligation data is presented in the form of codes, such as G, R, S or P. Each code represents a particular federal obligation type. (Refer to the list of Federal Obligation Codes at the end of this chapter for details.)

## 2.4.    Objectives of the Compliance Program.

**a.    Voluntary Compliance and Enforcement Actions.** Most violations of sponsor federal obligations are not a deliberate attempt to circumvent federal obligations. Generally, violations occur because sponsors do not understand specific requirements or how a requirement applies to a specific circumstance. Therefore, the program works to ensure sponsors are fully informed of their federal obligations and of the applicability of those obligations to the circumstances at a given airport. Informal resolution is the preferred course of action.  (See chapter 5 of this Order, Complaint Resolution.)

When reasonable efforts have failed to achieve voluntary compliance on the part of the sponsor, the FAA may take more formal compliance actions. This may result in withholding federal funds, issuing a Notice of Investigation (NOI) under 14 Code of Federal Regulations (CFR) Part 16, or initiating judicial action if warranted. An option available to the and regional airports divisions during the informal resolution process is to limit AIP grant funding to entitlement funding only; issuing a NOI or initiating formal legal action are options exercised by the FAA Headquarters Airport Compliance Division (ACO-100) in accordance with 14 CFR Part 16 procedures.



*In developing priorities for the regional administration of the compliance program, FAA personnel should direct attention to those airports with the greatest potential for compliance problems and to issues that have the largest impact on aeronautical users. Variables such as the number of based aircraft and annual aircraft operations are valid indicators of the impact of a particular airport. The classification of the airport – such as being a reliever airport like the Martin State Airport in Maryland (above) – is another valid indicator of the role and the impact a particular airport has in the nation's airport system. (Photo: FAA)*

**b.    Advisory Services.** Generally, the FAA will not substitute its judgment for that of the airport sponsor in matters of administration and management of airport facilities.

However, the FAA is in a position to assist airport sponsors in achieving voluntary compliance through guidance and counsel about the nature and applicability of federal compliance obligations affecting their airports.

**c.    Compliance Oversight.** Given the approximately 2,800 federally obligated airports, the FAA cannot practically conduct compliance oversight with an annual visit or review at each airport.

However, periodic monitoring of a certain number of federally obligated airports is necessary to identify individual issues and problems that may be indicative of system deficiencies.

**d. Uniform Application of Remedies.** FAA personnel involved in compliance should make every effort to obtain voluntary compliance; enforcement actions on nonsafety compliance matters should be taken only after exhausting all other appropriate measures.

When enforcement action is taken, it must be fair and applied in a uniform manner. When safety issues are identified, expeditious action must be pursued.

*When safety issues are identified, expeditious action is expected.*

**2.5. Program Elements.** Education is the primary tool for achieving program compliance. However, to maintain program integrity, FAA personnel must also include limited surveillance to detect recurring deficiencies, system weaknesses, or abuses by sponsors. Investigation and resolution of complaints is the most important tool of the compliance program.



*Consistent with the FAA mission, the most important objective in FAA's oversight of the compliance program is to ensure and preserve safety at federally obligated airports. Safety includes, among other things, maintaining runways, taxiways, and other operational areas in a safe and usable condition; keeping runway approaches cleared; providing operable and well-maintained marking and lighting in order to ensure safe aircraft operations. (Photo: FAA)*

When FAA efforts fail to obtain voluntary compliance, enforcement actions must be pursued.

**a. Education.** The education of sponsors may take many forms, beginning the sponsor receives its first federal grant or transfer of federal property. ADOs and FAA regional airports divisions should discuss with first-time sponsors the impact of specific grant assurances and/or land transfer federal obligations and let them know that the offices will continue to provide advisory services.

At least once every three years, FAA personnel should advise sponsors in writing to review their grant or land-transfer federal obligations. Compliance personnel should also provide sponsors with information or material to aid sponsors' understanding of their federal obligations.

Finally, sponsors should be encouraged to conduct or participate in periodic seminars or courses for federally obligated airports. In many instances, FAA regional airports divisions host or sponsor

airport-related events, such as conferences, that are good opportunities to disseminate information regarding airport compliance.

**b.     Surveillance.** Surveillance is the process of gathering data on the condition or operation of an airport to determine the sponsor's compliance with federal obligations. FAA personnel routinely gather such information during their site visits to airports. In addition, information is gathered from other sources, including other FAA offices, state inspectors, airport tenants, and information forms, such as FAA Form 5010, *Airport Master Record*. [3]

FAA personnel may also conduct surveillance by means of telephone discussions or written correspondence with appropriate airport officials to learn if potential problems exist. Further follow up through on-site surveillance may or may not be necessary depending on the information obtained. The information received should be documented and



*The airport compliance program is administered by the Airport Compliance Division (ACO-100) at FAA headquarters. As a division of the Office of Airport Compliance and Management Analysis (ACO), the Airport Compliance Division provides overall guidance and direction for conducting the compliance program. Part of the program relies on the formal investigative process set forth at 14 CFR Part 16.*

maintained for future reference. Alternately, FAA personnel may provide sponsors with printed material that identifies and explains the federal obligations accepted by that sponsor.

> ### *Findings from surveillance inspections should be shared with other federally obligated airports as an additional means of educating sponsors.*

**c.     Investigations of Complaints.** ADOs and regional airports divisions must investigate complaints from aeronautical users alleging that an airport is not complying with its federal obligations. FAA personnel should complete the investigation in a timely manner and notify the complainant in writing of the outcome of any investigation. Informal complaints need to be addressed in a timely manner (within 120 days, if possible). When an investigation reveals a violation of a federal obligation, ADOs and regional airports divisions should initiate a timely

---

[3] In many instances, state aviation inspectors gather the data for inclusion in FAA Form 5010 on behalf of the FAA.

dialogue with the affected airport and attempt to achieve voluntary compliance as soon as practicable.

Safety-related issues may require expedited action on the part of the FAA. Where appropriate, airport sponsors should also use an airport safety self-inspection checklist as a means to assist in ensuring safe airport operations.

**2.6.    Priorities and Emphasis.** When pursuing remedial or enforcement actions, the FAA considers all federal airport obligations important. However, consistent with the FAA mission, the most important objective in FAA's oversight of the compliance program is to ensure and preserve safety at all federally obligated airports.

Ensuring safe airport operations includes maintaining runways, taxiways, and other operational areas in a safe and usable condition; keeping runway approaches cleared; providing operable and well-maintained marking and lighting; etc.

In developing priorities for compliance surveillance in the region, FAA personnel should direct attention to those airports with the greatest potential for compliance problems and to those issues that have the largest impact on aeronautical users.

**2.7.    Responsibilities.**

**a.**    The Airport Compliance Program is administered by the Airport Compliance Division (ACO-100) at FAA headquarters. As a division of the Office of Airport Compliance and Field Operations (ACO), the Airport Compliance Division provides overall guidance and direction for conducting the compliance program. It conducts evaluations to determine compliance with the guidance contained in this Order. It also looks for opportunities to improve the quality of the compliance program. The Airport Compliance Division conducts recurrent training and on-request training to ADOs and regional airports divisions. Additionally, the Airport Compliance Division is responsible for elaborating policy, supporting ADOs and regional airports divisions in conducting informal resolution, and resolving formal complaints. The Airport Compliance Division also directs the formal enforcement of FAA grant obligations, as well as surplus and nonsurplus property conveyances. The Airport Compliance Division prepares generalized educational materials for ADOs and regional airports divisions to use in their compliance programs.

**b.**    ADOs and regional airports divisions are responsible for the day-to-day conduct of the compliance program in accordance with the direction provided in this Order. This guidance establishes the basic requirements and goals to be achieved in the compliance program. Compliance is an essential component in safeguarding both the federal investment and the public's interest in civil aviation. This also includes ensuring public access to the national system of airports.

**c.**    Only the Director, Office of Airport Compliance and (ACO-1) in FAA headquarters, generally through the formal Part 16 process, can order the suspension of primary entitlement grants. However, the ADOs and regional airports divisions – in conjunction with ACO-100 – can make decisions to suspend discretionary funding, including nonprimary entitlement grants.

**2.8.    Analyzing Compliance Status.**

**a.    Data Analysis.** FAA compliance personnel should carefully analyze accumulated data in evaluating a sponsor's compliance performance and identifying appropriate actions to correct any deficiencies noted. More often than not, when apprised of a deficiency, a sponsor will ask for recommendations to correct the problem.

**b.    Preliminary assessment.** FAA must make a judgment call in all cases as to whether a sponsor is reasonably meeting its federal commitments. A sponsor meets its commitments when:

    **(1).**    the federal obligations are fully understood;

    **(2).**    a program (*e.g.*, preventive maintenance, leasing policies, operating regulations, etc.) is in place that the FAA deems adequate to carry out the sponsor's commitments;

    **(3).**    the sponsor satisfactorily demonstrates that such a program is being carried out; and,

    **(4).**    past compliance issues have been addressed.

**c.    Follow-up.**

    **(1).**    Each ADO or regional airports division should develop a system to follow up and ensure that airports take action on any identified compliance deficiencies until the airport sponsor achieves compliance. Failing to follow up on compliance issues at the ADO or regional airports division level may lead to unnecessary and resource-intensive formal complaints.

    **(2).**    FAA compliance personnel must initiate action at those airports that are not being maintained or operated in accordance with the sponsors' commitments, especially if safety is involved. The offices should make an effort to help the sponsor meet these commitments voluntarily. When the sponsor has demonstrated an unwillingness to make the corrections necessary to achieve compliance, the offices must pursue corrective enforcement and document such actions.

    **(3).**    FAA may undertake a formal compliance inspection in response to a complaint. Such an inspection may also take place whenever the FAA has any reason to believe that a sponsor may be in violation of one or more of its federal obligations. Appendix G of this Order, *Formal Compliance Inspection*, contains the procedures and form(s) to follow in a formal compliance inspection.

**2.9.    Compliance Determination.** FAA personnel must remain aware of which airports are not in compliance in their areas of responsibility. Before the ADO can issue a federal airport grant, it must make an official determination that the sponsor is in compliance with its federal obligations.

A determination of compliance is a judgment call based on a review of all available data concerning the airport and the circumstances involving its operation. The review need not include a formal compliance inspection or a formal compliance determination. It should, however, include the properly documented review of available data on hand. At the region's discretion, the ADO may rely on a sponsor's self-certification of compliance when making a compliance determination prior issuing a grant. However, it is important that all data used to support this determination, including informal complaints and related materials, be analyzed and recorded in the appropriate files.

**a.    Notification.** When the ADO's assessment of the sponsor's performance concludes that the sponsor is not meeting its federal compliance obligations, the ADO must give the sponsor notification of apparent noncompliance. Failure to provide such notice delays the corrective action and the problem may become more difficult to resolve at a future date. Prompt



*The sponsor will be considered in compliance if the physical condition of paving, lighting, grading, runway, marking, etc., meet applicable standards and if the sponsor is following realistic procedures to preserve these facilities in an acceptable condition. This requirement also applies to federally obligated airports in the national systems that were previously military bases. In this photograph, we see the ramp of the Naval Air Station Miami in 1943. Today, this former Navy base is known as the Opa-Locka Airport near Miami, Florida. (Photo: National Archives)*

communication between the ADO and the sponsor about compliance deficiencies is essential to solving problems early before they become more difficult to resolve.

**b.      Actions Needed to Correct Noncompliance.** The ADO notification must clearly spell out the actions needed to correct the compliance deficiency. The office should also perform a timely follow-up review to ensure completion of the corrective action.

**2.10.   Airport Noncompliance List (ANL).** As a result of its compliance functions, FAA headquarters Airport Compliance Division (ACO-100) issues an *Airport Noncompliance List* (ANL) on a regular basis.

The ANL lists those obligated airports with egregious violations where the airport sponsor has been informally determined to be in noncompliance with its grant assurances and/or surplus property obligations as of a particular date. An airport is placed on the ANL if it falls in one or more of the following categories and the violations are so egregious as to preclude additional federal financial assistance until the issues are resolved:

**a.** Airports with a formal finding of noncompliance under 14 CFR Part 16 if corrective action has not been taken,

**b.** Airports listed in the Airport Improvement Program (AIP) Report to Congress under 49 U.S.C. § 47131 for certain land use violations,

**c.** Airports that are clearly in noncompliance despite FAA requests to the sponsor for corrective action, and

**d.** Airports where the violations are so egregious as to preclude additional federal financial assistance until the issues are resolved.

> *The ANL lists obligated airports with egregious violations where the airport sponsor has been informally determined to be in noncompliance with its grant assurances and/or surplus property obligations as of a particular date*

The Airport Noncompliance List is essentially an internal notification from ACO-100 to other FAA Airports offices regarding which airports are not to receive any further discretionary grants authorized under 49 U.S.C. § 47115  until corrective action is achieved. The formal findings of noncompliance under 14 CFR Part 16 that support the withholding of grants under 49 U.S.C. § 47114(c).

ACO-1 updates the Airport Noncompliance List as changes occur. The listing is automatically superseded as soon as a new is issued. Additional information on those airports having land use compliance issues may be available under the "Planning Section" of the *System of Airports Reporting (SOAR)* by using the airport identification (ID) function or by generating a Compliance Report from the same database. For a generic sample *Noncompliance List*, refer to Appendix G-1 of this Order.

**2.11 through 2.15 reserve**

## Federal Obligation Codes

| CODE | DEFINITION |
|------|------------|
| B | Privately owned airport obligated by agreement, Order 6030.40. |
| M | Privately owned airport obligated by grant agreement under AIP. |
| G | Grant agreement under FAAP, ADAP, or AIP |
| P | Surplus Property Agreement under Public Law 80–289 (real property only) |
| R | Surplus Property Agreement under Regulation 16–WAA. |
| S | Conveyance under Section 16 or Section 23. |
| V | Advance Planning Agreement under FAAP. |
| X | Obligations assumed by transfer. |
| Y | Assurance pursuant to Title VI, Civil Rights Act. |
| Z | Conveyance under Section 303, Federal Aviation Act. |
| 1 | Expired Grant Agreement; however, statutory Exclusive Rights Prohibition (Federal Aviation Act, Section 308A) remains in force for as long as the property is used as an airport. |
| 2 | Expired Section 303 Conveyance; however, Statutory Exclusive Rights Prohibition (Federal Aviation Act, Section 308A) remains in force for as long as the property is used as an airport. |
| 1 | Airports certificated under FAR Part 139. |
| 2 | A civil airport where military use is subject to a lease. |
| 3P | The airport is PARTIALLY released from National Emergency Use Provision. |
| 3E | The airport is ENTIRELY released from National Emergency Use Provision. |
| 4 | The airport includes surplus real property which has been conveyed for, or converted to, revenue production. |
| 5 | An exclusive military use airport. |
| 6 | The airport is in the process of disposal or reversion. |
| 7P | A ''Letter of Intent'' has been issued to release a PART of the airport property. |
| 7E | A ''Letter of Intent'' has been issued to release the ENTIRE airport property. |
| 8 | An exclusive right has been granted (whether or not in violation of an agreement). |
| 8P | An exclusive right has been granted (whether or not in violation of an agreement); however, this exclusive right is of the ''proprietary'' type. |
| 8N | An exclusive right exists through a P.L. 80–289 deed providing an exemption for fuel and oil sales (not overridden by prior or subsequent grant agreement); however, and exclusive right for fuel and oil sales has not been granted. |

9/30/2009                                                                                     5190.6B Change1

## Sample FAA Form 5010 Airport Master Record

| U.S. DEPARTMENT OF TRANSPORTATION<br>FEDERAL AVIATION ADMINISTRATION | **AIRPORT MASTER RECORD** | PRINT DATE:  09/23/2004<br>**AFD EFF        08/05/2004**<br>Form Approved OMB 2120-0015 |
|---|---|---|

| > 1 ASSOC CITY:  CAHOKIA/ST LOUIS | 4 STATE:   IL | LOC ID:  CPS | FAA SITE NR:  04458.8*A |
|---|---|---|---|
| > 2 ARPT NAME:   ST LOUIS DOWNTOWN | | 5 COUNTY:   ST CLAIR   IL | |
| 3 CBD TO AIRPORT (NM): 01 E | 6 REGION/ADO:  AGL/CHI | 7 SECT AERO CHT: ST LOUIS | |

| **GENERAL** | | **SERVICES** | | **BASED AIRCRAFT** | |
|---|---|---|---|---|---|
| 10 OWNERSHIP:    PUBLIC | | > 70 FUEL:   100LL A | | 90 SINGLE ENG: | 163 |
| > 11 OWNER:    BI-STATE DEVELOPMENT AGENCY | | > 71 AIRFRAME RPRS:  MAJOR | | 91 MULTI ENG: | 55 |
| > 12 ADDRESS:    707 N FIRST ST | | 72 PWR PLANT RPRS: MAJOR | | 92 JET: | 34 |
|   ST LOUIS, MO 63102-2595 | | 73 BOTTLE OXYGEN: | | | |
| > 13 PHONE NR:    314-982-1588 | | > 74 BULK OXYGEN:    HIGH | | TOTAL: | 252 |
| > 14 MANAGER:    ROBERT L. MCDANIEL | | 75 TSNT STORAGE:    HGR TIE | | 93 HELICOPTERS: | 13 |
| > 15 ADDRESS:    10 ARCHVIEW DR | | 78 OTHER SERVICES: | | 94 GLIDERS: | 0 |
|   CAHOKIA, IL  62206 | | CHTR INSTR RNTL SALES | | 95 MILITARY: | 0 |
| > 16 PHONE NR:    618-337-6060 | | | | 96 ULTRA-LIGHT: | 0 |
| > 17 ATTENDANCE SCHEDULE: | | | | | |

| MONTHS | DAYS | HOURS | | **FACILITIES** | | **OPERATIONS** | |
|---|---|---|---|---|---|---|---|
| ALL | ALL | ALL | | > 80 ARPT BCN:    CG | | 100 AIR CARRIER: | 0 |
| | | | | > 81 ARPT LGT SKED:    DUSK-DAWN | | 101 COMMUTER: | 0 |
| | | | | > 82 UNICOM:    122.950 | | 102 AIR TAXI: | 4,000 |
| | | | | > 83 WIND INDICATOR: YES-L | | 103 G A LOCAL: | 90,000 |
| 18 AIRPORT USE:    PUBLIC | | | | 84 SEGMENTED CIRCLE: NONE | | 104 G A ITNRNT: | 75,000 |
| 19 ARPT LAT:    38-34-14.608N  ESTIMATED | | | | 85 CONTROL TWR:  YES | | 105 MILITARY: | 1,000 |
| 20 ARPT LONG:    090-09-22.396W | | | | 86 FSS:  SAINT LOUIS | | | |
| 21 ARPT ELEV:    413  SURVEYED | | | | 87 FSS ON ARPT:  NO | | TOTAL: | 170,000 |
| 22 ACREAGE:    940 | | | | 88 FSS PHONE NR:  636-536-2980 | | OPERATIONS FOR | |
| > 23 RIGHT TRAFFIC:    30R, 12R | | | | 89 TOLL FREE NR:  1-800-WX-BRIEF | | MOS ENDING | |
| > 24 NON-COMM LANDING:    NO | | | | | | | |
| 25 NPIAS/FED AGREEMENTS:NGY | | | | | | | |
| 26 FAR 139 INDEX: | | | | | | | |

**RUNWAY DATA**

| | 04/22 | 12L/30R | 12R/30L |
|---|---|---|---|
| > 30 RUNWAY IDENT: | | | |
| >31 LENGTH: | 2,799 | 3,800 | 6,997 |
| >32 WIDTH: | 75 | 75 | 100 |
| > 33 SURF TYPE-COND: | ASPH-G | CONC-G | ASPH-G |
| >34 SURF TREATMENT: | | | |
| 35 GROSS WT:    SW | 12 | 30 | 43 |
| 36 (IN THSDS)    DW | | 30 | 71 |
| 37    DTW | | | 100 |
| 38    DDTW | | | |

**LIGHTING/APCH AIDS**

| | MED | MED | MED |
|---|---|---|---|
| >40 EDGE INTENSITY: | | | |
| >42 RWY MARK TYPE-COND | BSC - G / BSC - G | BSC - F / BSC - F | PIR - G / PIR - G |
| >43 VGSI | / | / | V4R / V4L |
| 44 THR CROSSING HGT | / | / | 50 / 50 |
| 45 VISUAL GLIDE ANGLE | / | / | 3.00 / 3.00 |
| >46 CNTRLN-TDZ | N - N / N - N | - / - | N - N / N - N |
| >47 RVR-RVV | - N / - N | - / - | - N / - N |
| >48 REIL | N / N | Y / Y | Y / N |
| > 49 APCH LIGHTS | / | / | / MALSR |

**OBSTRUCTION DATA**

| | A(V) / A(V) | A(V) / A(V) | B(V) / PIR |
|---|---|---|---|
| 50 FAR 77 CATEGORY | | | |
| > 51 DISPLACED THR | | | |
| > 52 CTLG OBSTN | TREE / TOWER | TREE / TREE | TREE / TREE |
| > 53 OBSTN MARKED/LGTD | / L | / | / |
| > 54 HGT ABOVE RWY END | 28 / 72 | 92 / 60 | 29 / 100 |
| > 55 DIST FROM RWY END | 799 / 1,645 | 3,840 / 2,674 | 806 / 3,803 |
| 56 CNTRLN OFFSET | 52R / 15R | 254L / 306R | 494L / 20R |
| 57 OBSTN CLNC SLOPE | 21:1 / 20:1 | 39:1 / 41:1 | 20:1 / 36:1 |
| 58 CLOSE-IN OBSTN | N / N | N / N | N / N |

**DECLARED DISTANCES**

| | | | |
|---|---|---|---|
| > 60 TAKE OFF RUN AVBL (TORA) | / | / | / |
| > 61 TAKE OFF DIST AVBL (TODA) | / | / | / |
| > 62 ACLT STOP DIST AVBL (ASDA) | / | / | / |
| > 63 LNDG DIST AVBL (LDA) | / | / | / |

(>) ARPT MGR PLEASE ADVISE FSS IN ITEM 86 WHEN CHANGES OCCUR TO ITEMS PRECEDED BY >

110 REMARKS:
A 081       MIRL RY 12R/30L PRESET ON MED INTST WHEN ATCT CLSD. MIRL RY 12L/30R NOT AVBL WHEN ATCT C LSD - ACTVT MALSR RY 30L WHEN ATCT
            CLSD - CTAF.
A 110       THIS AIRPORT HAS BEEN SURVEYED BY THE NATIONAL GEODETIC SURVEY.
A 110-01    DEER & MIGRATORY WATERFOWL ON & INVOF ARPT.
A 110-02    (A23) RIGHT TFC RYS 12R & 30R DURG DALGT HRS WHEN ATCT CLSD.

| 111 INSPECTOR:  (   S  )    SUPERSEDES PREVIOUS<br>**FAA**  Form 5010-1 (5-91) | 112 LAST INSP:  02/13/2003 | 113 LAST INFO REQ: |
|---|---|---|

## AIRPORT GRANT ASSURANCE SELF COMPLIANCE CERTIFICATION

I hereby certify that the below named airport is in compliance with all the terms and conditions of existing Federal Aviation Administration Grants and other assumed federal obligations with regard to: (Please check or initial each)

☐ a. Exclusive Rights Prohibition.

☐ b. Maintenance of the Airport. Safe operation, control, and maintenance of airport facilities.

☐ c. Protection of approaches.

☐ d. Compatible land use.

☐ e. Availability of facility to all types, kinds and classes of aeronautical activity on fair and reasonable terms without unjust discrimination.

☐ f. An approved ALP and Exhibit "A" is on file with the FAA which reflects the current land use of the airport.

☐ g. Utilization of Surplus Property is proper.

☐ h. Utilization of section 16/23/516 lands is proper.

☐ i. Sale or disposal of property acquired under FAAP/ADAP/AIP.

☐ j. Utilization and accounting of airport revenues is proper.

☐ k. Fee and rental rate structures which are maintained will make the airport as self-sustaining as possible.

☐ l. Sponsor rights and powers are preserved.

☐ m. To the best of my knowledge, the lease log reflects all major leases on the airport or airport property.

**A Guide to Sponsor Obligations**

This guide provides information on various obligations by airport sponsors through federal agreements and/or property conveyances. The obligations listed are those generally found in agreement and conveyance documents. Sponsors should be aware, however, that older deeds and agreements may contain obligations that are different from current standard assurances and deed restrictions. Also, some agreements contain special conditions applicable only to that airport. Therefore, the actual agreement or conveyance document itself should be reviewed to determine the specific obligations that apply.

**Sources of Obligations:**

a. Grant agreements issued under the Federal Airport Act of 1946 (1946 Airport Act), the Airport and Airway Development Act of 1970 (1970 Airport Act), and the Airport and Airway Improvement Act of 1982 (AAIA).

b. Surplus airport property instruments of transfer, issued pursuant to section 13g of the Surplus Property Act of 1944.

c. Deeds of conveyance issued under section 16 of the 1946 Airport Act, under section 23 of the 1970 Airport Act, and under section 516 of the AAIA.

d. AP-4 agreements authorized by various acts between 1939 and 1944. (Note: All AP-4 agreements have expired; however, sponsors continue to be subject to the statutory exclusive rights prohibition.)

e. Commitments in environmental documents prepared in accordance with current Federal Aviation Administration requirements, which address the National Environmental Policy Act of 1969 (NEPA) and the AAIA.

f. Separate written agreements between the sponsor and the FAA, including settlement agreements resulting from litigation.

**Obligations:**

The following is a list of assurances and deed restrictions most commonly encountered in compliance cases. Exceptions to the standard duration of the obligations in a grant agreement or conveyance document are noted. "Standard" duration means:

(1) Grant agreements for development other than land purchase. Pavement and other facilities built to FAA standards are designed to last at least 20 years, and the duration of the obligation should generally be assumed to be 20 years. The duration may be shorter for grants made exclusively for certain equipment, such as a vehicle, that clearly has a useful life shorter than 20 years.

(2) Grant agreements for land purchase. AIP grant agreements for purchase of land provide that obligations do not expire, since the useful life of land does not end or depreciate. However, FAAP and ADAP grants did not always contain this language, and the grant documents should be reviewed to determine whether the obligations expire in 20 years or continue indefinitely consistent with statutes. Also, grants to a private operator of a public-

use general aviation airport provide for a defined duration of the obligations attached to the grant, and the grant <u>documents should be reviewed to determine the actual obligations that apply.</u>

(3) <u>Surplus property deeds and nonsurplus land conveyance documents.</u> Documents conveying federal land and property interests for airport use generally have no expiration date, and obligations continue indefinitely until the sponsor is formally released from the obligation by the FAA. Obligations run with the land and bind subsequent owners.

**b. Exclusive Rights Prohibition:**

(1) <u>Applies to airports subject to:</u> Any federal agreement or property conveyance.

(2) <u>Obligation:</u> To operate the airport without granting or permitting any exclusive right to conduct any aeronautical activity at the airport. (Aeronautical activity is defined as any activity which involves, makes possible, or is required for the operation of an aircraft, or which contributes to or is required for the safety of such operations; *i.e.*, air taxi and charter operations, aircraft storage, sale of aviation fuel, etc.)

(3) <u>Duration of obligation:</u> For as long as the property is used as an airport.

**c. Maintenance of the Airport:**

(1) <u>Applies to airports subject to:</u> FAAP/ADAP/AIP agreements, surplus property, conveyances, and certain section 16/23/516 conveyances.

(2) <u>Obligation:</u> To preserve and maintain the airport facilities in a safe and serviceable condition. This applies to all facilities shown on the approved ALP which are dedicated for aviation use, and includes facilities conveyed under the Surplus Property Act.

(3) <u>Duration of obligation:</u> Standard.

**d. Operation of the Airport:**

(1) <u>Applies to airports subject to:</u> FAA/ADAP/AIP agreements and surplus property conveyances.

(2) <u>Obligation:</u> To operate the aeronautical and common use areas for the benefit of the public and in a manner that will eliminate hazards to aircraft and persons.

(3) <u>Duration of obligation:</u> Standard.

**e. Protection of Approaches:**

(1) <u>Applies to airports subject to:</u> FAAP/ADAP/AIP agreements and surplus property conveyances.

(2) <u>Obligation:</u> To prevent, insofar as it is reasonably possible, the growth or establishment of obstructions in the aerial approaches to the airport. (The term "obstruction" refers to natural or man made objects which penetrate the imaginary surfaces as defined in FAR Part 77, or other appropriate citation applicable to the specific agreement or conveyance document.)

(3) <u>Duration of obligation:</u> Standard.

**f.  Compatible Land Use**

(1) <u>Applies to airports subject to:</u> FAAP (after 1964)/ADAP/AIP agreements.

(2) <u>Obligation:</u> To take appropriate action, to the extent reasonable, to restrict the use of lands in the vicinity of the airport to activities and purposes compatible with normal airport operations.

(3) <u>Duration of obligation:</u> Standard.

**g.  Availability of Fair and Reasonable Terms:**

(1) <u>Applies to airports subject to:</u> Any federal agreement or property conveyance.

(2) <u>Obligation:</u> To operate the airport for the use and benefit of the public to make it available to all types, kinds, and classes of aeronautical activity on fair and reasonable terms and without unjust discrimination.

(3) <u>Duration of obligation:</u> Twenty years from the date of execution for grant agreement prior to 1964. For grants executed subsequent to the passage of the Civil Rights Act of 1964, the statutory requirement prohibiting discrimination remains in effect for as long as the property is used as an airport. The obligation runs with the land for surplus property and section 16/23/516 conveyances.

**h.  Adherence to the Airport Layout Plan:**

(1) <u>Applies to airports subject to:</u> FAAP/ADAP/AlP agreements.

(2) <u>Obligation:</u> To develop, operate, and maintain the airport in accordance with the latest approved airport layout plan. In addition, airport land depicted on the latest property map (Exhibit "A") cannot be disposed of or otherwise encumbered without prior FAA approval.

(3) <u>Duration of obligation:</u> Standard.

**i.  Utilization of Surplus Property:**

(1) <u>Applies to airports subject to:</u> Surplus property conveyances.

(2) <u>Obligation:</u> Property conveyed under the Surplus Property Act must be used to support the development, maintenance and operation of the airport. If not needed to directly support an aviation use, such property must be available for use to produce income for the airport. Such property may not be leased or rented at a discount or for nominal consideration to subsidize nonairport objectives. Airport property cannot be used, leased, sold, salvaged, or disposed of for other than for airport purposes without FAA approval.

(3) <u>Duration of obligation:</u> Standard.

**j.  Utilization of Section 16/23/516 lands:**

(1) <u>Applies to airports subject to:</u> Section 16/23/516 conveyances.

(2) <u>Obligation:</u> Property must be used for airport purposes; *i.e.*, uses directly related to the actual operation or the foreseeable aeronautical development of the airport. Incidental use of the property must be approved by the FAA.

(3) <u>Duration of obligation:</u> Standard.

**k. Sale or Other Disposal of Property Acquired Under FAAP/ADAP/AIP:**

(1) (<u>Applies to airports subject to:</u> FAAP/ADAP/AIP agreements.

(2) <u>Obligation:</u> To obtain FAA approval for the sale or other disposal of property acquired under FAAP/ADAP/AIP, as well as approval for the use of any net proceeds realized.

(3) <u>Duration of obligation:</u> Standard.

**l. Utilization of Airport Revenue:**

(1) <u>Applies to airports subject to:</u> Any federal agreement or property conveyance.

(2) <u>Obligation:</u> To use all airport revenues for the capital or operating costs of the airport, the local airport system, or other local facilities which are owned or operated by the owner or operator of the airport, and directly related to the actual air transportation of passengers or property.

(3) <u>Duration of obligation:</u> Standard for grants and conveyances executed prior to October 1, 1996. For airports receiving assistance on or after that date, the obligation continues as long as the facility is used as a public-use airport.

(4) <u>Special Conditions Affecting Noise Land and Future Aeronautical Use Land:</u> Apply interim revenue derived from noise land or future aeronautical use land to projects eligible for grants under the AIP. This income may not be used for the matching share of any grant.

**m. National Emergency Use Provision:**

(1) <u>Applies to airports subject to:</u> Surplus property conveyances (where sponsor not released from this clause.)

(2) <u>Obligation:</u> That during any war or national emergency, the government has the right of exclusive possession and control of the airport.

(3) <u>Duration of obligation:</u> Runs with the land (unless released from this clause by the FAA, with concurrence of the Department of Defense.)

**n. Fee and Rental Structure:**

(1) <u>Applies to airports subject to:</u> FAAP/ADAP/AIP agreements.

(2) <u>Obligation:</u> To maintain a fee and rental structure of the facilities and services being provided the airport users which will make the airport as self sustaining as possible. (Note:

Fair and reasonable for aeronautical activities and fair market value for nonaeronautical activities.)

(3) <u>Duration of obligation:</u> Standard.

**o.  Preserving Rights and Powers:**

(1) <u>Applies to airports subject to:</u> FAAP/ADAP/AIP agreements.

(2) <u>Obligation:</u> To not enter into any transaction which would operate to deprive it of any of the rights and powers necessary to perform any or all of the sponsor assurances without FAA approval, and to act promptly to acquire, extinguish or modify any outstanding rights or claims of right of others which would interfere with such performance by the sponsor. To not dispose of or encumber its title or other interests in the site and facilities for the duration of the terms, conditions, and assurances in the grant agreement without FAA approval.

(3) <u>Duration of Obligation:</u> Standard.

**p.   Environmental Requirements:** The AAIA requires that for certain types of project, an environment review be conducted. The review can take the form of either an environmental assessment or an environmental impact statement. These environmental documents often contain commitments related to mitigation of environmental impacts. FAA approval of environmental documents containing such commitments has the effect of requiring that these commitments be fulfilled before FAA grant issuance or as part of the grant.

**q.   Other Obligations:** The above obligations represent the more important obligations assumed by an airport sponsor. Other obligations that may be found in grant agreements include:
  – Use of Government Aircraft
  – Land for Federal Facilities
  – Standard Accounting Systems
  – Reports and Inspections
  – Consultation with Users
  – Terminal Development Prerequisites
  – Construction Inspection and Approval
  – Minimum Wage Rates
  – Veterans Preference
  – Audits, Audit Reports and Record Keeping Requirement
  – Local Approval
  – Civil Rights
  – Construction Accomplishment
  – Planning Projects
  – Good Title
  – Sponsor Fund Availability

9/30/2009                                                        5190.6B Change1

**Sample Lease Log**

| LESSEE | LEASE DATE | TERM | AREA (Acres / Sq. Ft.) | RENTAL RATE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Lease rates based on fair market value?                Yes ☐            No ☐

All airport revenue credited to airport account?        Yes ☐            No ☐

## Chapter 4:     Federal Grant Obligations and Responsibilities

**4.1.     Introduction.** This chapter provides a brief description of the three FAA grant programs for airports, the duration of federal obligations, the useful life of grant funded projects, and the legislatively mandated sponsor compliance requirements. It is the responsibility of the FAA Airports District Offices (ADOs) and regional airports divisions to ensure that the sponsors understand and comply with their grant assurances.

**4.2.     Sponsor Federal Obligations Under Various Grant Agreements.** Under the various federal grant programs, the sponsor of a project agrees to assume certain federal obligations pertaining to the operation and use of the airport. These federal obligations are embodied in the application for federal assistance as sponsor assurances. The federal obligations become a part of the grant offer, binding the grant recipient when it accepts federal funds for airport development.



**a.**     Since 1946, the FAA has administered three grant programs for development of airports:

> **(1).**     The Federal Aid to Airports Program (FAAP) pursuant to the Federal Airport Act of 1946, as amended, until repealed in 1970.

> **(2).**     The Airport Development Aid Program (ADAP) pursuant to the Airport and Airway Development Act of 1970 (1970 Airport Act), as amended, until repealed in 1982.

> **(3).**     The Airport Improvement Program (AIP) pursuant to the Airport and Airway Improvement Act of 1982 (AAIA), as amended. (See 49 U.S.C. § 47101, *et seq.*)

**b.     Assurances Pertaining to Grant Agreements.** Each of these FAA administered federal airport financial assistance programs required airport sponsors to agree to certain assurances under the authorizing legislation of the grant programs. Certain assurances remain consistent from one grant program to the next. Other assurances were added by legislative mandate as the grant programs developed. Some assurances were superseded over time. In addition, the FAA has statutory authority to prescribe additional assurances or requirements for sponsors. (See 49 U.S.C. § 47107(g).) Also, some grant agreements contain special covenants or conditions intended to address an airport-specific situation.



*The useful life of a federally funded airport development project extends only for the period during which it is serviceable and usable with ordinary day-to-day maintenance. Reconstruction, rehabilitation, or major repair of a federally funded airport project without additional federal aid does not automatically extend the duration of its useful life as it applies to grant agreements. Land, however, has no limit to its useful life. As such, obligations associated with land do not expire. (Photo: National Oceanic and Atmospheric Administration (NOAA))*

**c.     Special Project Conditions.** This Order generally does not address special conditions under which the FAA funded a particular project. An example of a special condition might be that funds would be withheld if land for a safety area were not acquired within a prescribed time period. Special conditions and assurances are enforced in the same manner as standard assurances.

**4.3.     The Duration of Federal Grant Obligations.** Federal obligations relating to the use, operation, and maintenance of the airport remain in effect throughout the useful life of the facilities developed under the project, but not to exceed 20 years. In cases where land was acquired with federal assistance under AIP, the federal land obligations remain in perpetuity.[8] In cases where land was acquired with FAAP or ADAP grants, FAA should review the language of such grants when it is necessary to determine the status of the sponsor's obligations since most FAAP land grants and some ADAP grant documents do not impose a perpetual obligation. For disposal of a specific parcel, the sponsor's obligation to reinvest the proceeds may depend on the grant history for that particular parcel. (More information about this process is contained in this Order in chapter

---

[8] Note: In cases where *any* land was acquired with AIP funds, the *entire* airport is obligated in perpetuity.

*22, Releases from Federal Obligations*.) Before concluding that a sponsor's grant obligations have expired, the FAA should review all land grants at the airport to ensure that no land grant contains a perpetual obligation. All AIP land grants and most surplus property deeds of conveyance include the obligation to operate the airport property as an airport in perpetuity.

Additionally, there are three assurances for which the obligation continues without limit as long as the airport is used as a public use airport: Grant Assurance 23, *Exclusive Rights*; Grant Assurance 25, *Airport Revenues*; and Grant Assurance 30, *Civil Rights*.

Private sponsors have the added requirement that the useful life of federally assisted projects shall be no less than 10 years from the date of acceptance of federal aid. (Public sponsors do not have this minimum useful life requirement.) The actual grant agreement should be consulted to verify the federal obligations sponsors agreed to and to ensure the sponsor is being held to those assurances. This Order does not replace reading the obligating documents.

**4.4.    The Useful Life of Grant Funded Projects.** The useful life of a federally funded airport development project extends for the period of time during which it is serviceable and usable with ordinary day-to-day maintenance.

Reconstruction, rehabilitation, or major repair of a federally funded airport project without additional federal aid does not automatically extend the duration of its useful life  as it applies to grant agreements. Generally, improvements are presumed to last at least 20 years because they are built to FAA standards. If new grants are issued for reconstruction, rehabilitation, or major repair, a new useful life period begins.

An airport sponsor cannot shorten its obligations by allowing projects to deteriorate. FAA regional airports divisions make the determination of when the useful life has expired on a federally funded project that needs reconstruction, rehabilitation, or major repair in order to continue serving the purpose for which it was developed. See paragraph 4.6.h of this chapter for detailed guidance on the duration of grant obligations.

> *In cases where land was acquired with federal assistance, the federal obligations relating to the use, operation, and maintenance of the airport generally remain in perpetuity.*

**4.5.    Airport Sponsor Compliance.** Legislatively mandated sponsor assurances have varied over time due to statutory amendments and project specific circumstances. Therefore, in assessing an airport sponsor's compliance status, the FAA must review each grant agreement entered into by the airport sponsor and the FAA in order to determine the airport sponsor's federal obligations accurately and to assess the sponsor's compliance with the applicable assurances.

**4.6.    Federal Obligations under the Basic Grant Assurance Requirements.** This section discusses the different assurance lists and airport grant programs.  Airport sponsors accept these assurances as a condition of receiving grant funds under the AIP for projects that involve airport development, noise mitigation, and airport planning.

When the airport sponsor accepts the grant, the assurances become binding contractual federal obligations between the sponsor and the FAA. It is the responsibility of the ADOs and regional airports divisions to ensure sponsors understand and comply with their assurances.

**a.    Standard Sponsor Assurances.** FAA uses three separate sets of standard sponsor assurances: Airport Sponsors (owners/operators).

**(1).**    Airport Sponsors (owners/operators).

**(2).**    Planning Agency Sponsors.

**(3).**    Nonairport Sponsors Undertaking Noise Compatibility Program Projects (referred to as nonairport sponsor assurances).

**b.    Types of Grant Programs or Projects.** There are five types of airport grant programs or projects that include assurances from one of the three sets of standard assurances:

**(1).**    Airport development programs undertaken by an airport sponsor.

**(2).**    Noise compatibility programs undertaken by an airport sponsor.

**(3).**    Planning projects undertaken by an airport sponsor.

**(4).**    Planning projects undertaken by planning agency sponsors.

**(5).**    Noise compatibility programs undertaken by nonairport sponsors.

**c.    Groupings.** Grant agreements list the assurances in three separate groups:

**(1).**    Group "A" *General*, sets forth the basic requirement binding the sponsor to all federal grant assurances.

**(2).**    Group "B" *Duration and Applicability*, establishes the length of time that assurances remain in effect and identifies which assurances apply to the various programs or projects.

**(3).**    Group "C" *Sponsor Certification*, lists all of the standard assurances that the sponsor must adhere to under the grant agreement.

**d.    Group A.** The *General* assurance states the basic requirement for the sponsor to abide by all applicable assurances as a condition of accepting a federal grant for airport development, noise compatibility, and airport planning. The general assurance requires the sponsor to include these assurances as part of its grant application. When the sponsor accepts the grant offer, FAA incorporates these assurances into the grant agreement. When the sponsor accepts, the agreement binds both the federal government and the sponsor to its terms.



*The FAA may also award grants to nonairport sponsoring government entities for noise compatibility programs. These could include adjacent communities to the airport that are impacted by aircraft landing or taking off, but which are not sponsors of that airport. The assurances for these grants bind the recipients to specific federal obligations. While these assurances are similar to the airport sponsor assurances, there are differences; they follow a different numbering scheme and exclude airport-specific requirements. (Photo: FAA)*

**e.    Group B.** The *Duration and Applicability* assurance identifies those assurances that apply to different types of grant programs and specifies the length of time the assurances remain in force.

**f.    Group C.** As of March 2011, there were 39 numbered assurances in the *Sponsor Certification* group for airport sponsors. All of these assurances apply to airport development programs and noise compatibility programs undertaken by an airport sponsor, but only 11 of them apply to planning projects undertaken by an airport sponsor.

**g.    Grant Assurance Applicability.**

**(1).    Airport Sponsor Airport Development and Noise Compatibility.** Requirements for airport development and noise compatibility programs undertaken by airport sponsors are the same. All 39 standard grant assurances for airport sponsors apply.

**(2).    Airport Sponsor Planning.** Requirements for airport sponsor planning projects are different from airport sponsor development or noise compatibility programs. Several of the numbered assurances for airport sponsors apply to airport planning projects: Grant Assurance 1, *General Federal Requirements*; Grant Assurance 2, *Responsibility and Authority of the Sponsor*; Grant Assurance 3, *Sponsor Fund Availability*; Grant Assurance 5, *Preserving Rights and Powers*; Grant Assurance 6, *Consistency with Local Plans*; Grant Assurance 13, *Accounting System, Audit, and Record Keeping Requirements*; Grant Assurance 18, *Planning Projects*; Grant Assurance 30, *Civil Rights*; Grant Assurance 32, *Engineering and Design Services*; Grant Assurance 33, *Foreign Market Restrictions*; and Grant Assurance 34, *Policies, Standards, and Specifications*. The terms, conditions, and

assurances of the grant agreement shall remain in full force and effect during the life of the planning project. In addition, Grant Assurance 25, *Airport Revenues*, will apply where the planning grant applies to a specific airport.to a specific airport.

**(3).   Nonairport Sponsor Noise Programs.** The FAA may also award grants to nonairport sponsoring government entities for noise compatibility programs. These would include adjacent communities impacted by aircraft noise, but which are not sponsors of that airport. The assurances for these grants bind the sponsors to specific federal obligations. While these assurances are similar to the airport sponsor assurances, there are some differences.



*Grant Assurance 4, Good Title, requires the airport sponsor to assure that good title exists or that the sponsor will acquire good title for any property where federal funds will be used. For airport development programs, the sponsor must assure that the sponsor, another public agency, or the federal government holds good title to the airfield or airport site. If not, the sponsor must give its assurance that it will acquire good title satisfactory to the Secretary. (Photo: FAA)*

Specifically, these assurances follow a different numbering scheme and exclude airport-specific requirements. For example, airport sponsor Grant Assurance 19, *Operation and Maintenance*, includes a section on operating the airport to serve aeronautical users. This applies only to airport sponsors and is not part of the assurance for nonairport sponsors. For nonairport sponsors, the comparable assurance on operation and maintenance includes only the last section of Grant Assurance 19, *Operation and Maintenance*, which requires the grant recipient to operate and maintain noise compatibility items or noise program implementation items obtained with federal funds. Even though the assurances for airport sponsors and nonairport sponsors have different numbering and vary slightly, the subjects addressed are consistent



*Although not specifically mentioned in the standard grant assurances, the accepted useful life for personal property acquisitions, such as aircraft rescue and firefighting (ARFF) or snow removal equipment is generally less than 20 years. The federal obligations associated with new ARFF equipment purchased with AIP funds is ten (10) years unless stated otherwise. The normal useful life of a piece of snow removal equipment is about ten (10) years. (Photos: FAA)*



**(4).    Planning Agency Sponsors.**[9] A planning agency sponsor is a governmental entity that has planning responsibilities for an area that includes an airport, but is not the airport sponsor. A separate set of standard assurances applies to planning agency sponsors. Several of the applicable assurances mirror the assurance topics for airport sponsor planning projects, but the language is slightly different.

> *A planning agency sponsor is a governmental entity that has planning responsibilities for an area that includes an airport, but is not the airport sponsor.*

**h.    Grant Duration.**

**(1).    General.** Most of the assurances remain in effect for the useful life of the facilities developed, equipment acquired, or project items installed in the facilities, not to exceed 20 years. Some assurances have no limit on the duration of terms; they remain in effect as long as the airport remains an airport. This is true for Grant Assurance 23, *Exclusive Rights;* Grant Assurance 25, *Airport Revenues;* and Grant Assurance 30, *Civil Rights*. In addition, under AIP grants, the duration of the terms, conditions, and assurances do not expire with respect to real property acquired with federal funds (land and appurtenances, when applicable) as covered by Grant Assurance 4, *Good Title*; Grant Assurance 31, *Disposal of Land*; and Grant Assurance 35, *Relocation and Real Property Acquisition*.

---

[9] See grant assurances for Non-Airport Sponsors Undertaking Noise Compatibility Program Projects.

(2).    **Intended Purpose.** The FAA Office of Chief Counsel has indicated the FAA may determine the useful life of an airport or airport facility has expired if it is no longer used or needed for the purpose for which it was developed.

(3).    **Equipment.** Although not specifically mentioned in the standard grant assurances, the accepted useful life for personal property acquisitions, such as Aircraft Rescue and Firefighting (ARFF) or snow removal equipment is generally less than 20 years. The duration of this federal obligation for equipment was generally one (1) year in cases where surplus used personal property was accepted from the U.S. Government; however, the federal obligations associated with new ARFF equipment purchased with AIP funds is ten (10) years unless stated otherwise. The normal useful life of a piece of snow removal equipment is about ten (10) years. (See Program Guidance Letter 08-04, *AIP Eligibility for Snow Removal Equipment (SRE)*, dated April 24, 2008, which is available online. See also chapter 23 of this Order, *Reversions of Airport Property*, for information related to the release of personal property federal obligations.)

(4).    **Private Airport Sponsors.** The requirements for airport development and noise compatibility programs undertaken by an airport sponsor apply to both public agency sponsors and private sponsors.  However, for private sponsors there is an added requirement that the minimum applicable duration will not be less than ten (10) years, regardless of the useful life.

**i.**    **Agency Responsibilities.** The Airport Compliance Division (ACO-100) deals primarily with the set of standard assurances for airport sponsors. The FAA Office of Airport Planning and Programming (APP) handles issues involving standard grant assurances for planning agencies and nonairport sponsors. The ADOs and regional airports divisions ensure that the sponsor understands and complies with the applicable assurances.

**4.7 through 4.10 reserved.**

9/30/2009                                                                 5190.6B Change1

**Table 4.1 Grant Assurance Applicability**

| | Airport Sponsor | | | Nonsponsor | |
|---|---|---|---|---|---|
| Grant Assurance | Development | Noise | Planning | Noise | Planning |
| **#1      General Federal Requirements** | X | X | X | X | X |
| **#2      Responsibility and Authority of the Sponsor** | X | X | X | X | X |
| **#3      Sponsor Fund Availability** | X | X | X | X | X |
| **#4      Good Title** | X | X | | X | |
| **#5      Preserving Rights and Powers** | X | X | X | X | X |
| **#6      Consistency with Local Plans** | X | X | X | X | X |
| **#7      Consideration of Local Interest** | X | X | | X | |
| **#8      Consultation with Users** | X | X | | | |
| **#9      Public Hearings** | X | X | | | |
| **#10    Air and Water Quality Standards** | X | X | | | |
| **#11    Pavement Preventive Maintenance** | X | X | | | |
| **#12    Terminal Development Prerequisites** | X | X | | | |
| **#13   Accounting System, Audit and Record Keeping** | X | X | X | X | X |
| **#14    Minimum Wage Rates** | X | X | | X | |
| **#15    Veteran's Preference** | X | X | | X | |
| **#16    Conformity to Plans and Specifications** | X | X | | X | |
| **#17    Construction Inspection and Approval** | X | X | | X | |
| **#18    Planning Projects** | X | X | X | | X |
| **#19    Operations and Maintenance** | X | X | | X | |
| **#20    Hazard Removal and Mitigation** | X | X | | X | |
| **#21    Compatible Land Use** | X | X | | X | |
| **#22    Economic Nondiscrimination** | X | X | | | |
| **#23    Exclusive Rights** | X | X | | | |

*  *Standard grant assurances for nonairport sponsors of noise compatibility programs and for planning agency sponsors of planning programs are numbered differently and vary slightly in language.*

9/30/2009                                                          5190.6B Change1

**Table 4.2 Standard Grant Assurance Applied to Airport Programs and Projects**

| Type of Assurance | Type of Program |
|---|---|
| **Airport Sponsor** | Airport Development |
| **Airport Sponsor** | Noise Compatibility |
| **Airport Sponsor** | Planning Projects |
| **Planning Agency** | Planning Projects |
| **Nonairport Sponsor** | Noise Compatibility |

9/30/2009                                                                 5190.6B Change1

**Table 4.3 Grant Assurance Duration**

| Project Type and Entity | Duration |
|---|---|
| **Public Sponsor Airport Development** | |
| **Exclusive Rights, 23** | No limit |
| **Airport Revenue, 25** | No limit |
| **Real Property, 4, 31, 35** | No limit |
| **Other Assurances, 1-3, 5-22, 26-29, 32-34, 36-39** | Useful life not to exceed 20 years |
| **Public Sponsor Aircraft Noise** | Same as for airport development |
| **Public Sponsor Planning** | Life of project |
| **Grant Assurances 1-3, 5-6, 13, 18, 30, 32-34** | |
| **Private Sponsor Airport Development** | Same as for public sponsor airport development except useful life may be no less than 10 years. |
| **Private Sponsor Noise** | Same as for public sponsor |
| **Private Sponsor Planning** | Same as for public sponsor |
| **Non Airport Sponsor Noise – General** | Useful life not to exceed 20 years |
| **Non Airport Sponsor Noise – Land** | No limit |
| **Non Airport Sponsor - Planning** | Life of project |
| **Planning Agency – Planning** | Life of project |
| **Civil Rights Assurance for any project** | Specified in the assurance |

**Table 4.4 Typical Grant History for a Specific Airport McClelland-Palomar Airport, San Diego, California (CRQ) 1983-2005**

| Grant Number | FY | Description | Entitlement | Discretionary | Total |
|---|---|---|---|---|---|
| 001-1983 | 1983 | Rehabilitate Taxiway | 0.00 | 352,258.00 | 352,258.00 |
| | | Groove Runway | 0.00 | 204,010.00 | 204,010.00 |
| 002-1988 | 1988 | Rehabilitate Taxiway Lighting | 125,000.00 | 0.00 | 125,000.00 |
| | | Install Runway Lighting | 175,000.00 | 0.00 | 175,000.00 |
| | | Install Apron Lighting | 100,000.00 | 0.00 | 100,000.00 |
| 003-1988 | 1988 | Conduct Noise Compatibility Plan Study | 0.00 | 133,220.00 | 133,220.00 |
| 004-1991 | 1991 | Improve Access Road | 128,000.00 | 0.00 | 128,000.00 |
| | | Install Perimeter Fencing | 37,641.00 | 0.00 | 37,641.00 |
| 005-1992 | 1992 | Rehabilitate Apron | 500,000.00 | 75,000.00 | 575,000.00 |
| | | Construct Apron | 500,000.00 | 75,000.00 | 575,000.00 |
| 006-1992 | 1992 | Noise Mitigation Measures | 0.00 | 390,124.00 | 390,124.00 |
| 007-1993 | 1993 | Conduct Airport Master Plan Study | 0.00 | 126,000.00 | 126,000.00 |
| 008-1994 | 1994 | Acquire Security Equipment | 70,000.00 | 0.00 | 70,000.00 |
| | | Expand Apron | 33,443.00 | 0.00 | 33,443.00 |
| | | Acquire Aircraft Rescue & Fire Fighting Safety Equipment | 126,000.00 | 0.00 | 126,000.00 |
| 009-1995 | 1995 | Acquire Security Equipment | 205,934.00 | 0.00 | 205,934.00 |
| | | Install Guidance Signs | 236,099.00 | 0.00 | 236,099.00 |
| | | Install Apron Lighting | 178,246.00 | 0.00 | 178,246.00 |
| | | Extend Runway | 100,000.00 | 0.00 | 100,000.00 |
| | | Extend Taxiway | 100,000.00 | 0.00 | 100,000.00 |
| 010-1997 | 1997 | Extend Runway | 605,451.00 | 0.00 | 605,451.00 |
| | | Improve Runway Safety Area | 200,000.00 | 150,818.00 | 350,818.00 |
| | | Extend Taxiway | 200,000.00 | 0.00 | 200,000.00 |
| 011-1999 | 1999 | Rehabilitate Taxiway | 0.00 | 806,000.00 | 806,000.00 |
| | | Groove Runway | 363,664.00 | 0.00 | 363,664.00 |
| | | Construct Taxiway | 0.00 | 144,000.00 | 144,000.00 |
| 012-1999 | 1999 | Groove Runway | 18,259.00 | 0.00 | 18,259.00 |
| 013-2000 | 2000 | Construct Taxiway | 650,000.00 | 0.00 | 650,000.00 |
| 014-2001 | 2001 | Conduct Noise Compatibility Plan Study | 0.00 | 200,000.00 | 200,000.00 |
| 015-2001 | 2001 | Construct Taxiway | 805,754.00 | 43,529.00 | 849,283.00 |
| 017-2002 | 2002 | Construct Taxiway | 298,552.00 | 0.00 | 298,552.00 |
| 018-2003 | 2003 | Construct Apron | 800,000.00 | 0.00 | 800,000.00 |
| | | Acquire Land for Development | 1,098,552.00 | 284,783.00 | 1,383,335.00 |
| 019-2004 | 2004 | Conduct Noise Compatibility Plan Study | 55,071.00 | 0.00 | 55,071.00 |
| | | Rehabilitate Taxiway | 209,000.00 | 0.00 | 209,000.00 |
| | | Acquire Land for Development | 1,123,238.00 | 0.00 | 1,123,238.00 |
| 020-2005 | 2005 | Acquire Aircraft Rescue & Fire Fighting Vehicle | 0.00 | 495,000.00 | 495,000.00 |
| | | Improve Runway Safety Area | 0.00 | 630,000.00 | 630,000.00 |
| | | | | **TOTAL GRANTS: $13,152,646.00** | |

9/30/2009                                                                 5190.6B Change1

**Exhibit: Federal Aid to Airports Program (FAAP)**

| Year | Announced Allocation | Number of Airports | Year | Announced Allocation | Number of Airports |
|------|---------------------|-------------------|------|---------------------|-------------------|
| 1947-48 | 66.6 | 908 | 1960 | 57.1 | 288 |
| 1949 | 35.1 | 455 | 1961 | 58.8 | 314 |
| 1950 | 29.8 | 314 | 1962 | 70.1 | 327 |
| 1951 | 24.8 | 186 | 1963 | 74.3 | 419 |
| 1952 | 15.0 | 226 | 1964 | 76.0 | 452 |
| 1953 | 10.0 | 169 | 1965 | 72.6 | 413 |
| 1954 | (No program) | (No program) | 1966 | 84.5 | 445 |
| 1955 | 20.4 | 164 | 1967 | 72.5 | 341 |
| 1956 | 58.3 | 524 | 1968 | 70.2 | 386 |
| 1957 | 51.9 | 368 | 1969 | 74.7 | 397 |
| 1958 | 55.0 | 334 | 1970 | 34.1 | 177 |
| 1959 | 63.6 | 358 | | | |

**Exhibit: Airport Development Aid Program (ADAP) and Planning Grant Program (PGP)**

| Year | ADAP: Net Obligations | ADAP: No. of Projects | PGP: Net Obligations | PGP: Grants Issued |
|------|----------------------|----------------------|---------------------|-------------------|
| 1971 | 170.0 | 231 | 3.6 | 42 |
| 1972 | 280.0 | 464 | 9.0 | 180 |
| 1973 | 206.6 | 450 | 9.6 | 275 |
| 1974 | 299.7 | 646 | 8.2 | 277 |
| 1975 | 339.9 | 643 | 9.6 | 286 |
| 1976 & Tran. Qtr. | 416.3 | 525 | 6.0 | 122 |
| 1977 | 506.3 | 757 | 11.8 | 205 |
| 1978 | 539.8 | 761 | 14.0 | 242 |
| 1979 | 624.2 | 858 | 15.0 | 241 |
| 1980 | 639.0 | 817 | 10.0 | 165 |
| 1981 | 438.5 | 622 | (No program) | (No program) |

## Chapter 8:    Exclusive Rights

**8.1.    Introduction.** This chapter describes the sponsor's federal obligations under Grant Assurance 23, *Exclusive Rights*, which prohibits an airport sponsor from granting an exclusive right for the use of the airport, including granting an exclusive right to any person or entity providing or intending to provide aeronautical services to the public.

In particular, the sponsor may not grant a special privilege or a monopoly to anyone providing aeronautical services on the airport or engaging in an aeronautical use. The intent of this restriction is to promote aeronautical activity and protect fair competition at federally obligated airports.

It is the responsibility of the FAA airports district offices (ADOs) and regional airports divisions to ensure that the sponsor has not extended any exclusive right to any airport operator or user.

**8.2.    Definition of an Exclusive Right.** An exclusive right is defined as a power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege or right. An exclusive right may be conferred either by express agreement, by imposition of unreasonable standards or requirements or by another means. Such a right conferred on one or more parties, but excluding others from enjoying or exercising a similar right or right, would be an exclusive right.[18]

**8.3.    Legislative and Statutory History.**

**a.    General.** Through the years, the exclusive rights provision has become a federal obligation that applies in cases involving airport development grants, and surplus and nonsurplus conveyances of federal property.[19]

> ### *The prohibition against exclusive rights is contained in section 303 of the Civil Aeronautics Act of 1938 (P.L. No. 75-706, 52 Stat. 973) and applies to any airport upon which any federal funds have been expended.*

**b.    1938 to Date.** The exclusive rights provision is the oldest federal obligation affecting federally funded airports. The legislative background for the exclusive rights provisions began in l938. The prohibition against exclusive rights was first contained in section 303 of the Civil Aeronautics Act of 1938 (Public Law (P.L.) No. 75-706, 52 Stat. 973 recodified at 49 United States Code (U.S.C.) 40103(e)) and applies to any airport upon which any federal funds have been expended.

To develop and improve airports between 1939 and 1944, Congress authorized the *Development of Landing Areas National Defense* (DLAND) and the *Development of Civil Landing Areas* (DCLA) programs. In accordance with these programs, the federal government and the sponsor entered into an agreement, called an AP-4 Agreement, by which the sponsor provided the land and

---

[18] 30 Fed. Reg. 13661, see also AC 150/5190-6, Appendix 1.

[19] The applicable grant programs were the Federal Aid to Airports Program (FAAP), Airport Development Aid Program (ADAP), and Airport Improvement Program (AIP).

the federal government developed the airport. AP-4 Agreements contained a covenant stating that the sponsor would operate the airport without the grant or exercise of any exclusive right for the use of the airport within the meaning of section 303 of the Civil Aeronautics Act of 1938. Although the useful life of all AP-4 improvements expired by 1969, the airports that entered into these agreements continue to be subject to the exclusive rights prohibition. An airport remains federally obligated as long as the airport continues to be operated as an airport – regardless of whether it remains under the same sponsor or not.

Following World War II, under the provisions of the Surplus Property Act of 1944 (section 13(g)) (as codified and amended by 49 U.S.C. §§ 47151-47153), large numbers of military installations were conveyed without monetary consideration to public agencies. However, in 1947, Congress amended the Surplus Property Act (Public Law (P.L.) No. 80-289 to require the following language:

"No exclusive right for the use of the airport at which the property disposed of is located shall be vested (either directly or indirectly) in any person or persons to the exclusion of others in the same class. For the purpose of this condition, an exclusive right is defined to mean: (1) any exclusive right to use the airport for conducting any particular aeronautical activity requiring the operation of aircraft; (2) any exclusive right to engage in the sale of supplying of aircraft, aircraft accessories, equipment or supplies (excluding the sale of gasoline or oil), aircraft services necessary for the operation of aircraft (including the maintenance and repair of aircraft, aircraft engines, and propellers appliances)."

In accordance with the Airport and Airway Improvement Act of l982 (AAIA), 49 U.S.C. § 47101, *et seq.*, the Federal Aviation Act of 1958 (FAA Act) 49 U.S.C. § 40103(e), and the Airport Improvement Program (AIP) grant assurances, the owner or operator of any airport that has been developed or improved with federal grant assistance is required to operate the airport for the use and benefit of the public and to make it available for all types, kinds, and classes of aeronautical activity and without granting an exclusive right. The same obligation was required in previous grant programs such as the Federal Aid to Airports Program (FAAP), in effect between 1946 and 1970, and the Airport Development Aid Program (ADAP), which was in use between 1970 and 1982.

Finally, the exclusive rights obligation also exists for



*Following World War II, under the provisions of the Surplus Property Act of 1944 (section 13(g)) (as amended by 49 U.S.C. §§ 47151-47153), large numbers of military installations were conveyed without monetary consideration to public agencies. (Photo: US Navy)*

airports that have received nonsurplus government property under 49 U.S.C. § 47125 and previous corresponding statutes.

c.     **Governing Statutes.** Today, Title 49 U.S.C. subtitle VII, *Aviation Programs*, contains the prohibition against exclusive rights in three locations:

(1).     49 U.S.C. § 40103(e), *No Exclusive Rights at Certain Facilities.*

(2).     49 U.S.C. § 47107(a), *General Written Assurances.*

(3).     49 U.S.C. § 47152, *Terms of Conveyances.*

> ***An airport remains federally obligated as long as the airport continues to be operated as an airport – regardless of whether it remains under the same sponsor.***

d.     **Prohibition Applies Only to Aeronautical Activities.** When called upon to interpret the application of section 303, the Attorney General of the United States affirmed the prohibition against exclusive rights. In an opinion dated June 4, 1941, the Attorney General stated "…it is my opinion that the grant of an exclusive right to use an airport for a particular aeronautical activity, such as an air carrier, falls within the provision of section 303 of the Civil Aeronautics Act precluding any exclusive right for the use of any landing area."

If an airport sponsor prohibits an aeronautical activity without a commercial component, coordination with ACO-1 and the Office of Chief Counsel is necessary.

**8.4.  Development of the Exclusive Rights Prohibition into FAA Policy.**

a.     **Implementation of the Federal Airport Act.** During the immediate post-war years, the Civil Aeronautics Board (CAB) was simultaneously engaged in processing the first Federal Aid to Airports Program (FAAP) development projects and working with the military to convey former military installations to public entities.



*Granting options or preferences on future airport lease sites to a single service provider may be construed as the intent to grant an exclusive right. Therefore, the use of leases with options or future preferences, such as rights of first refusal, must generally be avoided. This is because a right of first refusal could allow an existing tenant to hold a claim on airport land at little or no cost that could be used by a competing aeronautical entity. It could then exercise the option when there is a prospect of competition. (Photo: FAA)*

**b.      Interpretations of Aeronautical Activity.**

**(1).      Airfield.** When approving grants for airport development, the CAB (and later the FAA) interpreted the exclusive rights prohibition principally in terms of the airfield. Accordingly, they considered activities that used the airfield (*e.g.*, air carriers, flight schools, and charter service) as subject to the prohibition. All nonaeronautical activities, such as restaurants and other terminal concessions, ground transportation, and car rentals are excluded from the prohibition.

**(2).      Inclusion of Aeronautical Supporting Activities.** In 1962, the FAA published its *Policy on Exclusive Rights* in the *Federal Register*. The policy extended the prohibition to all aeronautical activities. Such aeronautical activities are those that involve, make possible, or are required for the operation of aircraft; or that contribute to, or are required for the safety of such operations.[20] The FAA further clarified the application of the prohibition in FAA Order 5190.1, *Exclusive Rights*, on October 12, 1965.

**c.      Current Agency Policy.** The FAA has taken the position that the existence of an exclusive right to conduct any aeronautical activity at an airport limits the usefulness of the airport and deprives the public of the benefits of competitive enterprise. The FAA considers it inappropriate to provide federal funds for improvements to airports where the benefits of such improvements will not be fully realized by all users due to the inherent restrictions of an exclusive monopoly on aeronautical activities.

Advisory Circular (AC) 150/5190-6, *Exclusive Rights at Federally Obligated Airports*, provides airport sponsors with the information they need to comply with their federal obligation regarding exclusive rights.

**d.      Effect of the Prohibition on Airport Improvement Program (AIP) Grants.** Federal statutory law prohibits sponsors from granting an exclusive right. Consequently, it does not matter how the sponsor granted the exclusive right (*e.g.*, express agreement, unreasonable minimum standards, action of a former sponsor, or other means). The FAA will not award a sponsor an Airport Improvement Program (AIP) grant until that exclusive right is removed from the sponsor's airport. The FAA may also take other actions to return the sponsor to compliance with its federal obligations.

> *Federal statutory law prohibits sponsors from granting an exclusive right. Consequently, it does not matter how the sponsor granted the exclusive right – express agreement, unreasonable minimum standards, action of a former sponsor, or other means.*

**e.      Duration of Prohibition Against Exclusive Rights.** Once federal funds have been expended at an airport, including through a surplus property conveyance, the exclusive rights prohibition is applicable to that airport for as long as it is operated as an airport. In other words, it

---

[20] AC 150/5190-6, Appendix 1, § 1.1(a).

runs in perpetuity at the airport even though 20 years may have passed since the airport received its last AIP grant. In fact, there are airports today where the only federal obligation is the exclusive rights prohibition.

**f.    Grant Assurance 23, *Exclusive Rights*.** Since enactment of the AAIA, sponsor grant agreements have included the exclusive rights assurance. The grant assurance applies to public and private airport sponsors alike for as long as the airport remains an airport. It also applies to sponsor airport development and noise mitigation projects. The assurance does not extend to planning projects or to nonsponsor noise mitigation projects.

**8.5.    Aeronautical Operations of the Sponsor.** The exclusive rights prohibition does not apply to services provided by the sponsor itself. The airport sponsor may elect to provide any or all of the aeronautical services at its airport, and to be the exclusive provider of those services. A sponsor may exercise – but may not grant – the exclusive right to provide any aeronautical service. This exception is known as the airport's "proprietary exclusive" right.[21] (See paragraph 8.9.a of this chapter.)

The sponsor may exercise a proprietary exclusive right provided the sponsor engages in the aeronautical activity as a principal using its own employees and resources. The sponsor may not designate an independent commercial enterprise as its agent. In other words, the sponsor may not rely on a third party or a management company to provide the services under its proprietary exclusive right. These airport sponsors must engage in such activities using their own employees.[22]

**8.6.    Airports Having a Single Aeronautical Service Provider.** Where the sponsor has not entered into an express agreement, commitment, understanding, or an apparent intent to exclude other reasonably qualified enterprises, the FAA does not consider the presence of only one provider engaged in an aeronautical activity as a violation of the exclusive rights prohibition.[23] The FAA will consider the sponsor's willingness to make the airport available to additional reasonably qualified providers. (See paragraph 8.9.b of this chapter.)

**8.7.    Denying Requests by Qualified Providers.**

**a.    Conditions for Denial.** The assurance prohibiting the granting of an exclusive right does not penalize a sponsor for continuing an existing single provider when <u>both</u> of the following conditions exist:

    **(1).**    It can be demonstrated that it would be unreasonably costly, burdensome, or impractical for more than one entity to provide the service, and

    **(2).**    The sponsor would have to reduce the leased space that is currently being used for an aeronautical purpose by the existing provider in order to accommodate a second

---

[21] The airport's proprietary exclusive right, however, may not interfere with an aeronautical users' right to self-service or self-fuel. (AC 150/5190-6, paragraph 1.3(a)(2).) Such activity must conform to an airport's minimum standards or reasonable rules and regulations.

[22] An aeronautical user exercising its right to self-service or self-fuel is also required to use its own employees and equipment.

[23] See 49 U.S.C. §§ 40103(e) and 47107(a)(4).

provider. In the case of denying additional providers, the sponsor must have adequate justification and documentation of the facts supporting its decision acceptable to the FAA.

Both conditions must be met. (See 49 U.S.C. § 47107(a)(4)(A and B).)

**b.** **Demonstrable Need.** When the service provider has space in excess of its *reasonable* needs and the sponsor claims it is justified based on the service provider's *future* needs, the FAA may find the sponsor in violation of the exclusive rights prohibition if the service provider is banking land and/or facilities that it cannot put to gainful aeronautical use in a reasonable period of time and/or the vacant property controlled by the service provider denies a competitor from gaining entry onto the airport.

> *A sponsor may exclude an incumbent on-airport service provider from responding to a request for proposals based on the sponsor's desire to increase competition in airport services. That action is not a violation of Grant Assurance 22, Economic Nondiscrimination, since the sponsor is taking a necessary step to preclude the granting of an exclusive right.*

**(1).**     Granting options or preferences on future airport lease sites to a single service provider may be construed as intent to grant an exclusive right. Therefore, the use of leases with options or future preferences, such as rights of first refusal, must generally be avoided. This is because a right of first refusal could allow an existing tenant to hold a claim on airport land at little or no cost. Then, when faced with the prospect of competition, that leaseholder could exercise its option to inhibit access by others and limit or prevent competition.

**(2).**     A sponsor may exclude an incumbent on-airport service provider from responding to a Request for Proposal (RFP)by eliminating the provider from eligibility for the RFP based on the sponsor's desire to increase competition in airport services. The FAA will not consider that action a violation of Grant Assurance 22, *Economic Nondiscrimination*, since the sponsor is taking a necessary step to preclude granting of an exclusive right.

**(3).**    When a sponsor denies a request by a service provider to conduct business on the airport based on the lack of available space, the ADO or regional airports division should conduct a site visit to confirm that the space and/or facilities leased to service providers only represent their reasonable demonstrable need and are not being banked for the long-term future.



*An airport sponsor is under no obligation to permit aircraft owners or operators to introduce fueling equipment or practices on the airport that would be unsafe or detrimental to the public welfare or that would affect the efficient use of airport facilities by the public. A aircraft hangar is to house an aircraft and related equipment, not to be used as general storage space. (Photo: FAA)*

## 8.8.   Exclusive Rights Violations.

**a.    Restrictions Based on Safety and Efficiency.** An airport sponsor can deny an individual or prospective aeronautical service provider the right to engage in an on-airport aeronautical activity for reasons of safety and efficiency if the kind of activity (*e.g.*, skydiving, sailplanes, ultralights) would adversely impact the safety and efficiency of another aeronautical activity at the airport, typically fixed-wing operations. An aeronautical operator holding an FAA certificate is presumed to be a safe operator, and the airport sponsor may not deny access to an individual certificated operator on the basis of safety of its aeronautical operations. Any safety concerns with an operator would need to be brought to the attention of the FAA. However, the airport sponsor may find that an aeronautical activity as a whole is inconsistent with the safety and efficiency of the airport and may, therefore, not permit that activity at all, subject to concurrence by the FAA. The airport sponsor may also prohibit access by an individual or individual service provider that

has not complied with the airport's minimum standards or operations rules for safe use of airport property.

Any denial based on safety must be based on reasonable evidence demonstrating that airport safety will be compromised if the applicant or individual is allowed to engage in the proposed aeronautical activity. Airport sponsors should carefully consider the safety reasons for denying an aeronautical service provider or individual the opportunity to engage in an aeronautical activity if the denial has the possible effect of limiting competition or access.

The FAA is the final authority in determining what, in fact, constitutes a compromise of safety. As such, an airport sponsor that is contemplating the denial of a proposed on-airport aeronautical activity or access is encouraged to contact the local ADO or regional airports division. Those offices will then seek assistance from FAA Flight Standards (FS) and Air Traffic (AT) to assess the reasonableness of the proposed action because of safety and efficiency, and to determine whether unjust discrimination or an exclusive rights violation results from the proposed restrictions.



Safety concerns are not limited to aeronautical activities but may include Occupational Safety and Health Administration (OSHA) standards, fire safety standards, building codes, or sanitation considerations. Restrictions on aeronautical operators by airport sponsors for safety must be reasonable. Examples of reasonable restrictions include, but are not limited to: (1) restrictions placed on the handling of aviation fuel and other flammable products, including aircraft paint and thinners; (2) requirements to keep fire lanes open; and (3) weight

*The fact that a single business or enterprise may provide most or all of the on-airport aeronautical services is not, in itself, evidence of an exclusive rights violation. An exclusive rights violation is the denial by the airport sponsor to afford other qualified parties an opportunity to be an on-airport aeronautical service provider. The airport sponsor may issue a Request for Proposal (RFP)in a competitive offering for all qualified parties to compete for the right to be an on-airport service provider. (Photo: FAA)*

limitations placed on vehicles and aircraft to protect pavement from damage. (See chapter 14 of this Order, *Restrictions Based on Safety and Efficiency Procedures and Organization*.)

**b.    Restrictions on Self-Service.** An aircraft owner or operator[24] may tie down, adjust, repair, refuel, clean, and otherwise service his/her own aircraft, provided the service is performed by the aircraft owner/operator or his/her employees with resources supplied by the aircraft owner or operator.

Moreover, the service must be conducted in accordance with reasonable rules, regulations or standards established by the airport sponsor. Any unreasonable restriction imposed on the owners or operators of aircraft regarding the servicing of their own aircraft may be construed as an exclusive rights violation. In accordance with the federal grant assurances:

> **(1).**    An airport sponsor may not prevent an owner or operator of an aircraft from performing services on his/her own aircraft with his/her own employees and equipment. Restrictions imposed by an airport sponsor that have the effect of channeling self-service activities to a commercial aeronautical service provider may be an exclusive rights violation.

> ### *An airport sponsor may not prevent an owner or operator of an aircraft from performing services on his/her own aircraft with his/her own employees and equipment.*

> **(2).**    An airport sponsor must reasonably provide for self-servicing activity, but is not obligated to lease airport facilities and land for such activity. That is, the airport sponsor is not required to encumber the airport with leases and facilities for self-servicing activity.

> **(3).**    An airport sponsor is under no obligation to permit aircraft owners or operators to introduce fueling equipment or practices on the airport that would be unsafe or detrimental to the public welfare or that would affect the efficient use of airport facilities by the public.

**NOTE:** Fueling from a pull-up commercial fuel pump is not considered self-fueling under the federal grant assurances since it involves fueling from a self-service pump made available by the airport or a commercial aeronautical service provider.

**8.9.    Exceptions to the General Rule.**

**a.    Aeronautical Activities Provided by the Airport Sponsor (Proprietary Exclusive Right).** The owner of a public use airport may elect to provide any or all of the aeronautical services needed by the public at the airport. The airport sponsor may exercise, but not grant, an exclusive right to provide aeronautical services to the public. If the airport sponsor opts to provide an aeronautical service exclusively, it must use its own employees and resources. Thus, an airport owner or sponsor cannot exercise a proprietary exclusive right through a management contract.

---

[24] For many purposes, the FAA has interpreted an aircraft owner's right to self-service to include operators with long-term possession rights. For example, a significant number of aircraft operated by airlines are not owned, but are leased under terms that give the operator airline owner-like powers. This includes operational control, exclusive use, and long-term lease terms. The same is true for other aeronautical operators such as charter companies, flight schools, and flying clubs, all of which may very well lease aircraft under terms that result in owner-like powers. If doubt exists on whether a particular "operator" can be considered as the owner for the purpose of this guidance, the ADO will make the determination. (A listing of ADOs can be found on the FAA website.)

Note that while the policy technically extends to private owners of public use airports, private owners may not have the same immunity from antitrust laws as public agencies. A proprietary exclusive can be exercised only for fuel sales and support services, not for use of the landing area itself.

As a practical matter, most airport sponsors recognize that aeronautical services are best provided by profit-motivated, private enterprises. However, there may be situations that the airport sponsor believes would justify providing aeronautical services itself. For example, in a situation where the revenue potential is insufficient to attract private enterprise, it may be necessary for the airport sponsor to provide the aeronautical service. The reverse may also be true. The revenue potential might be so significant that the airport sponsor chooses to perform the aeronautical activity itself in order to become more financially self-sustaining. Aircraft fueling is a prime example of an aeronautical service an airport sponsor may choose to provide itself. While the airport sponsor may exercise its proprietary exclusive to provide fueling services, aircraft owners may still assert the right to obtain their own fuel and bring it onto the airport to service their own aircraft, but only with their own employees and equipment and in conformance with reasonable airport rules, regulations, and minimum standards.

**b.      Single Activity.** The fact that a single business or enterprise may provide most or all of the on-airport aeronautical services is not, in itself, evidence of an exclusive rights violation. An exclusive rights violation is the denial by the airport sponsor to afford other qualified parties an opportunity to be an on-airport aeronautical service provider. The airport sponsor may issue a competitive offering for all qualified parties to compete for the right to be an on-airport service provider.[25] The airport sponsor is not required to accept all qualified service providers without limitation. The fact that only one qualified party pursued an opportunity in a competitive offering would not subject the airport sponsor to an exclusive rights violation. However, the airport sponsor cannot, as a matter of convenience, choose to have only one fixed-base operator (FBO)[26] to provide services at the airport regardless of the circumstances at the airport.

**c.      Statutory Requirement Relating to Single Activities.** Since 1938, there has been a statutory prohibition on exclusive rights (49 U.S.C. § 40103(e)) [independent of the parallel grant assurance requirement at 49 U.S.C. § 47107(a)(4)]. It currently states, "A person does not have an exclusive right to use an air navigation facility on which Government money has been expended." (An "air navigation facility" includes, among other things, an airport. See "Definitions" at 49 U.S.C. § 40102.)

This prohibition predates the parallel statutory grant assurance requirement enacted as part of the AAIA. It is independent of the grant assurance requirement.

---

[25] The grant assurances do not prohibit an airport sponsor from entering into long-term leases with commercial entities, by negotiation, solicitation, or other means. An airport sponsor may choose to select Fixed-Base Operators (FBOs) or other aeronautical service providers through a Request For Proposals (RFP) process. If it chooses to do so, the airport sponsor may use this process each time a new applicant is considered. This action, in and by itself, is not unreasonable or contrary to the federal obligations.

[26] A Fixed-Base Operator (FBO) is a commercial entity providing aeronautical services such as fueling, maintenance, storage, ground and flight instruction, etc. to the public.



*Since most federally owned airports are maintained and operated with federal funds appropriated for purposes other than the support of civil aviation (usually to accommodate a military or defense mission), the federal government is not subject to the exclusive rights prohibition. Such airports do not receive AIP funds and are not subject to grant assurances. Consequently, when the base commanders (or other federal government entities) grant operating rights to airlines and other aeronautical activities to meet their own transportation and civil aviation requirements (such as moving personnel and equipment), they are not subject to sponsor federal obligations. Similarly, the base commander of an active military base has no federal obligation to permit civilian operations at the air base. (Photo: USAF)*

Both statutory prohibitions contain an exception to permit single FBOs if it is unreasonably costly, burdensome, or impractical for more than one FBO to provide services, <u>and</u> allowing more than one FBO to provide services would reduce the space leased under an existing agreement between the airport and single FBO. Both conditions must be met for the exception to apply.

**d.    Space Limitation.** A single enterprise may expand as needed, even if its growth ultimately results in the occupancy of all available space. However, an exclusive rights violation occurs when an airport sponsor unreasonably excludes a qualified applicant from engaging in an on-airport aeronautical activity without just cause or fails to provide an opportunity for qualified applicants to be an

aeronautical service provider. An exclusive rights violation can occur through the use of leases where, for example, all the available airport land and/or facilities suitable for aeronautical activities are leased to a single aeronautical service provider who cannot put it into productive use within a reasonable period of time, thereby denying other qualified parties the opportunity to compete to be an aeronautical service provider at the airport. An airport sponsor's refusal to permit a single FBO to expand based on the sponsor's desire to open the airport to competition is not a violation of the grant assurances. Additionally, an airport sponsor may exclude an incumbent FBO from participating under a competitive solicitation in order to bring a second FBO onto the airport to create a more competitive environment.

A lease that confers an exclusive right will be construed as having the intent to do so and, therefore, constitute an exclusive rights violation.  Airport sponsors are better served by requiring that leases to a single aeronautical service provider be limited to the amount of land the service provider can demonstrate it actually needs and can be put to immediate productive use. In the event that

additional space is required later, the airport sponsor may require the incumbent service provider to compete along with all other qualified service providers for the available airport land.

> ### *The grant of options or preferences on future airport lease sites to a single service provider may be construed as intent to grant an exclusive right. Leases with options or future preferences, such as rights of first refusal, should generally be avoided.*

The grant of options or preferences on future airport lease sites to a single service provider may be construed as intent to grant an exclusive right. Therefore, leases with options or future preferences, such as rights of first refusal, should generally be avoided.

**8.10.   UNICOM.** The Federal Communications Commission (FCC) authorizes use of special UNICOM[27] frequencies for air-to-ground communication at airports. The primary purpose of the communications station is to disseminate aeronautical data, such as weather, wind direction, and runway information. They are used by aircraft in the air and on the ground for both preflight and post flight activities. Since UNICOM is supposed to be subject to the airport owner's control, its use by the airport and the airport only, does not constitute a grant of exclusive rights to which the statutory prohibition of section 40103(e) would apply.

To prevent conflicting reports, the FCC will not license more than one UNICOM station at the same airport. However, unless properly controlled, allowing an aeronautical service provider to operate the sponsor's UNICOM station on behalf of the airport sponsor could result in an advantage over competitors in attracting aeronautical users. When the sponsor fails to retain the station license in its own name and turns control of the license to a single service provider, the FAA may find the sponsor in violation of the prohibition against exclusive rights.

> ### *The FAA will not license more than one UNICOM station at the same airport.*

**8.11.   Implementation of Policy.**

**a.      Voluntary Compliance.**  When the sponsor engages in – or fails to extinguish – an exclusive right voluntarily, the FAA will find the sponsor in violation of the prohibition against exclusive rights and its federal obligations.

**b.      Remedies.** When the FAA finds the sponsor in violation of the exclusive rights provision, and the situation remains uncorrected, FAA may withhold AIP grant assistance. In addition, FAA may withhold Facilities and Equipment (F&E) funding, except for equipment needed for safety or, generally as a last resort, seek reversion of the airport under the Surplus Property Act. (*Chapter 2 of this Order, Compliance Program*, discusses handling of grant assurance violations

---

[27] UNICOM is a nongovernment air/ground radio communication station. It may provide airport information at public use airports where there is neither a tower nor a Flight Service Station (FSS).

Under certain circumstances, the FAA may also issue any orders it deems necessary. These orders are enforced through the federal courts.

**c.      FAA Exception.** Where required for the national defense or deemed essential to national interest, the FAA may grant an exception to the remedies above.

**8.12.   Military and Special Purpose Airports.**

**a.      Applicability to the Federal Government.** The federal government is not subject to the exclusive rights prohibition. Since most federally owned airports are maintained and operated with federal funds appropriated for purposes other than the support of civil aviation (usually to accommodate a military or defense mission), such airports do not receive AIP funds and are not subject to grant assurances.

Consequently, when the federal government entity that owns the facility allows operating rights to airlines and other aeronautical activities to meet the government's own transportation and civil aviation requirements (such as moving personnel and equipment), the government is not subject to sponsor federal obligations. Similarly, the base commander of an active military base has no federal obligation to permit civilian operations at the air base.

**b.      JointUse Airports.** When a civilian airport sponsor obligates itself under FAA grant agreements or property conveyance agreements, that entity becomes subject to the same federal obligations as other sponsors regardless of whether the facilities are located on federal installations or whether they are operated under jointuse agreements with the Department of Defense (DoD) or other federal agencies. At jointuse airports, federal grant assurance obligations do not apply to areas within exclusive DoD control.

**8.13. through 8.18. reserved.**

### Appendix C: Advisory Circulars on Exclusive Rights and Minimum Standards for Commercial Aeronautical Activities

A copy of Advisory Circular No. 150/5190-6, *Exclusive Rights at Federally Obligated Airports*, is available on the FAA website at https://www.faa.gov/airports/resources/advisory_circulars/index.cfm/go/document.information/documentNumber/150_5190-6.

A copy of Advisory Circular No. 150/5190-7, Minimum Standards for Commercial Aeronautical Activities, is available on the FAA website at https://www.faa.gov/airports/resources/advisory_circulars/index.cfm/go/document.information/documentNumber/150_5190-7.



U.S. Department
of Transportation

**Federal Aviation
Administration**

# Advisory Circular

| | | |
|---|---|---|
| **Subject:** EXCLUSIVE RIGHTS AT FEDERALLY-OBLIGATED AIRPORTS | **Date:** January 4, 2007<br>**Initiated by:** ACO-100 | **AC No:** 150/5190-6<br>**Change:** |

**1. PURPOSE**. This advisory circular (AC) provides basic information pertaining to the Federal Aviation Administration's (FAA's) prohibition on the granting of exclusive rights at federally-obligated airports. The prohibition on the granting of exclusive rights is one of the obligations assumed by the airport sponsors of public airports that have accepted federal assistance, either in the form of grants or property conveyances. This AC provides guidance on how an airport sponsor can comply with the statutory prohibition on the granting of exclusive rights. Section 1 explains FAA's policy on exclusive rights, the statutory basis for the policy, and exceptions to the policy. Section 2 provides an overview of how the FAA ensures compliance with applicable Federal obligations.

**2. CANCELLATION.** AC 150/5190-5, *Exclusive Rights and Minimum Standards for Commercial Aeronautical Activities* (Change 1), dated June 10, 2002, is cancelled.

**3. DEFINITIONS.** Definitions for some of the terms used in this AC are found in Appendix 1.

**4. BACKGROUND.** In accordance with the FAA Airport and Airway Improvement Act of l982, 49 U.S.C. § 47101, et seq., 49 U.S.C. § 40103(e), and the Airport Improvement Program (AIP) grant assurances, the owner or operator of any airport that has been developed or improved with Federal grant assistance is required to operate the airport for the use and benefit of the public and to make it available for all types, kinds, and classes of aeronautical activity and without granting an exclusive right.[1] The Surplus Property Act of l944 (as amended by 49 U.S.C., §§ 47151-47153) contains parallel obligations under its terms for the conveyance of Federal property for airport purposes.

Similar obligations exist for airports that have received non-surplus government property under 49 U.S.C. § 47125 and previous corresponding statutes. Airports that have received real property under AP-4 agreements remain obligated by the exclusive rights prohibition even though all other obligations are considered expired by the FAA.[2]

It is FAA policy that the sponsor of a federally obligated airport will not grant an exclusive right for the use of the airport to any person providing, or intending to provide, aeronautical services or commodities to the public and will not, either directly or indirectly, grant or permit any person, firm, or corporation, the exclusive right at the airport to conduct aeronautical activities. The exclusive rights

---

[1] The legislative background for the exclusive rights provisions discussed in this AC began as early as l938 and evolved under the Federal-Aid Airport Program (FAAP), Airport Development Aid Program (ADAP), and Airport Improvement Program (AIP) and was also adopted in land conveyances.
[2] See FAA Order 5190.6A (Section 2-18) for additional information.

prohibition applies to both commercial entities engaging in providing aeronautical services and individual aeronautical users of the airport. The intent of the prohibition on exclusive rights is to promote fair competition at federally-obligated, public use airports for the benefit of aeronautical users. The exclusive rights prohibition remains in effect as long as the airport is operated as an airport, even if the original period for which an airport sponsor was obligated has expired.

The granting of an exclusive right for the conduct of any aeronautical activity on a federally-obligated airport is generally regarded as contrary to the requirements of the applicable Federal obligations, whether such exclusive right results from an express agreement, from the imposition of unreasonable standards or requirements, or by any other means.  Existence of an exclusive right at an airport limits the usefulness of the airport and deprives the public of the benefits that flow from competition.

## 5. RELATED READING MATERIALS.

a. *Federal Aviation Agency Policy Statement, Exclusive Rights at Airports*, Order 5190.1A, as published in the Federal Register (30 FR 13661), October 27, l965.

b. *Rules of Practice for Federally Assisted Airport Proceedings*, as published in the Federal Register (61 FR 53998), October 16, l996.

c. *FAA Airport Compliance Requirements*, Order 5190.6A, October 1, 1989.

d. Further information can be obtained at the Airports District Office (ADO) in your area. A listing of ADOs can be found at http://www.faa.gov/airports_airtraffic/airports/regional_guidance/.

DAVID L. BENNETT
Director, Office of Airport Safety
  and Standards

## SECTION 1 - EXCLUSIVE RIGHTS

**1.1. OBLIGATION AGAINST GRANTING EXCLUSIVE RIGHTS.** Most exclusive rights agreements violate the grant assurances contained in FAA grant agreements or similar obligations in surplus property conveyances. With few exceptions, an airport sponsor is prohibited from granting a right to a single operator for the provision of an aeronautical activity to the exclusion of others. See definition of exclusive right in Appendix 1. Accordingly, FAA policy prohibits the creation or continuance of exclusive rights agreements at obligated airports where the airport sponsor has received Federal airport development assistance for the airport's improvement or development. This prohibition applies regardless of how the exclusive right was created, whether by express agreement or the imposition of unreasonable minimum standards and/or requirements (inadvertent or otherwise).

**1.2. AGENCY POLICY.** The existence of an exclusive right to conduct any aeronautical activity at an airport limits the usefulness of the airport and deprives the public of the benefits that flow from competitive enterprise. The purpose of the exclusive rights provision as applied to civil aeronautics is to prevent monopolies and combinations in restraint of trade and to promote competition at federally-obligated airports. An exclusive rights violation occurs when the airport sponsor excludes others, either intentionally or unintentionally, from participating in an on-airport aeronautical activity. A prohibited exclusive right can be manifested by an express agreement, unreasonable minimum standards, or by any other means. Significant to understanding the exclusive rights policy, is the recognition that it is the impact of the activity, and not necessarily the airport sponsor's intent, that constitutes an exclusive rights violation.

**1.3. EXCLUSIVE RIGHTS VIOLATIONS AND EXCEPTIONS TO THE GENERAL RULE.** The following paragraphs address exclusive rights violations and certain exceptions to the exclusive rights policy due to circumstances that make an exception necessary.

**a. Exclusive Rights Violations**

**1. Restrictions Based on Safety and Efficiency.** An airport sponsor can deny a prospective aeronautical service provider the right to engage in an on-airport aeronautical activity for reasons of safety and efficiency. A denial based on safety must be based on evidence demonstrating that airport safety will be compromised if the applicant is allowed to engage in the proposed aeronautical activity. Airport sponsors should carefully scrutinize the safety reasons for denying an aeronautical service provider the opportunity to engage in an aeronautical activity if the denial has the possible effect of limiting competition.

The FAA is the final authority in determining what, in fact, constitutes a compromise of safety. As such, an airport sponsor that is contemplating the denial of a proposed on-airport aeronautical activity is encouraged to contact the local Airports District Office (ADO) or the Regional Airports Office. Those offices will then seek assistance from FAA Flight Standards (FS) and Air Traffic (AT) to assess the reasonableness of the proposed action and whether unjust discrimination results from the proposed restrictions on aeronautical activities because of safety and efficiency. [3]

---

[3] Here the word efficiency refers to the efficient use of navigable airspace, an inherent FAA Air Traffic Control function. That is the reason why FAA Air Traffic (AT) is to be consulted in such cases. It is not meant to be an interpretation that could be construed as protecting the "efficient'' operation of an existing aeronautical service provider for example.

**2. Restrictions on Self-Service.** An aircraft owner or operator[4] may tie down, adjust, repair, refuel, clean, and otherwise service his/her own aircraft, provided the service is performed by the aircraft owner/operator or his/her employees with resources supplied by the aircraft owner or operator. Moreover, the service must be conducted in accordance with reasonable rules, regulations or standards established by the airport sponsor. Any unreasonable restriction imposed on the owners or operators of aircraft regarding the servicing of their own aircraft may be construed as an exclusive rights violation. In accordance with the FAA grant assurances:

> **(1)** An airport sponsor may not prevent an owner or operator of an aircraft from performing services on his/her own aircraft with his/her own employees and equipment. Restrictions imposed by an airport sponsor that have the effect of channeling self-service activities to a commercial aeronautical service provider may be an exclusive rights violation.

> **(2)** An airport sponsor must reasonably provide for self-servicing activity but is not obligated to lease airport facilities and land for such activity. That is, the airport sponsor is not required to encumber the airport with leases and facilities for self-servicing activity, and

> **(3)** An airport sponsor is under no obligation to permit aircraft owners or operators to introduce equipment, personnel, or practices on the airport that would be unsafe, unsightly, or detrimental to the public welfare or that would affect the efficient use of airport facilities by the public.

**NOTE:** Fueling from a pull up commercial fuel pump is not considered self-fueling under the FAA grant assurances since it involves fueling from a self-service pump made available by the airport or a commercial aeronautical service provider. For the actual definition, see definition "e" Commercial Self-Service Fueling in Appendix 1.

Safety concerns are not limited to aeronautical activities but may include Occupational Safety and Health Administration (OSHA) standards, fire safety standards, building codes, or sanitation considerations. Restrictions by airport sponsors for safety must be reasonable. Examples of reasonable restrictions include restrictions placed on the handling of aviation fuel and other flammable products, including aircraft paint and thinners; requirements to keep fire lanes open; weight limitations placed on vehicles and aircraft to protect pavement from damage; and other similar safety based restrictions.

**b. Exceptions to the General Rule**

**1. Aeronautical Activities Provided by the Airport Sponsor (Proprietary Exclusive Right).** The owner of a public-use airport (public or private owner) may elect to provide any or all of the aeronautical services needed by the public at the airport. The airport sponsor may exercise, but not grant, an exclusive right to provide aeronautical services to the public. If the airport sponsor opts to provide an aeronautical service exclusively, it must use its own employees and resources. Thus, an airport owner or sponsor cannot exercise a proprietary exclusive right through a management contract.

---

[4] For many purposes, the FAA has for a long time interpreted an aircraft owner's right to self-service to include operators. For example, a significant number of aircraft operated by airlines are not owned but leased under terms that give the operator airline owner-like powers. This includes operational control, exclusive use and long-term lease terms. The same is true for other aeronautical operators such as charter companies, flight schools and flying clubs, all of which may very well lease aircraft under terms that result in owner-like powers. If in a particular case, a doubt exists on whether a particular "operator" can be considered as the owner for the purpose of this guidance, please contact the Airports District Office (ADO) in your area. A listing of ADOs can be found at http://www.faa.gov/airports_airtraffic/airports/regional_guidance/.

As a practical matter, most airport sponsors recognize that aeronautical services are best provided by profit-motivated, private enterprises. However, there may be situations that the airport sponsor believes would support the airport providing aeronautical services. Examples include situations where the revenue potential is insufficient to attract private enterprises and it is necessary for the airport sponsor to provide the aeronautical service, or situations where the revenue potential is so significant that the airport sponsor chooses to perform the aeronautical activity itself in order to become more financially self-sustaining. An example of an airport sponsor choosing to provide an aeronautical service would be aircraft fueling. While the airport sponsor may exercise its proprietary exclusive to provide fueling services, aircraft owners may assert the right to obtain their own fuel and bring it onto the airport to service their own aircraft, but only with their own employees and equipment and in conformance with reasonable airport rules, regulations and standards.

**2. Single Activity.** The fact that a single business or enterprise may provide most or all of the on-airport aeronautical services is not, in itself, evidence of an exclusive rights violation. What is an exclusive rights violation is the denial by the airport sponsor to afford other qualified parties an opportunity to be an on-airport aeronautical service provider. The airport sponsor may issue a competitive offering for all qualified parties to compete for the right to be an on-airport service provider.[5] The airport sponsor is not required to accept all qualified service providers without limitation. The fact that only one qualified party pursued an opportunity in a competitive offering would not subject the airport sponsor to an exclusive rights violation. However, the airport sponsor cannot as a matter of convenience choose to have only one FBO provide services at the airport regardless of the circumstances at the airport.

> **(A) Statutory Requirement Relating to Single Activities.** Since 1938, there has been a statutory prohibition on exclusive rights, 49 U.S.C. § 40103(e), independent of the parallel grant assurance requirement at 49 U.S.C. § 47107(a)(4). This statutory prohibition currently states, "A person does not have an exclusive right to use an air navigation facility on which Government money has been expended." (An "air navigation facility" includes, among other things, an airport. See "Definitions" at 49 U.S.C. § 40102.) The statutory prohibition, however, contains an exception relating to single activities. Specifically, providing services at an airport by only one fixed base operator (FBO) is not an exclusive right if it is unreasonably costly, burdensome, or impractical for more than one FBO to provide the services, and allowing more than one FBO to provide the services requires a reduction in space leased under an existing agreement between one FBO and the airport sponsor. Both conditions must be met. See 49 U.S.C. § 47107(a)(4) (A and B).

> **(B)** The grant assurance relating to exclusive rights contains similar language.

**3. Space Limitation.** A single enterprise may expand as needed, even if its growth ultimately results in the occupancy of all available space. However, an exclusive rights violation occurs when an airport sponsor unreasonably excludes a qualified applicant from engaging in an on-airport aeronautical activity without just cause or fails to provide an opportunity for qualified applicants to be an aeronautical service provider. An exclusive rights violation can occur through the use of leases where, for example, all the available airport land and/or facilities suitable for aeronautical activities are leased to a single aeronautical service provider who cannot put it into productive use within a reasonable period of time, thereby denying other qualified parties the opportunity to compete to be an

---

[5] The grant assurances do not prohibit an airport sponsor from entering into long-term leases with commercial entities, by negotiation, solicitation, or other means. An airport sponsor may choose to select FBOs or other aeronautical service providers through an RPF process, and, if it chooses to do so, it can do it each time a new applicant is considered. This in and by itself is not unreasonable or contrary to the Federal obligations.

aeronautical service provider at the airport. An airport sponsor's refusal to permit a single FBO to expand based on the sponsor's desire to open the airport to competition is not a violation of the grant assurances. Additionally, an airport sponsor may exclude an incumbent FBO from participating under a competitive solicitation in order to bring a second FBO onto the airport to create a more competitive environment.

A lease that confers an exclusive right will be construed as having the intent to do so and, therefore, be an exclusive rights violation. Airport sponsors are better served by requiring that leases to a single aeronautical service provider be limited to the amount of land the service provider can demonstrate it actually needs and can be put to immediate productive use. In the event that additional space is required later, the airport sponsor may require the incumbent service provider to compete along with all other qualified service providers for the available airport land. The grant of options or preferences on future airport lease sites to a single service provider may be construed as intent to grant an exclusive right and therefore, the use of leases with options or future preferences, such as rights-of-first refusal, must generally be avoided. This is because a right of first refusal can allow an existing tenant, at little or no cost, to hold a claim on airport land that could be used for a second FBO, then lease that land when there is a prospect of competition.

**4. Monopolies Beyond the Airport Sponsor's Control.** Certain exclusive franchises exist on public airports that are sanctioned by local or Federal law and do not contravene the FAA's policy against exclusive rights agreements. One such franchise that exists at most public airports is UNICOM, which provides frequencies for air-to-ground communications at airports. The Federal Communications Commission (FCC), which regulates and authorizes the use of UNICOM frequencies, will not issue more than one ground station license at the same airport. Thus, an exclusive franchise is created. A legally supported franchise, such as UNICOM, grants the recipient licensee an advantage over competitors, but does not result in a violation of the agency's prohibition against exclusive rights. In cases such as this, the FAA recommends that the airport sponsor obtain the subject license in its own name. Using droplines, the airport sponsor can then make the facility available to all fixed base operations on an as needed basis. Regardless of which method the airport sponsor uses, control over the facility must be held by the individual or entity that holds the license.

**1.5. THROUGH 1.8. RESERVED.**

**SECTION 2.  THE ENFORCEMENT PROCESS**

**2.1. AIRPORT COMPLIANCE PROGRAM.** The FAA ensures airport sponsor compliance with Federal grant obligations through its Airport Compliance Program. The Airport Compliance Program arises from requirements in the Airport and Airway Improvement Act of 1982, as amended, 49 U.S.C. § 47101, *et seq*., and the airport sponsor's agreement to comply with the assurances contained in the grant agreement in exchange for Federal airport development assistance. The Airport Compliance Program is designed to maintain a system of safe and properly maintained airports that are operated in a manner that protects the public's interest and investment in a national airport system.

**a**. Under the Airport Compliance Program, any person who believes that an airport sponsor may be in noncompliance with a grant assurance may register their concerns with the local FAA Airport District Office (ADO). ADO personnel may investigate informally under 14 C.F.R. 13.1 the allegations of noncompliance and, in the event that the allegations are confirmed, attempt to persuade the airport sponsor to come back into compliance. Should this measure prove unsatisfactory, the concerned party may file a formal complaint under 14 C.F.R. Part 16, Rules of Practice for Federally-

Case 3:20-cv-03678-MCR-ZCB   Document 71-5   Filed 11/28/22   Page 74 of 91

Assisted Airport Proceedings. In addition, as described in §16.29(b), the FAA may initiate its own investigation.

**b.**   Complaints filed with the FAA under 14 C.F.R. Part 16 are subject to an administrative review, which entails consideration of the complainant's allegations and the airport sponsor's response to the allegations. The FAA will make a formal written determination on the complaint. A determination against the airport sponsor can result in an FAA action to withhold current and future grant funding for the airport. The FAA's final determination under 14 CFR Part 16 may be appealed to the U.S. Court of Appeals.

**2.2. THROUGH 2.5. RESERVED.**

# APPENDIX 1.  DEFINITIONS

**1.1.**   The following are definitions for the specific purpose of this AC.

**a.  Aeronautical Activity.**  Any activity that involves, makes possible, or is required for the operation of aircraft or that contributes to or is required for the safety of such operations.  Activities within this definition, commonly conducted on airports, include, but are not limited to, the following: general and corporate aviation, air taxi and charter operations, scheduled and nonscheduled air carrier operations, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, aircraft sales and services, aircraft storage, sale of aviation petroleum products, repair and maintenance of aircraft, sale of aircraft parts, parachute or ultralight activities, and any other activities that, because of their direct relationship to the operation of aircraft, can appropriately be regarded as aeronautical activities. Activities, such as model aircraft and model rocket operations, are not aeronautical activities.

**b.  Airport District Office (ADO)**. These FAA offices are outlying units or extensions of regional airport divisions.  They advise and assist airport sponsors with funding requests to improve and develop public airports. They also provide advisory services to the owners and operators of both public and private airports in the operation and maintenance of airports.  See the FAA Web site for a complete listing of all ADO offices at http://www.faa.gov/airports_airtraffic/airports/regional_guidance/.

**c. Airport.** An area of land or water which is used, or intended to be used, for the aircraft takeoff and landing.  It includes any appurtenant areas used, or intended to be used, for airport buildings or other airport facilities or rights-of-way, together with all airport buildings and facilities located thereon.  It also includes any heliport.

**d.  Airport Sponsor**. The airport sponsor is the entity that is legally, financially, and otherwise able to assume and carry out the certifications, representations, warranties, assurances, covenants and other obligations required of sponsors, which are contained in the AIP grant agreement and  property conveyances.

**e.  Commercial Self-Service Fueling.**  A fueling concept that enables a pilot to fuel an aircraft from a commercial fuel pump installed for that purpose by an FBO or the airport sponsor.  The fueling facility may or may not be attended.

**f.  Exclusive Right.**   A power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege, or right.  An exclusive right can be conferred either by express agreement, by the imposition of unreasonable standards or requirements, or by any other means.   Such a right conferred on one or more parties, but excluding others from enjoying or exercising a similar right or rights, would be an exclusive right.

**g.  Federal Airport Obligations.** All references to a Federal grant program, Federal airport development assistance, or Federal aid contained in this AC are intended to address obligations arising from the conveyance of land or from grant agreements entered under one of the following acts:

> **(1)  Surplus Property Act of l944 (SPA), as amended, 49 U.S.C. §§ 47151-47153.** Surplus property instruments of transfer were issued by the War Assets Administration (WAA) and are now issued by its successor, the General Services Administration (GSA). However, the law imposes upon the FAA (delegated to FAA from The Department of Transportation) the sole responsibility for determining and enforcing compliance with the terms and conditions of all instruments of transfer by which surplus airport property is or has been conveyed to non-Federal public agencies pursuant to the SPA. 49 U.S.C. § 47151(b).

8

(2) **Federal-Aid Airport Program (FAAP).** This grant-in-aid program administered by the agency under the authority of the Federal Airport Act of 1946, as amended, assisted public agencies in the development of a nationwide system of public airports. The Federal Airport Act of 1946 was repealed and superseded by the Airport Development Aid Program (ADAP) of 1970.

(3) **Airport Development Aid Program (ADAP).** This grant-in-aid program administered by the FAA under the authority of the Airport and Airway Development Act of 1970, as amended, assisted public agencies in the expansion and substantial improvement of the Nation's airport system. The l970 act was repealed and superseded by the Airport and Airway Improvement Act of l982 (AAIA).

(4) **Airport Improvement Program (AIP).** This grant-in-aid program administered by the FAA under the authority of the Airport and Airway Improvement Act of l982, 49 U.S.C. § 47101, *et seq*., assists in maintaining a safe and efficient nationwide system of public-use airports that meet the present and future needs of civil aeronautics.

**h.   Federal Grant Assurance.** A Federal grant assurance is a provision within a Federal grant agreement to which the recipient of Federal airport development assistance has agreed to comply in consideration of the assistance provided.

**i.   Fixed Base Operator (FBO).** A business granted the right by the airport sponsor to operate on an airport and provide aeronautical services such as fueling, hangaring, tie-down and parking, aircraft rental, aircraft maintenance, and flight instruction.

**j.   Grant Agreement.** A Federal grant agreement represents an agreement made between the FAA (on behalf of the United States) and an airport sponsor for the grant of Federal funding.

**k.   Proprietary Exclusive.** The owner of a public-use airport (public or private owner) may elect to provide any or all of the aeronautical services needed by the public at the airport. In fact, the statutory prohibition against exclusive rights does not apply to these owners. However, while they may exercise the exclusive right to provide aeronautical services, they may not grant or convey this exclusive right to another party. The airport sponsor that elects to engage in a proprietary exclusive must use its own employees and resources to carry out its venture. An independent commercial enterprise that has been designated as an agent of the airport sponsor may not exercise nor be granted such an exclusive right.

**l.   Public Airport.** Means an airport open for public use and that is publicly owned and controlled by a public agency.

**m.   Public-Use Airport**. Means either a public airport or a privately owned airport open for public use.

**n.   Specialized Aviation Service Operations (SASO).** SASOs are sometimes known as single-service providers or special FBOs performing less than full services. These types of companies differ from a full service FBO in that they typically offer only a specialized aeronautical service such as aircraft sales, flight training, aircraft maintenance and avionics services for example.

**o.   Self-Fueling and Self-Service.** Self-fueling means the fueling or servicing of an aircraft (i.e. changing the oil, washing) by the owner of the aircraft with his or her own employees and using his or her own equipment. Self-fueling and other self-services cannot be contracted out to another party. Self-fueling implies using fuel obtained by the aircraft owner from the source of his/her preference. As one of many self-service activities that can be conducted by the aircraft owner or operator by his or her own employees using his or her own equipment, self-fueling, differs from using a self-service fueling pump made available by the airport, an FBO or an aeronautical service provider. The use of a self-service fueling pump is a commercial activity and is not considered self-fueling as defined herein

AC 150/5190-6                                                                1/4/2007

and can be subject to minimum standards. In addition to self-fueling, other self-service activities that can be performed by the aircraft owner with his or her own employees includes activities such as maintaining, repairing, cleaning, and otherwise providing service to an aircraft, provided the service is performed by the aircraft owner or his/her employees with resources supplied by the aircraft owner.  Title 14 CFR Part 43 permits the holder of a pilot certificate to perform specific types of preventative maintenance on any aircraft owned or operated by the pilot.



**U.S. Department of Transportation**

**Federal Aviation Administration**

# Advisory Circular

| | |
|---|---|
| **Subject:** MINIMUM STANDARDS FOR COMMERCIAL AERONAUTICAL ACTIVITIES | **Date:** August 28, 2006  **AC No:** 150/5190-7 <br> **Initiated by:** ACO-100  **Change:** |

**1. PURPOSE**. This advisory circular (AC) provides basic information pertaining to the Federal Aviation Administration's (FAA's) recommendations on commercial minimum standards and related policies. Although minimum standards are optional, the FAA highly recommends their use and implementation as a means to minimize the potential for violations of Federal obligations at federally obligated airports.

**2. CANCELLATION.** AC 150/5190-5, *Exclusive Rights and Minimum Standards for Commercial Aeronautical Activities* (Change 1), dated June 10, 2002, is cancelled.

**3. BACKGROUND.**  In accordance with the Airport and Airway Improvement Act of l982, 49 United States Code (U.S.C.) § 47101, *et seq.,* and the Airport Improvement Program Sponsor Assurances, the owner or operator of any airport  (airport sponsor) that has been developed or improved with Federal grant assistance or conveyances of Federal property assistance is required to operate the airport for the use and benefit of the public and to make it available for all types, kinds, and classes of aeronautical activity.[1]  The Surplus Property Act of l944 (as amended by 49 U.S.C., §§ 47151-47153) contains a parallel obligation under its terms for the conveyance of Federal property for airport purposes. Similar obligations exist for airports that have received nonsurplus government property under 49 U.S.C. § 47125 and previous corresponding statutes.

These Federal obligations involve several distinct requirements.  Most important is that the airport and its facilities must be available for public use as an airport.  The terms imposed on those who use the airport and its services must be reasonable and applied without unjust discrimination, whether by the airport sponsor or by a contractor or licensee who has been granted a right by the airport sponsor to offer services or commodities normally required to serve aeronautical users of the airport.

Federal law requires that recipients of Federal grants (administered by the FAA) sign a grant agreement or covenant in a conveyance of property that sets out the obligations that an airport sponsor assumes in exchange for Federal assistance. The FAA's policy recommending minimum standards stems from the airport sponsor's grant assurances and similar property conveyance obligations to make the airport available for public use on reasonable conditions and without unjust discrimination.

---

[1] The legislative background for the provisions discussed in this AC began as early as l938 and evolved under the Federal Aid to Airports Program (FAAP), Airport Development Aid Program (ADAP), and Airport Improvement Program (AIP).

**4. USE OF THIS AC.** This AC addresses FAA's policy on minimum standards and provides guidance on developing effective minimum standards. This AC describes the sponsor's prerogative to establish minimum standards for commercial aeronautical service providers at federally obligated airports. Additionally, this AC provides guidance for self-service operations and self-service rules and regulation of other aeronautical activities.  It does not address requirements imposed on nonaeronautical entities, which are usually addressed as part of the airport's contracts, leases, rules and regulations, and/or local laws. The FAA does not approve minimum standards.  However, the FAA airports district and regional offices will review proposed minimum standards at the request of an airport sponsor. The FAA regional and district offices may advise airport sponsors on the appropriateness of proposed standards to ensure the standards do not place the airport in a position inconsistent with its Federal obligations.

**5. RELATED READING MATERIALS.**

a. *FAA Airport Compliance Requirements*, Order 5190.6A, dated October 16, l989.

b. Further information can be obtained at the Airports District Office (ADO) in your area. A listing of ADOs can be found at http://www.faa.gov/airports_airtraffic/airports/regional_guidance/.

DAVID L. BENNETT
Director, Office of Airport
   Safety and Standards

# SECTION 1.  MINIMUM STANDARDS

**1.1. POLICY.**  The airport sponsor of a federally obligated airport agrees to make available the opportunity to engage in commercial aeronautical activities by persons, firms, or corporations that meet reasonable minimum standards established by the airport sponsor. The airport sponsor's purpose in imposing standards is to ensure a safe, efficient and adequate level of operation and services is offered to the public.  Such standards must be reasonable and not unjustly discriminatory. In exchange for the opportunity to engage in a commercial aeronautical activity, an aeronautical service provider engaged in an aeronautical activity agrees to comply with the minimum standards developed by the airport sponsor.  Compliance with the airport's minimum standards should be made part of an aeronautical service provider's lease agreement with the airport sponsor.

The FAA suggests that airport sponsors establish reasonable minimum standards that are relevant to the proposed aeronautical activity with the goal of protecting the level and quality of services offered to the public.  Once the airport sponsor has established minimum standards, it should apply them objectively and uniformly to all similarly situated on-airport aeronautical service providers. The failure to do so may result in a violation of the prohibition against exclusive rights and/or a finding of unjust economic discrimination for imposing unreasonable terms and conditions for airport use.

## 1.2. DEVELOPING MINIMUM STANDARDS.

**a. Objective**. The FAA objective in recommending the development of minimum standards serves to promote safety in all airport activities, protect airport users from unlicensed and unauthorized products and services, maintain and enhance the availability of adequate services for all airport users, promote the orderly development of airport land, and ensure efficiency of operations. Therefore, airport sponsors should strive to develop minimum standards that are fair and reasonable to all on-airport aeronautical service providers and relevant to the aeronautical activity to which it is applied. Any use of minimum standards to protect the interests of an exclusive business operation may be interpreted as the grant of an exclusive right and a potential violation of the airport sponsor's grant assurances and the FAA's policy on exclusive rights.

**b.  Authority Vested in Airport Sponsors.**   Grant Assurance 22 *Economic Nondiscrimination* Sections (h) and (i) (see 49 U.S.C. § 47107) provides that the sponsor may establish such reasonable, and not unjustly discriminatory, conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the airport.  The sponsor may prohibit or limit any given type, kind or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public.

Under certain circumstances, an airport sponsor could deny airport users the opportunity to conduct aeronautical activities at the airport for reasons of safety and efficiency.[2]   A denial based on safety must be based on evidence demonstrating that safety will be compromised if the applicant is allowed to engage in the proposed aeronautical activity.  Airport sponsors should carefully scrutinize the safety reasons for denying an aeronautical service provider the opportunity to engage in an aeronautical activity if the denial has the possible effect of limiting competition.

The FAA is the final authority in determining what, in fact, constitutes a compromise of safety.  As such, an airport sponsor that is contemplating the denial of a proposed on-airport aeronautical activity

---

[2] The word efficiency refers to the efficient use of navigable airspace, which is an Air Traffic Control function. It is not meant to be an interpretation that could be construed as protecting the "efficient'' operation of an existing aeronautical service provider at the airport.

is encouraged to contact the local Airports District Office (ADO) or the Regional Airports Office before taking action.  Those offices will then seek assistance from FAA Flight Standards (FS) and Air Traffic (AT) to assess the reasonableness and whether unjust discrimination results from the proposed restrictions on aeronautical activities based on safety and efficiency.

**c. Developing Minimum Standards.**   When developing minimum standards, the most critical consideration is the particular nature of the aeronautical activity and operating environment at the airport.  Minimum standards should be tailored to the specific aeronautical activity and the airport to which they are to be applied. For example, it would be unreasonable to apply the minimum standards for a fixed-base operator (FBO) at a medium or large hub airport to a general aviation airport serving primarily piston-powered aircraft. The imposition of unreasonable requirements illustrates why "fill-in-the-blank" minimum standards and the blanket adoption of standards of other airports may not be effective.  Instead, in Section 2 of this document, the FAA has provided guidance in the form of questions and examples to illustrate an approach to the development and implementation of minimum standards.  It is important that the reader understand that what follows does not constitute a complete model for minimum standards, but rather a source of ideas to which the airport sponsor can turn when developing minimum standards.

**d. Sponsor Prerogative to Establish Minimum Standards.**   When the airport sponsor imposes reasonable and not unjustly discriminatory minimum standards for airport operations through the use of reasonable minimum standards, the FAA generally will not find the airport sponsor in violation of the Federal obligations. Considerations for applying those standards may include, but are not limited to, the following:

> **(1)** Apply standards to all providers of aeronautical services, from full service FBOs to single service providers;

> **(2)** Impose conditions that ensure safe and efficient operation of the airport in accordance with FAA rules, regulations, and guidance;

> **(3)** Ensure standards are reasonable, not unjustly discriminatory, attainable, uniformly applied and reasonably protect the investment of providers of aeronautical services to meet minimum standards from competition not making a similar investment;

> **(4)** Ensure standards are relevant to the activity to which they apply; and

> **(5)** Ensure standards provide the opportunity for newcomers who meet the minimum standards to offer their aeronautical services within the market demand for such services.

**Note:** There is no requirement for inclusion of nonaeronautical activities (such as a restaurant, parking or car rental concession) in minimum standards since those activities are not covered under the grant assurances or covenants in conveyance of Federal property.

**e. Practical Considerations.**   Many airport sponsors include minimum standards in their lease agreements with aeronautical service providers. While minimum standards implemented in this manner can be effective, they also render the airport sponsor vulnerable to the challenges of prospective aeronautical service providers on the grounds that the minimum standards are not objective.  The FAA encourages airport sponsors to publish their minimum standards periodically. Minimum standards can be amended periodically over time; however, a constant juggling of minimum standards is not encouraged.  Notifying aeronautical service providers that the changes to

minimum standards are to improve the quality of the aeronautical service offered to the public can facilitate earlier acceptance of changes.  An airport sponsor can provide for periodic reviews of the minimum standards to ensure that the standards continue to be reasonable. To foster a more receptive environment, the FAA encourages airport sponsors to include aeronautical users in the process leading to changes in minimum standards.

**f. Factors to Consider.** Numerous factors can and should be considered when developing minimum standards. Airport sponsors may avoid unreasonable standards by selecting factors that accurately reflect the nature of the aeronautical activity under consideration. It is impossible for the FAA to present every possible factor necessary for a task, mostly because of the vast differences that exist between individual airports.  Obvious factors one should consider are:

**(1)**   What type of airport is at issue?  Is it a large airport or a small rural airport?  Will the airport provide service to only small general aviation aircraft or will it serve high performance aircraft and air taxi operators as well?

**(2)**   What types of aeronautical activities will be conducted on the airport?

**(3)**   How much space will be required for each type of aeronautical activity that may prospectively operate at the airport?

**(4)**   What type of documentation will business applicants be required to present as evidence of financial stability and good credit?

**(5)**   To what extent will each type of aeronautical activity be required to demonstrate compliance with sanitation, health, and safety codes?

**(6)** What requirements will be imposed regarding minimum insurance coverage and indemnity provisions?

**(7)**   Is each minimum standard relevant to the aeronautical activity for which it is to be applied?

**g. New Versus Existing Aeronautical Service Providers.** Airport sponsors are encouraged to develop minimum standards for new aeronautical business ventures it desires to attract to the airport. Minimum standards may be part of a competitive solicitation to encourage prospective service providers to be more responsive in their proposals. Minimum standards can be modified to reflect the airport's experience and to be watchful for new opportunities (i.e. such as Specialized Aviation Service Operations (SASOs)). Minimum standards should be updated  to reflect current conditions that exist at the airport and not those that existed in the past. In any case, once an airport sponsor receives a proposal for a new aeronautical business, it must ascertain whether the existing minimum standards can be used for the new business or new minimum standards should be developed to better fit the new business venture.  However, in all cases, the airport sponsor must ensure that in changing minimum standards for whatever reason, it is not applying unreasonable standards or creating a situation that will unjustly discriminate against other similarly situated aeronautical service providers. The FAA stands by the principle that once minimum standards have been established, airport sponsors must uniformly apply them to all similarly situated aeronautical service providers. Some points of consideration are as follows:

**(1)**   Can new minimum standards be designed to address the needs of both existing and future aeronautical business? If not, can a tiered set of minimum standards be developed to address the

same type of aeronautical activity but differ significantly in scale and investment (i.e. an FBO building large hangars and serving high performance aircraft and a second FBO building and only T-hangars and serving only smaller general aviation aircraft)?

**(2)** Was the minimum standard created under a lease agreement (with a specific aeronautical service provider) so the subject standard may not be reasonable if applied to other aeronautical service providers?

**(3)** Has conformance to the minimum standards been made a part of the contract between the aeronautical service provider and the airport sponsor?

**(4)** Has the financial performance of the airport improved or declined since the time the minimum standards were implemented?

## 1.3. MINIMUM STANDARDS APPLY BY ACTIVITY.

Difficulties can arise if the airport sponsor requires that all businesses comply with all provisions of the published minimum standards. An airport sponsor should develop reasonable, relevant, and applicable standards for each type and class of service.

**a.    Specialized Aviation Service Operations.** When specialized aviation service operations (SASOs), sometimes known as single-service providers or special FBOs, apply to do business on an airport, "all" provisions of the published minimum standards may not apply.  This is not to say that all SASOs providing the same or similar services should not equally comply with all applicable minimum standards.  However, an airport should not, without adequate justification, require that a service provider desiring to provide a single service or less than full service also meet the criteria for a full-service FBO.  Examples of these specialized services may include aircraft flying clubs, flight training, aircraft airframe and powerplant repair/maintenance, aircraft charter, air taxi or air ambulance, aircraft sales, avionics, instrument or propeller services, or other specialized commercial flight support businesses.  Airport sponsors generally do not allow fuel sales alone as a SASO, but usually require that fuel sales be bundled with other services.

**b. Independent Operators.** If individual operators are to be allowed to perform a single-service aeronautical activity on the airport (aircraft washing, maintenance, etc.), the airport sponsor should have a licensing or permitting process in place that provides a level of regulation and compensation satisfactory to the airport.  Frequently, a yearly fee or percentage of the gross receipts fee is a satisfactory way of monitoring this type of operation.

**c. Self-Fueling and Other Self-Service Activities.**  Since self-service operations performed by the owner or operator of the aircraft using his or her own employees and equipment are not commercial activities, the FAA recommends that airport sponsor requirements concerning those non-commercial activities be separate from the document designed to address commercial activities. Airport rules and regulations or specific language in leases can better address requirements concerning self-service operations and other airport activities.

Self-fueling means the fueling or servicing of an aircraft (i.e. changing the oil, washing) by the owner of the aircraft with his or her own employees and using his or her own equipment. Self-fueling and other self-services cannot be contracted out to another party. Self-fueling implies using fuel obtained by the aircraft owner from the source of his/her preference. As one of many self-service activities that can be conducted by the aircraft owner or operator by his or her own employees using his or her own equipment, self-fueling, differs from using a self-service fueling pump made available by the airport,

an FBO or an aeronautical service provider. The use of a self-service fueling pump is a commercial activity and is not considered self-fueling as defined herein.

In addition to self-fueling, other self-service activities that can be performed by the aircraft owner with his or her own employees includes activities such as maintaining, repairing, cleaning, and otherwise providing service to an aircraft, provided the service is performed by the aircraft owner or his/her employees with resources supplied by the aircraft owner.  Title 14 Code of Federal Regulations (CFR) Part 43 permits the holder of a pilot certificate to perform specific types of preventative maintenance on any aircraft owned or operated by the pilot.

**1.4. THROUGH THE FENCE OPERATOR**.  The owner of an airport may, at times, enter into an agreement (i.e. access agreement or lease agreement) that permits access to the public landing area by independent operators offering an aeronautical activity or to owners of aircraft based on land adjacent to, but not a part of, the airport property**.** However, a through-the-fence operation could undermine an airport's minimum standards unless the airport sponsor is careful to apply its minimum standards through an airport access agreement, including conditions to protect the airport's ability to meet all of its Federal obligations.

**a. No Obligation to Permit Through-the-Fence.** The obligation to make an airport available for the use and benefit of the public does not require the airport sponsor to permit ground access by aircraft from adjacent property. Through-the-fence arrangements can place an encumbrance upon the airport property and reduce the airport's ability to meet its Federal obligations.  As a general principal the FAA does not support agreements that grant access to the public landing area by aircraft stored and serviced off-site on adjacent property.

In some cases, however, the airport sponsor may opt to grant through-the-fence access, but it should do so on a case-by-case basis and only when the airport retains its ability to meet its Federal obligations. To minimize the possibility of conflict between a through-the-fence agreement and the airports' ability to meet its Federal obligations, the airport sponsor must retain the legal right to require the off-site property owner or party granted access to the airport to conform in all respects to the requirements of any existing or proposed grant agreement or Federal property conveyance obligation. This includes requirements to ensure operating safety and equitable compensation for use of the airport. Special safety and operational requirements should be incorporated into any access agreement to ensure that the through-the-fence access does not complicate the control of vehicular and aircraft traffic or compromise the security of the airfield operations area.

Proposed new agreements granting access to a public landing area from off-site locations should be reported to the FAA Regional Airports Division with a full statement of the circumstances and a copy of the proposed through-the-fence or access agreement so the FAA can review it for consistency with the airport sponsor's Federal obligations and incorporate it into the current Airport Layout Plan (ALP).

**b. Access Agreement.** Any through-the-fence access should be subject to a written agreement between the airport sponsor and the party granted access. The access agreement should specify what specific rights of access are granted; payment provisions that provide, at a minimum, parity with similarly situated on-airport tenants and equitable compensation for the use of the airport; expiration date; default and termination provisions; insurance and indemnity provisions; and a clear statement that the access agreement is subordinate to the grant assurances and/or Federal property conveyance obligations and that the sponsor shall have the express right to amend or terminate the access agreement to ensure continued compliance with all grant assurances and Federal property conveyance obligations.

The access agreement should have a fixed contract period and the airport sponsor is under no obligation to accept a proposed assignment or sale of the access agreement by one party to another. It is encouraged that airport sponsors expressly prohibit the sale or assignment of its access agreement.

**1.5.  RESERVED.**

## SECTION 2.  GUIDANCE ON DEVELOPING MINIMUM STANDARDS

**2.1. SAMPLE QUESTIONS.** As a guide for the airport sponsor, the following series of questions are provided to address some of the various types of specific services or activities frequently offered to the public:

**a. Fuel Sales.** The on-airport sale of fuel and oil requires numerous considerations that include, but are not limited to, the physical requirements for a safe and environmentally sound operation.  Some recommended considerations are listed below:

> **(1)**  Where on the airport will the fuel tanks be installed? Who will control access to the fueling site? What parties will be granted access to the site to receive fueling services?

> **(2)**  Will fuel tanks be installed above or below ground? Will fuel trucks be utilized to fuel remotely parked aircraft?

> **(3)** Will the fueling operator have sufficient fuel capacity and types of fuel to accommodate the mix of aircraft using the airport?

> **(4)**  How many days' supply of fuel will be available on airport?  Are provisions to resupply the on-airport fuel tanks sufficient to ensure a continuous fuel supply?

> **(5)**  Will the fueling operator have suitable liability insurance and indemnify the airport sponsor for liability for its fueling operation, including fuel spills and environmental contamination?

**b. Personnel Requirements.** An aeronautical service provider's need for personnel will be dictated by the size of the airport and the public demand for aeronautical services.   In all instances, an airport sponsor will be well advised to ensure that aeronautical service providers have sufficient personnel to run their operation safely and meet aeronautical demand for the services in question. Naturally, the personnel requirements will vary with the specific aeronautical service being offered.

> **(1)**  How many fully trained and qualified personnel will be available each day and over what hours to provide aeronautical services?  Will this reasonably meet the demand by aeronautical users?

> **(2)** Describe the training and qualifications of personnel engaged in the services provided to aeronautical users.

**c.  Airport and Passenger Services.** This is a necessary consideration in those instances where the airport has aeronautical service providers engaged in handling services for air carrier and/or cargo carriers that do not provide their own support personnel on-site:

**(1)** Provide a list of the equipment and services (both above and below wing) that will be provided by the aeronautical service provider, including ground power units**,** over night parking areas, towing equipment, starters, remote tie-down areas, jacks, oxygen, compressed air, tire repair, sanitary lavatory service, ticketing and passenger check-in services, office and baggage handling services and storage space.

**(2)** What provisions have been made regarding passenger conveniences and services?

**(a)** Access to passenger loading bridges/steps, sanitary rest rooms, boarding hold rooms, telephones, food and beverage service, and other passenger concessions.

**(b)** Access to concession and ground transportation services for the benefit of passengers and/or crewmembers.

**d. Flight Training Activities.** On-airport flight training can be provided by the airport sponsor/owner or by a service provider.  The minimum standards imposed on flight instruction operations should take the following information into consideration:

**(1)** What type of flight training will the service provider offer?

**(2)** What arrangements have been made for the office space the school is required to maintain under 14 CFR 141.25?  What is the minimum amount of classroom space that the service provider must obtain?

**(3)** Will flight training be provided on a full-time or part-time basis?

**(4)** What type of aircraft and how many will be available for training at the on-airport location?

**(5)** What provisions have been made for the storage and maintenance of the aircraft?

**(6)** What provisions will be made for rest rooms, briefing rooms, and food service?

**(7)** What coordination and contacts exist with the local Flight Standards District Office?

**e.  Aircraft Engine/Accessory Repair and Maintenance.** The applicant for an on-airport repair station is subject to several regulatory requirements under 14 CFR Part 145 *Repair Stations*. Depending on the type and size of the proposed repair station, the following questions may provide helpful guidelines:

**(1)** What qualifications will be required of the repair station employees?  Typically, the holder of a domestic repair station certificate must provide adequate personnel who can perform, supervise, and inspect the work for which the station is rated.

**(2)** What repair station ratings does the applicant hold?

**(3)** What types of services will the repair station offer to the public?  These services can vary from repair to maintenance of aircraft and include painting, upholstery, etc.

**(4)** Can the applicant secure sufficient airport space to provide facilities so work being done is protected from weather elements, dust, and heat?  The amount of space required will be directly related to the largest item or aircraft to be serviced under the operator's rating.

**(5)** Will suitable shop space exist to provide a place for machine tools and equipment in sufficient proximity to where the work is performed?

**(6)** What amount of space will be necessary for the storage of standard parts, spare parts, raw materials, etc.?

**(7)**   What type of lighting and ventilation will the work areas have?  Will the ventilation be adequate to protect the health and efficiency of the workers?

**(8)** If spray painting, cleaning, or machining is performed, has sufficient distance between the operations performed and the testing operations been provided to prevent adverse affects on testing equipment?

**f.  Skydiving.**   Skydiving is an aeronautical activity.  Any restriction, limitation, or ban on skydiving on the airport must be based on the grant assurance that provides that the airport sponsor may prohibit or limit aeronautical use for the safe operation of the airport (subject to FAA approval). The following questions present reasonable factors the sponsor might contemplate when developing minimum standards that apply to skydiving:

**(1)** Will this activity present or create a safety hazard to the normal operations of aircraft arriving or departing from the airport? If so, has the local Airports District Office (ADO) or the Regional Airports Office been contacted and have those FAA offices sought the assistance from FAA Flight Standards (FS) and Air Traffic (AT) to assess whether safe airport operations would be jeopardized?

**(2)** Can skydiving operations be safely accommodated at the airport? Can a drop zone be safely established within the boundaries of the airport? Is guidance in FAA AC-90-66A *Recommended Standards Traffic Patterns and Practices for Aeronautical Operations at Airports Without Operating Control Towers,* 14 CFR Part 105 and United States Parachute Association's (USPA) *Basic Safety Requirements* being followed?

**(3)** What reasonable time periods can be designated for jumping in a manner consistent with Part 105? What experience requirements are needed for an on-airport drop zone?

**(4)** What is a reasonable fee that the jumpers and/or their organizations can pay for the privilege of using airport property?

**(5)** Has the relevant air traffic control facility been advised of the proposed parachute operation? Does the air traffic control facility have concerns about the efficiency and utility of the airport and its related instrument procedures?

**(6)** Will it be necessary to determine the impact of the proposed activity on the efficiency and utility of the airport, related instrument approaches or nearby Instrument Flight Rules (IFR)? If so, has FAA Air Traffic reviewed the matter and issued a finding?

**g. Ultralight Vehicles and Light Sport Aviation.** The operation of ultralights and light sport aircraft are aeronautical activities and must, therefore, be generally accommodated on airports that have been

developed with Federal airport development assistance.  Airport sponsors are encouraged to consider some of the following questions:

> **(1)** Can ultralight aircraft be safely accommodated at the airport? Is guidance in FAA AC-90-66A *Recommended Standards Traffic Patterns and Practices for Aeronautical Operations at Airports Without Operating Control Towers* and 14 CFR Part 103 being followed?

> **(2)** Can all types of Light Sport aircraft be safely accommodated at the airport?

> **(3)** Will this activity present or create a safety hazard to the normal operations of aircraft arriving or departing from the airport? If so, has FAA Flight Standards reviewed the matter and issued a finding?

> **(4)** Will an FAA airspace study be necessary to determine the efficiency and utility of the airport when considering the proposed activity? If so, has FAA Air Traffic reviewed the matter and issued a finding?

**h. Fractional Aircraft Ownership.** Fractional ownership programs are subject to an FAA oversight program similar to that provided to air carriers, with the exception of en route inspections. The FAA has for a long time and under certain circumstances, interpreted an aircraft owner's right to self-service to include operators.  For example, a significant number of aircraft operated by airlines are not owned but leased under terms that give the operator airline owner-like powers.  The same is true for other aeronautical operators such as charter companies, flight schools, and flying clubs, which may not hold title to the aircraft, but through leasing arrangements, for example, retain full and exclusive control of the aircraft for long periods of time.  The same is true of 14 CFR Part 91 Subpart K. Fractional ownership companies are subject to operational control responsibilities, maintenance requirements, and safety requirements not unlike 14 CFR Part 135 operators. For additional information on fractional ownership, contact your local Flight Standards District Office.

**i. Other Requirements.** When drafting minimum standards documents, airport sponsors may have to take into account other Federal, state, and local requirements. This includes Federal requirements and guidance by the Transportation Safety Administration (TSA) and the Environmental Protection Agency (EPA), state requirements such as aircraft registration (in some states) and local fire regulations. For guidance on matters such as these, please contact the FAA's Airports District Office (ADO) in your area and/or state aviation agency.  A listing of ADOs can be found at http://www.faa.gov/airports_airtraffic/airports/regional_guidance/.   Information and contacts regarding state aviation agencies is available at http://www.nasao.org/.

**2.2. THROUGH 2.5. RESERVED.**

# APPENDIX 1.  DEFINITIONS

**1.1.**   The following are definitions for the specific purpose of this AC.

**a.   Aeronautical Activity.** Any activity that involves, makes possible, or is required for the operation of aircraft or that contributes to or is required for the safety of such operations.  Activities within this definition, commonly conducted on airports, include, but are not limited to, the following: general and corporate aviation, air taxi and charter operations, scheduled and nonscheduled air carrier operations, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, aircraft sales and services, aircraft storage, sale of aviation petroleum products, repair and maintenance of aircraft, sale of aircraft parts, parachute or ultralight activities, and any other activities that, because of their direct relationship to the operation of aircraft, can appropriately be regarded as aeronautical activities. Activities, such as model aircraft and model rocket operations, are not aeronautical activities.

**b. Airport.** An area of land or water that is used, or intended to be used, for the aircraft takeoff and landing.  It includes any appurtenant areas used, or intended to be used, for airport buildings or other airport facilities or rights-of-way, together with all airport buildings and facilities located thereon.  It also includes any heliport.

**c.   Airport District Office (ADO)**. These FAA offices are outlying units or extensions of regional airport divisions.  They advise and assist airport sponsors with funding requests to improve and develop public airports. They also provide advisory services to the owners and operators of both public and private airports in the operation and maintenance of airports.  See the FAA Web site for a complete listing of all ADO offices at http://www.faa.gov/airports_airtraffic/airports/regional_guidance/.

**d.   Airport Sponsor**. The airport sponsor is either a public agency or a private owner of a public-use airport that submits to the FAA an application for financial assistance (such as AIP grants) for the airport.  In accepting an application for financial assistance, the FAA will ensure that the airport sponsor is legally, financially, and otherwise able to assume and carry out the certifications, representations, warranties, assurances, covenants and other obligations required of sponsors, which are contained in the AIP grant agreement and property conveyances.

**e.   Commercial Self-Service Fueling.**  A fueling concept that enables a pilot to fuel an aircraft from a commercial fuel pump installed for that purpose by an FBO or the airport sponsor.  The fueling facility may or may not be attended.

**f.   Exclusive Right.**   A power, privilege, or other right excluding or debarring another from enjoying or exercising a like power, privilege, or right.  An exclusive right can be conferred either by express agreement (i.e. lease agreement), by the imposition of unreasonable standards or requirements, or by any other means.  Such a right conferred on one or more parties, but excluding others from enjoying or exercising a similar right or rights, would be an exclusive right.

**g.   Federal Airport Obligations.** All references to a Federal grant program, Federal airport development assistance, or Federal aid contained in this AC are intended to address obligations arising from the conveyance of land or from grant agreements entered under one of the following acts:

> **(1)  Surplus Property Act of l944 (SPA), as amended, 49 U.S.C. §§ 47151-47153.**  Surplus property instruments of transfer were issued by the War Assets Administration (WAA) and are now issued by its successor, the General Services Administration (GSA).  However, the law imposes upon the FAA (delegated to FAA from The Department of Transportation) the sole responsibility for determining and enforcing compliance with the terms and conditions of

all instruments of transfer by which surplus airport property is or has been conveyed to non-Federal public agencies pursuant to the SPA. 49 U.S.C. § 47151(b).

**(2) Federal Aid to Airports Program (FAAP).** This grant-in-aid program administered by the agency under the authority of the Federal Airport Act of 1946, as amended, assisted public agencies in the development of a nationwide system of public airports. The Federal Airport Act of 1946 was repealed and superseded by the Airport Development Aid Program (ADAP) of 1970.

**(3) Airport Development Aid Program (ADAP).** This grant-in-aid program administered by the FAA under the authority of the Airport and Airway Development Act of 1970, as amended, assisted public agencies in the expansion and substantial improvement of the Nation's airport system. The l970 act was repealed and superseded by the Airport and Airway Improvement Act of 1982 (AAIA).

**(4) Airport Improvement Program (AIP).** This grant-in-aid program administered by the FAA under the authority of the Airport and Airway Improvement Act of l982, 49 U.S.C. § 47101, *et seq*., assists in maintaining a safe and efficient nationwide system of public-use airports that meet the present and future needs of civil aeronautics.

**h.  Federal Grant Assurance.** A Federal grant assurance is a provision within a Federal grant agreement to which the recipient of Federal airport development assistance has agreed to comply in consideration of the assistance provided. Grant assurances are required by statute, 49 U.S.C. § 47101.

**i.  Fixed-Base Operator (FBO).** A commercial business granted the right by the airport sponsor to operate on an airport and provide aeronautical services such as fueling, hangaring, tie-down and parking, aircraft rental, aircraft maintenance, flight instruction, etc.

**j.  Fractional Ownership.** Fractional ownership operations are aircraft operations that take place under the auspices of 14 CFR Part 91 Subpart K. This type of operation offers aircraft owners increased flexibility in the ownership and operation of aircraft including shared or joint aircraft ownership. It provides for the management of the aircraft by an aircraft management company. The aircraft owners participating in the program agree not only to share their own aircraft with others having a shared interest in that aircraft, but also to lease their aircraft to other owners in the program (dry lease exchange program).[3] A fractional owner or owner means an individual or entity that possesses a minimum fractional ownership interest in a program aircraft and that has entered into the applicable program agreements. For additional information, please see 14 CFR 91.1001 *Applicability* at  http://www.access.gpo.gov/nara/cfr/waisidx_04/14cfr91_04.html  and contact your local Flight Standards District Office.

**k.  Grant Agreement.** A Federal grant agreement represents an agreement made between the FAA (on behalf of the United States) and an airport sponsor for the grant of Federal funding.

**l.  Public Airport.** Means an airport open for public use that is publicly owned and controlled by a public agency.

**m.  Public-Use Airport**. Means either a public airport or a privately owned airport open for public use.

---

[3] A dry lease aircraft exchange means an arrangement, documented by the written program agreements, under which program aircraft are available, on an as needed basis without crew, to each fractional owner.

**n. Specialized Aviation Service Operations (SASO).** SASOs are sometimes known as single-service providers or special FBOs performing less than full services. These types of companies differ from a full service FBO in that they typically offer only a specialized aeronautical service such as aircraft sales, flight training, aircraft maintenance, or avionics services for example.

**o. Self-Fueling and Self-Service.**   Self-fueling means the fueling or servicing of an aircraft (i.e. changing the oil, washing) by the owner of the aircraft with his or her own employees and using his or her own equipment. Self-fueling and other self-services cannot be contracted out to another party. Self-fueling implies using fuel obtained by the aircraft owner from the source of his/her preference. As one of many self-service activities that can be conducted by the aircraft owner or operator by his or her own employees using his or her own equipment, self-fueling, differs from using a self-service fueling pump made available by the airport, an FBO, or an aeronautical service provider. The use of a self-service fueling pump is a commercial activity and is not considered self-fueling as defined herein. In addition to self-fueling, other self-service activities that can be performed by the aircraft owner with his or her own employees includes activities such as maintaining, repairing, cleaning, and otherwise providing service to an aircraft, provided the service is performed by the aircraft owner or his/her employees with resources supplied by the aircraft owner.

**p. Through-the-Fence Operations.** Through-the-fence operations are those activities permitted by an airport sponsor through an agreement that permits access to the public landing area by independent entities or operators offering an aeronautical activity or to owners of aircraft based on land adjacent to, but not a part of, the airport property**.** The obligation to make an airport available for the use and benefit of the public does not impose any requirement for the airport sponsor to permit ground access by aircraft from adjacent property.